Filed 2/4/13

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,                                    )
                                               )
      Plaintiff and Respondent,      )
                                               )          S054569
           v.                    )
                                               )
DANIEL LEE WHALEN,                             )
                                               )      Stanislaus County
      Defendant and Appellant.       )    Super. Ct. No. 25297
_____)

A jury found defendant Daniel Lee Whalen guilty of the 1994 first degree murder (Pen. Code, § 187, subd. (a))[1] and first degree robbery (§ 212.5, subd. (a)) of Sherman Robbins, and found true the special circumstance allegation that the murder was committed during the course of a robbery (§ 190.2, former subd. (a)(17)(i), now subd. (a)(17)(A)), and the allegation that defendant personally used a firearm in the commission of the offenses (§ 12022.5). Defendant admitted he had suffered three prior serious felony convictions (§ 667, subd. (d)), and had served four prior prison terms (§ 667.5, subd. (b)). After a penalty trial, the jury returned a verdict of death for the murder. The trial court denied defendant's automatic application to modify the verdict (§ 190.4, subd. (e)), and imposed the death sentence for the murder and a prison term for the robbery and enhancements.

---

[1]     Hereafter undesignated statutory references are to the Penal Code.

1

This appeal is automatic.  (§ 1239, subd. (b).)  We affirm the judgment in its entirety.

## I. FACTS

In March 1994, Sherman Robbins was house sitting for his brother, who was away on vacation.  Late one evening, defendant and his accomplices, Michelle Lee Joe and Melissa Fader, gained entry into the home by pretending the car they had been driving had broken down.  The three took numerous items from the house, and defendant shot Robbins as he lay on a couch with his hands tied behind his back.  Joe and Fader were initially charged, along with defendant, with Robbins's first degree murder and robbery, but each agreed to plead guilty to lesser charges in exchange for her testimony against defendant.[2]  At trial, defendant attempted to place the blame for the murder on Joe and argued the evidence was legally insufficient to corroborate the accomplice testimony.  At the penalty phase, defendant's attorney and an expert relayed to jurors defendant's expressed desire for the jury to impose the death penalty, but each made a case for sparing defendant's life.

---

[2]     Fader pleaded guilty to the robbery of Robbins with a vicarious arming enhancement (§ 12022, subd. (a)), in exchange for a sentence of up to seven years imprisonment, which she was serving when she testified, and her testimony in this case. Joe pleaded guilty to the second degree murder and robbery of Robbins with a vicarious arming enhancement, in exchange for a sentence of 16 years to life imprisonment, which she was serving when she testified, and her testimony in this case.

**A. Guilt Phase**

    *1. The prosecution's case*

        *a. Background and investigation*

Sherman Robbins was an elderly diabetic man who normally lived alone in an apartment in Modesto. Sherman was kind to "street people" and they were welcome at his apartment for food or a bath. In mid-March 1994, Sherman was house sitting at his brother Bill's house at 519 Nebraska Avenue in Modesto while Bill and his wife, Alvina, vacationed in Ireland. Bill's daughter-in-law, Shirley Robbins, occasionally visited Sherman at the Nebraska Avenue house and took him for blood tests.

On Saturday, March 19, Shirley was at the Nebraska Avenue house most of the day with other family members, helping Sherman clean the yard. A few days earlier, the family had rented a dumpster to facilitate the cleanup. Around noon, a man and a woman whom Shirley did not know, but who later were identified as Johnny Long and Michelle Joe, drove up in an olive green, late 1960s Ford Mustang, and stayed for a couple of hours. Sherman introduced Long as his cousin, and Long helped Sherman move a pole. Joe mostly stayed in the car with her three children, but went into the house at least once to get water or to take her children to the bathroom.

The next day, Sunday, Shirley spoke with Sherman on the phone about his doctor's appointment on Monday. On Monday, March 21, Shirley's daughter, Krista, arrived at the Nebraska Avenue house around 8:00 or 9:00 a.m. to take Sherman to the doctor. When Krista arrived, Joe was there going through the dumpster, while Joe's children played in the yard. Sherman told Krista that Joe was his cousin's girlfriend. After Krista dropped Sherman off for his appointment, she informed Shirley that Joe had been at the house. Shirley directed Krista to go back to the house and make sure the doors were locked. When Krista returned,

Joe was no longer there. Krista checked the doors, but not the windows. As she was leaving, she noticed Joe and Long driving up again in the green Mustang. They stopped and gave Krista a "dirty look," but Krista did not stop or speak with them because Sherman had said they could take some boxes from the house, and Krista assumed they were going to the house to retrieve the boxes.

Shirley spoke with Sherman by phone between 7:00 and 9:00 p.m. that evening. The following day, Tuesday, March 22, she tried to call him several times but he did not answer.

Shirley went to the Nebraska Avenue house early Wednesday morning. When she pulled up, she noticed two newspapers were in the driveway. Both the screen door and wooden front door were open. Sensing something "wasn't right," she entered the house and discovered Sherman's dead body on the couch. She immediately called 911. When the police arrived, she told them about Long and a woman with long hair (Joe).

Stanislaus County Sheriff's Department Patrol Officer Brian Markum arrived at the scene about 8:00 a.m. Upon entering the house, he found Sherman's body on the couch, surrounded by blood. There was a large hole in Sherman's right temple. Markum determined Sherman was deceased and secured the crime scene.

Giles New, an investigator with the Stanislaus County Sheriff's Department, arrived at the scene around 9:00 a.m. and later that day became the principal investigator. Inside the house, he noticed a hole in the end of the couch near Sherman's head. Cotton material from inside the couch, as well as shotgun pellets, were on the floor. Sherman's senior citizen's identification card was in a wallet on a bed in the second bedroom.

Examining the exterior of the house, New found that a screen had been removed and placed on the ground below the windows of each of the two

4

bedrooms on the south side of the house.  One window was open in each bedroom. There was a fresh trail in the high, wet grass leading from the south side of the house to an area 30 to 40 feet from the brush pile at the end of the dirt road that extended south from Nebraska Avenue.  Tire tracks extended along the dirt road and ended near the brush pile, and there were shoe tracks in that area.  None of the tracks were ever matched to any tires or shoes.

Stanislaus County Sheriff's Department identification officer Dan Cron photographed the crime scene and processed it for fingerprints.  He determined that a latent palm print taken from the back bedroom window on the south side of the house matched the rolled palm print of Melissa Fader.

Department of Justice Criminalist John Miller helped recover shotgun pellets and a "torn and chewed up" 20-gauge shotgun shell from the crime scene. The pellets were scattered all over the room in which Sherman's body lay on the couch, and a group of pellets had gouged a hole in the floor near the couch.  Based on measurements of the height of the gunshot hole in the arm of the couch near Sherman's head, and the location of the hole gouged in the floor in relation to the couch, Miller determined the shot had been fired at an angle of approximately 30 degrees relative to the floor.  Miller further concluded Sherman had been shot while lying in the position in which his body was found.

Department of Justice firearms expert Duane Lovaas later examined the pellets and partial shotgun shell recovered from the crime scene.  He discovered there were two sizes of pellets, and that the shell had striations indicating it had travelled through the barrel of a shotgun.  Additionally, the powder in the shell had not ignited.  Based on this evidence, Lovaas concluded someone had loaded a 12-gauge shell behind a 20-gauge shell in a 12-gauge shotgun and then fired, propelling the 20-gauge shell through the barrel like a bullet, followed by the 12-gauge pellets.  No firearm was given to Lovaas for comparison.

5

On Thursday, the day after Shirley found Sherman's body, forensic pathologist Thomas Beaver conducted an autopsy. He determined the cause of death was a shotgun wound to the right temporal area of Sherman's head. The presence of black, sooty material around the wound indicated the shot was fired at close range, probably from within inches. Sherman's hands were tied tightly behind his back with a twill-patterned necktie. Ligature furrows on the skin under the tie had the same pattern. The absence of bruising under the skin indicated there had been minimal struggle against the soft cloth. Beaver estimated Sherman had died 24 to 48 hours earlier.

When Bill and Alvina returned home from Ireland, they determined that a Remington 870 12-gauge shotgun and a .22-caliber rifle were missing from the gun cabinet. Also missing were a typewriter, a microwave oven, a small television set, a Magnavox CD player, a small tape player, a large peanut butter jar full of pennies, and a Makita grinder that had been stored in the barn behind the house. Bill identified People's exhibit No. 56, an item recovered in the murder investigation (see p. 12, *post*), as his Makita grinder.

Investigator New arrested defendant in April 1994. Upon his arrest, defendant spontaneously said, "I was expecting to get picked up sooner or later. Sometimes the best place to hide is right under your noses."

b. *Events surrounding the murder*

Defendant's accomplices, Joe and Fader, provided the principal testimony regarding the killing. John Richie and Rick Saso testified about events both before and after the killing. The testimony of these witnesses was consistent in many respects, but varied in its details and from what each witness had said in prior statements. We set out the testimony of these witnesses in some detail.

6

### i. John Richie

John Richie testified pursuant to a grant of immunity from prosecution for any crimes associated with his testimony. Richie testified Sherman Robbins was his aunt's brother and had taken Richie to get candy when he was a child. Richie also was acquainted with Michelle Joe; he had protected her on occasion from her former boyfriend, who beat her.

Richie testified he first met defendant several years before the events at issue in this case, at a place called Butler's Camp. About a month or two before defendant was arrested, defendant began living with Richie, Richie's girlfriend Kathy Sisk, and their children, in Richie's apartment.

On the morning of March 21, 1994, Joe drove to Richie's apartment in a green Mustang and asked for defendant. Richie followed defendant outside, where he overheard Joe ask defendant to help her commit a burglary. Richie went back inside, and defendant came in about a half-hour to an hour later. Richie "pleaded" with defendant not to participate in the burglary, and defendant assured Richie he would not do it.

According to Richie, Joe came to the apartment again shortly before dark and asked Richie to babysit her child. Richie agreed. Joe left as it was getting darker, and defendant left as well, but Richie was not sure if they left together. Richie did not see either defendant or Joe until the following morning. Richie had gone to visit his friend, Rick Saso. When he returned, defendant and Joe were at the apartment with various items including a small television set, a microwave oven, a computer or typewriter, a stereo, a rifle, and a shotgun. The shotgun smelled like gunpowder. Sisk and Melissa Fader, whom Richie had not met before, were counting pennies from a jar. Fader claimed the pennies were hers. Joe had "urinated herself" and asked to use the shower, and Sisk gave Joe some fresh clothes to wear.

7

Richie testified that he rode his bicycle to Saso's home and told him there was some property for sale at his apartment. Saso followed Richie back to the apartment in his car. While the others bartered over the property, Richie went outside. At some point, Saso emerged and asked Richie to help him put the property in his car. Saso said he had traded an "eight-ball" — about 3.75 grams of methamphetamine — for all of the property. Richie helped Saso load the items into the car, and Saso left. Back in the apartment, defendant gave Richie part of his share of the methamphetamine, and they, along with Joe and Fader, "indulged" in use of the drug. Fader and Joe then left as it was getting light outside.

According to Richie, over the next few days defendant seemed nervous and watched the newspapers. At some point, defendant volunteered to Richie that he had killed a man. Defendant said he had tied the man up, "told him to 'get right with God and he would be back in a minute,' " and then shot him. Defendant also said that he and Joe had argued about the way in which the victim was to die. Joe wanted the victim smothered because it would be quieter, but defendant said that " 'wrestling with [the victim] until he died would have been more of a torture than shooting him.' " Defendant did not say why he had killed the man. When Richie asked defendant how he could do such a thing, defendant said "it was nothing, that you couldn't get emotionally involved." Either during this conversation, or a subsequent one, Richie asked defendant to leave the apartment.

Richie further testified that at some point after his arrest defendant wrote Richie a letter from jail. According to Richie, the second sentence of the third paragraph of the letter began, " '[W]ith both Michelle and Melissa telling on me . . . .' " In the letter, defendant did not deny that what Joe and Fader were saying about him was true.

8

## ii. *Melissa Fader*

In March 1994, Melissa Fader was living in a trailer in Modesto behind her landlady Nellie Thompson. On March 21, Fader's friend, Michelle Joe, stopped by in a green Mustang with her new boyfriend, Johnny Long, around 10:30 or 11:00 a.m. and chatted with Fader for a while, then left. A couple of hours later, Joe drove up again in the Mustang with her daughter Crystal, but without Long. Joe told Fader she had told Long she needed to borrow the car to take Fader to the hospital. Joe and Fader then cruised around in the Mustang for an hour or two trying to "score some dope" — meaning "crank" or methamphetamine — but they were unsuccessful. Joe dropped Fader off at her trailer and left.

According to Fader, she next saw Joe around 10:30 or 11:00 p.m. that night. Fader had been up for several days on crank and was fighting with her boyfriend, who had locked her in the trailer with a padlock. Fader told Joe she wanted to get away, and Joe invited Fader to come with her. Fader climbed out the window, taking some clothes so she could change later if necessary.

Fader testified that when she got in the backseat of the Mustang, defendant was in the front passenger seat. Fader had met defendant once before. Both defendant and Joe had gloves on, but Fader had none. Joe, who was driving, told Fader they were going to rob a house where no one was home.[3] The plan was to enter the house, take things, and leave. Joe drove to the house at 519 Nebraska Avenue and pulled into the driveway. Joe walked up to the house and determined an old man was sleeping inside. They then drove around trying to find a back way

---

[3]    On cross-examination, Fader contradicted herself and said Joe had told her that morning that Long's uncle was house sitting and would be at the Nebraska Avenue house.

9

into the house, but were unsuccessful.[4] They returned to the house and parked near a brush pile.

According to Fader, Joe announced a plan to wake the old man, tell him her car had broken down, and ask if she and Fader could spend the night. While Joe walked up to the house, defendant retrieved a tool from a shed behind the house and put it in the car's trunk. After about five minutes, Joe returned to the car and said, " 'let's go.' " Joe instructed defendant to wait 15 minutes; she and Fader then walked to the house. Sherman let them in, and Joe pretended to use the phone while Sherman offered Fader a beer. Joe claimed to be unable to reach anyone by phone. Sherman said the women could stay the night and told them to make themselves at home. He showed them to a bedroom and left them alone. Joe then instructed Fader to go back out and talk to Sherman. Fader did so, then took a bath and made a sandwich. Eventually, she fell asleep on the small sofa, and Sherman fell asleep on the large sofa.

At 3:30 a.m., Fader explained, she awoke to find defendant standing over Sherman, pointing a large gun at him and loudly demanding to know where he kept his wallet. Sherman answered the wallet was in a box in the bedroom. Defendant ordered Fader to tie up Sherman. When Fader refused, defendant pointed the gun at her and said " 'you're gonna do it.' " Defendant handed Fader a necktie and told Sherman to put his hands behind his back. Fader tied Sherman's hands, loosely at first, but defendant ordered her to tie them tighter. Defendant seemed angry, whereas earlier in the evening his mood had been "civil."

---

[4]     A neighbor who lived about 300 yards south of the Nebraska Avenue house testified that late at night on March 21, 1994, a green Mustang with three people inside drove into his yard, made a U-turn, and left as dogs were barking.

10

Fader testified that she told defendant she wanted to leave, but defendant said " 'you ain't going nowhere,' " and ordered her to grab the microwave oven and typewriter. Fader took those items to the car and returned through the sliding glass door. Sherman was lying on his stomach on the sofa with defendant standing over him. Fader found Joe in the second bedroom, going through Sherman's wallet. Fader said she wanted to leave, and Joe told her to go out the window, which she did. Joe handed Fader some items — including a "radio" or "stereo" and a large jar of pennies — through the window, and Fader took them to the car. Joe emerged from the house and put more items in the car. Together Fader and Joe then loaded a few more things that had been piled outside the window into the car. Joe then got in the driver's seat, and Fader got in the backseat.

According to Fader, after about five minutes, the women heard a gunshot. Defendant emerged from the house carrying a shotgun, which he put in the trunk. He got in the car and said, " 'let's get out of here.' " Joe informed him there was another gun in the house. Defendant returned to the house and retrieved a second gun, which Fader described as a "long gun" that could have been a rifle. Defendant put that gun in the trunk and got back in the car. Joe then drove away.

At defendant's suggestion, Fader testified, they drove to Prescott Estates, where defendant unsuccessfully tried to sell the stolen property. Eventually they arrived at Richie's apartment. Fader was not acquainted with Richie or the apartment at that time. Joe, who had urinated in her pants, took a shower and changed into some fresh clothes provided by Richie's girlfriend, Sisk. Fader and defendant went into the bathroom and ingested some crank. Fader then went into the bedroom and started counting pennies from the jar taken from the Nebraska Avenue house.

11

According to Fader, two men showed up at the apartment to purchase the stolen property while Fader stayed in the bedroom counting pennies. After a while, Joe entered the bedroom and said they had gotten an "eight-ball" of crank for all of the items. When Fader emerged from the bedroom, the crank was being divided up. Fader received a gram or half a gram.

Fader testified that she and defendant went into the bathroom and ingested more crank. Fader then returned to the bedroom and continued counting and rolling pennies. Defendant followed her into the bedroom and wanted to "mess around." Fader did not want to but complied "under force" because she was afraid of defendant. Afterwards, when it was getting light outside, Joe took Fader home and instructed her not to tell anyone what had happened at the Nebraska Avenue house.

Fader testified that when she arrived home, she had her share of the crank, about $4 in pennies, and a grinder. Fader tried to sell the grinder to Nellie Thompson for $5. Thompson did not want the grinder, but gave Fader $5 anyway. Fader put the grinder on Thompson's porch. About a week later, Fader told Thompson defendant had raped her the day she got the grinder. Fader identified People's exhibit No. 56 as the grinder she had obtained from the robbery and left on Thompson's porch.[5]

### iii. Michelle Joe

Joe testified she had known Fader for about six years before the crime, and first met defendant in March 1994 at Richie's apartment. During the week preceding the murder, she had been to the Nebraska Avenue house three or four

---

[5] Thompson confirmed Fader had tried to sell her the grinder and had told her about the alleged rape. At some point, the police came and took the grinder.

times and had entered the house once or twice. At that time, she was using about 1.5 grams of methamphetamine per day and had been using for the past three years.

According to Joe, on the morning of March 21, 1994, she first went with Long to the Nebraska Avenue house to go through the dumpster, then stopped by Fader's trailer on the way back to Long's apartment. She concocted a story about needing to take Fader to the hospital in order to get Long to lend her his car. After ingesting some methamphetamine, she picked up Fader in the afternoon and they drove around for a few hours unsuccessfully trying to obtain more. After dropping Fader off at her trailer, Joe obtained some methamphetamine from Rick Saso, ingested it, and rode around until after dark.

Eventually, Joe explained, she ended up at Richie's apartment. She encountered Richie outside the apartment and asked if defendant was there. Defendant came out and sat in the car with Joe. Joe asked defendant to help her commit a burglary. Defendant asked if anyone would be home; Joe responded she didn't think so. Defendant agreed to help. Joe left, and returned a short while later. Someone gave Joe a pair of gloves, and defendant obtained gloves too.

According to Joe, she drove with defendant to Fader's trailer, which was padlocked. At the window, Joe invited Fader to help with the burglary. Fader handed Joe a key to the padlock, and Joe opened the door, allowing Fader to leave. Fader, who was upset because she had been arguing with her boyfriend, brought along a tote bag and got in the back seat of the Mustang.

Joe explained that she drove to the Nebraska Avenue house and parked on the dirt road near a pile of branches. She went up to the house to see if anyone was there. After looking in the living room window and seeing Sherman asleep on the couch, she returned to the car and informed the others. They then drove around looking for a back way in, drove into someone's driveway, heard a dog

13

barking, turned around, and came back to the Nebraska Avenue house. At some point during this period, defendant went to an area behind the house, retrieved a chainsaw, and put it in the Mustang.

Joe testified that she came up with a plan to pretend the car had broken down. Joe and Fader walked up to the house together and knocked on the sliding glass door while defendant waited in back. When Sherman answered, Joe explained they were having car trouble and asked to use the phone; Sherman agreed. Once inside, Joe faked a phone call to Long, telling Sherman she was unable to reach him. Sherman agreed to allow the women to stay the night. The three talked for a while and had some drinks. Sherman then showed Joe to a bedroom. While Fader and Sherman continued talking in the living room, Joe emerged from the bedroom a couple of times to check on them and get a cigarette or a glass of water. Fader was on the loveseat and Sherman was on the couch. Fader got up to fix herself something to eat, took a bath, and went back to the living room. After a time, Fader and Sherman fell asleep. Joe then turned on the bedroom light as a signal, and defendant climbed in the bedroom window.[6] Joe and defendant went through the drawers in the bedroom and unplugged a CD player and a television set.

Joe explained that she went back to the family room, determined Fader and Sherman were still asleep, and returned to the bedroom. Defendant left the bedroom. She then heard a "ruckus" — something opened and slammed, and someone was shouting. When she emerged, she saw defendant, who was holding a large gun like a shotgun, standing in front of Sherman as he lay on the couch.

---

[6]    On cross-examination, Joe testified defendant came in the window one to two hours earlier and stayed in the bedroom until Fader and Sherman fell asleep.

14

Joe went into a bedroom and unplugged a "boom box" to steal. Fader came in and told her defendant wanted her to find something to tie up Sherman with. Fader said defendant had pointed the gun at her. Fader found a necktie and left. Joe went into the dining room and saw defendant standing over Sherman, demanding to know where he kept his wallet. Sherman said the wallet was in the bedroom. Joe retrieved the wallet from a green box in the bedroom and, without opening it, handed it to Fader.

Joe testified that defendant instructed her to get the car. She moved the car into the driveway near the house. When she returned, defendant was still standing over Sherman, who was lying tied up on the couch. Defendant angrily commanded Joe and Fader to load the items they had gathered into the car. Joe told defendant she was afraid and did not want to go through with the burglary, but defendant raised his voice and told her to just get stuff into the car. Joe and Fader complied, putting several items, including a "boom box," a typewriter and a microwave oven, into the car.[7] When Joe returned to the house, she asked defendant if he was going to kill Sherman. Defendant said "no" but seemed very upset.

Joe explained that when she went back outside, Fader was already at the car. As Joe was opening the rear car door for Fader, she heard a gunshot. She and Fader got in the car. Defendant emerged from the house carrying a gun, put the gun in the car, then returned to the house and retrieved a second gun, which he also placed at his side in the car.

---

[7]  According to Joe, Fader said defendant wanted her to go out the window. Fader opened the window, but Joe could not recall if Fader left through it. Joe had no recollection of handing or throwing stolen property through the window.

At defendant's suggestion, Joe testified, she drove to Prescott Estates. On the way, Joe asked defendant if he had killed Sherman; defendant responded he had not. At Prescott Estates, defendant unsuccessfully tried to sell the stolen property. Eventually, the three returned to Richie's apartment. Joe took a shower and changed clothes because she had urinated in her pants, while Fader counted pennies in the bedroom. Richie and defendant unloaded the stolen items from the car and brought them inside. When Joe emerged after her shower, defendant and Richie were in the kitchen talking to Rick Saso. The stolen property was on the kitchen table. Some methamphetamine was on a mirror on the counter; the men were dividing it up with a razor blade.

Joe testified that Saso gave some methamphetamine to defendant, and she received about a gram of the drug. She took her share into the bedroom and ingested some of it. When she emerged from the bedroom, only Saso was there. Joe told Saso she thought defendant might have killed someone. Saso got up, kissed Joe and left without saying anything. Joe then saw Fader and defendant come in from outside and go into the bedroom. When Fader came out of the bedroom, she asked Joe to take her home, which Joe did.

### iv. Rick Saso

Rick Anthony Saso testified pursuant to a grant of immunity from prosecution for any crimes associated with his testimony. Saso testified that in 1994 he used, and made his living selling, drugs. He first met defendant at Richie's apartment. Saso also was acquainted with Joe; she occasionally had sex with him in exchange for drugs.

Saso explained that one night, Richie came to Saso's apartment and said he had some guns to sell. Saso drove to Richie's apartment as it was getting light outside, bringing along some drugs to exchange for the guns if the guns were

16

"nice."  When he arrived at Richie's apartment, Sisk, Richie's children, defendant, Joe and another woman whom Saso had not met before were there; Richie arrived a few minutes later.  Joe was pacing around the house and seemed scared; the other woman sat in the kitchen.  Defendant remained in the bedroom while Saso negotiated with the others regarding the price of the guns.  After about an hour, defendant emerged.  Saso offered defendant 1/16 of an ounce of methamphetamine for the guns, but defendant demanded an eight-ball.  Saso eventually "cheated" defendant "a little bit" and gave him 1.5 grams, which is less than 1/16 of an ounce.  The value of the drugs was about $70.  Richie wrapped up the guns and put them in Saso's car.  About a week later, Saso sold the guns after Richie told him defendant had used them to shoot someone.

### 2. *The defense case*

Nellie Thompson testified she had assisted Fader with obtaining SSI (Supplemental Security Income) disability benefits, based on Fader's drug addiction and her mental status.  In Thompson's opinion, Fader had the mental ability of a 12 year old.  According to Thompson, after an article appeared in a newspaper about the killing of a man in Patterson, Fader told Thompson that in October 1993 she, Joe, and Joe's ex-boyfriend had gone to a house in the country and taken some things.  Fader told Thompson that when a dog barked, she had jumped into the car through the window and cut her leg.  According to Thompson, when Fader heard about the Patterson murder, she exclaimed, " 'Oh my god, I thought they shot the dog.  They said they shot the dog.' "  Thompson said Fader told her about this incident three to four months before she mentioned being raped by defendant.

Defense investigator Alan Peacock testified he first interviewed Nellie Thompson in August 1994.  He recounted that Thompson never told him or any

17

member of his office that Fader had reported being raped by defendant. Instead, he said, the first time Thompson mentioned the alleged rape was in the hallway just before she testified for the prosecution.

The parties entered into several stipulations regarding prior statements by prosecution witnesses, including the following:

Joe never told law enforcement that she had urinated on herself on the night of the murder.

Fader told Detective New that Joe did all of the bargaining in the exchange of the stolen property for drugs. Fader said she and defendant went to the store; when they came back to Richie's apartment the stolen property was gone and Joe had an eight-ball, which they split three ways. Fader further said that Joe instructed her to "take the [rap]" for the crime. Fader thought defendant should "take the [rap]" because he had the guns and was the one "doing this shit."

Richie told Detective Viohl that a few days after defendant and Joe obtained the stolen guns, defendant told Richie he had to leave because he [defendant] was endangering Richie's family. Defendant also said there was a "drunkard" at the house where they had obtained the guns. This was the last time defendant spoke to Richie about the events at the Nebraska Avenue house.

Saso told Detective Valdez that he gave Richie the dope in exchange for the guns, and that he sold the guns for more dope the next day.

### 3. Rebuttal

Detective New testified that he had checked for reports of an elderly man being killed in a rural area where there was a dog in October 1993. He found no such occurrence.

18

## B. Penalty Phase

### 1. The prosecution's case in aggravation

Sharon Kennedy was working as a teller at Bank of America's Ceres branch on May 26, 1988. She testified that on that day, defendant came into the bank, went to the window of another teller, Frances Passalaqua, and handed her a note that said "This is a robbery." Kennedy immediately pushed a "panic" button. Defendant turned and ran out the door, bumping into a customer on the way out. Kennedy did not see a gun and nobody was shot. Frances Passalaqua testified consistently with Kennedy, but she could not identify the robber. She did not give the robber any money.

The parties stipulated that defendant had sustained several convictions. On April 15, 1971, defendant was convicted of armed robbery and assault with a deadly weapon on a police officer. He was sentenced to prison and released on June 5, 1975. On March 17, 1976, defendant was convicted of robbery. He was sentenced to prison and released on May 16, 1979. On January 16, 1980, defendant was convicted of possession of a firearm by a felon. He was sentenced to prison and released on November 8, 1985. On March 29, 1989, defendant was convicted of the May 26, 1988, attempted robbery of Frances Passalaqua. He was sentenced to prison and released on November 23, 1993.

### 2. The defense case

Defense investigator Alan Peacock testified he had conducted an investigation into defendant's background but had found no one who could serve as a "social historian" for defendant. Defendant's family was "nonexistent." Defendant's father and sister had died, and he never knew his natural mother. Defendant had one close friend and a daughter whom he was "adamant" about not involving in his case. Peacock did not know defendant's stepmother's name. According to Peacock, what was known about defendant's social history came

19

from his California Department of Corrections records. Defendant had been involved in the criminal justice system since the age of 14, when he had assaulted his father. The records documented an "extended history of abuse of controlled substances," including alcohol, methamphetamine, heroin, marijuana, and other street drugs. Defendant, who was 48 years old at the time of trial, had spent most of his adult life in a locked facility. His longest period out of confinement was 18 months, during which he absconded from parole.

Officer James Park had retired from the California Department of Corrections and Rehabilitation after serving as its chief of classification for many years. He testified that if defendant were sentenced to life in prison without the possibility of parole, he would automatically be classified as a "Level 4" prisoner, meaning he would be subject to the highest level of security in the general prison population.[8] In a Level 4 prison, prisoners were double-celled in eight-by-10-foot cells surrounding a guard station. There were gun ports visible from each cell, and "a rifle [could] be brought to bear anywhere . . . in front of the cells or in the exercise area." Prisoners could earn privileges for good behavior and could purchase items such as television sets if they had the funds. Prisoners generally worked to produce products that saved the state money.

Park had reviewed defendant's prison disciplinary and work records and had spoken with him. Defendant told Park that he wanted to be sentenced to death; however, Park believed that if sentenced to life without possibility of parole, defendant would "settle down" and become a useful prisoner. According

---

[8] Only prisoners in the security housing unit, or SHU, would be subject to tighter security. The SHU was reserved for known gang leaders and other prisoners who were assaultive or difficult to manage.

20

to Park, in the past defendant had gotten along well with staff and had done good work in prison, but occasionally had refused to work. Defendant also received commendations several times. For example, defendant had helped two officers who were being confronted by an inmate with a razor blade, helped other prisoners adjust to new jobs, volunteered to work during a lockdown, and turned in a knife that a supervisor had forgotten to collect from him.

Defendant had gotten into trouble a few times for having homemade wine, called pruno. He had once attempted suicide, had failed to report to work four times, and once had refused to remove a towel from a window. On the latter occasion, he cursed, but there was no violence. Defendant also had been written up for possessing a wrench that could be used to unscrew the cover on an electrical outlet, where contraband could be hidden.

Park noted that life prisoners — particularly those in their 40's and 50's — were considered a stabilizing force because of their interest in the prison remaining quiet.

## II. DISCUSSION

### A. Jury Selection Issues

#### 1. Challenges for cause

Defendant makes several claims of error related to jury selection and the trial court's application of the standard for exclusion set forth in *Wainwright v. Witt* (1985) 469 U.S. 412 (*Witt*) and *Witherspoon v. Illinois* (1968) 391 U.S. 510 (*Witherspoon*). Defendant claims the trial court exhibited a pro-death-penalty bias in questioning prospective jurors, erroneously refused to excuse for cause 15 prospective jurors based on their views regarding the death penalty, and erred by excusing for cause two prospective jurors based primarily on their written answers to a questionnaire. Defendant claims these errors resulted in a jury composed of

21

pro-death and otherwise biased jurors and violated his rights to a fair and impartial jury, to a fair trial, to the presumption of innocence, to freedom from self-incrimination, to the effective assistance of counsel, to due process of law, and to a reliable guilt and penalty determination guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and parallel provisions of the California Constitution. For the reasons discussed *post*, we conclude defendant's claims are without merit.

### a. Legal Principles

We recently summarized the governing principles: "A prospective juror's personal views concerning the death penalty do not necessarily afford a basis for excusing the juror for bias in a capital case. (*Uttecht v. Brown* (2007) 551 U.S. 1, 6 (*Uttecht*) [' "[a] man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State," [citation] . . .'].) Rather, '[t]o achieve the constitutional imperative of impartiality, the law permits a prospective juror to be challenged for cause only if his or her views in favor of or against capital punishment "would 'prevent or substantially impair the performance of his . . . duties as a juror' " in accordance with the court's instructions and the juror's oath.' (*People v. Blair* (2005) 36 Cal.4th 686, 741, quoting *Witt*, *supra*, 469 U.S. at p. 424.) Under this standard, a prospective juror is properly excluded in a capital case if he or she is unable to follow the trial court's instructions and 'conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate. [Citations.]' (*People v. McWhorter* (2009) 47 Cal.4th 318, 340; see *People v. Jenkins* (2000) 22 Cal.4th 900, 987 (*Jenkins*).) The analysis is the same whether the claim is the failure to exclude prospective jurors who exhibited a prodeath bias, or wrongful exclusion of

prospective jurors who exhibited an antideath bias.  (See *People v. Hoyos* (2007) 41 Cal.4th 872, 906.)" (*People v. Jones* (2012) 54 Cal.4th 1, 40-41.)

"During voir dire, jurors commonly supply conflicting or equivocal responses to questions directed at their potential bias or incapacity to serve.  When such conflicting or equivocal answers are given, the trial court, through its observation of the juror's demeanor as well as through its evaluation of the juror's verbal responses, is best suited to reach a conclusion regarding the juror's actual state of mind.  (*People v. Hamilton* (2009) 45 Cal.4th 863, 890 (*Hamilton*).)' " 'There is no requirement that a prospective juror's bias against the death penalty be proven with unmistakable clarity.  [Citations.]  Rather, it is sufficient that the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law in the case before the juror.' " ' (*People v. Abilez* (2007) 41 Cal.4th 472, 497-498.)  '[T]he [trial court's] finding may be upheld even in the absence of clear statements from the juror that he or she is impaired because "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings." [Citation.]  Thus, when there is ambiguity in the prospective juror's statements, "the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve it in favor of the State." ' (*Uttecht, supra,* 551 U.S. at p. 7.)" (*People v. Jones, supra,* 54 Cal.4th at p. 41.)

"A trial court's determination concerning juror bias is reviewed for abuse of discretion.  (*People v. Abilez, supra,* 41 Cal.4th at pp. 497-498.)  '[A]ppellate courts recognize that a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable

23

information that simply does not appear on the record.' (*People v. Stewart* (2004) 33 Cal.4th 425, 451 (*Stewart*).) As such, 'the reviewing court generally must defer to the judge who sees and hears the prospective juror, and who has the "definite impression" that he is biased, despite a failure to express clear views.' (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1007 (*Lewis and Oliver*); see *Uttecht, supra,* 551 U.S. at p. 9 ['Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors.'].)" (*People v. Jones, supra,* 54 Cal.4th at pp. 41-42.)

"[U]nder existing United States Supreme Court precedent, the erroneous excusal of a prospective juror for cause based on that person's views concerning the death penalty *automatically* compels the reversal of the penalty phase without any inquiry as to whether the error actually prejudiced defendant's penalty determination." (*People v. Riccardi* (2012) 54 Cal.4th 758, 783, citing *Gray v. Mississippi* (1987) 481 U.S. 648; see also *People v. Riccardi,* at p. 840 (conc. opn. of Cantil-Sakauye, C. J.).) "To prevail on a claim that the court erroneously denied a challenge for cause, however, the defendant must show ' "that the court's rulings affected his right to a fair and impartial jury." ' " (*People v. Clark* (2011) 52 Cal.4th 856, 895.)

### b. Factual Background

Jury selection proceeded in the following manner. At the outset, the court gave the entire panel of prospective jurors a brief oral explanation of the charges against defendant, the stages of a death penalty trial, the duties of a juror, and the process of jury selection. All prospective jurors who were not excused for hardship then filled out a 30-page questionnaire comprised of 122 questions.

24

Questions Nos. 9-32 and 87-88 were prefaced by an explanation of the phases of a death penalty trial and focused on the prospective jurors' beliefs about and attitudes toward the death penalty and their ability to set aside those beliefs and follow the law. Other questions involved such matters as the prospective jurors' exposure to media coverage about the case, attitudes toward plea bargaining, familiarity with and attitudes toward drug and alcohol addiction and psychological testimony, and educational, employment and family background.

After filling out the questionnaires, the prospective jurors underwent oral voir dire. Before this process began, the court announced it intended to conduct most of the questioning itself, but would allow counsel to ask appropriate followup questions. The prospective jurors were brought into the courtroom in groups of between 14 and 17 individuals. The court first questioned each group as a whole regarding some preliminary matters. Prospective jurors not excused during group questioning were then questioned individually, outside the presence of the other prospective jurors. Of the 158 prospective jurors questioned in this manner, 73 were excused for cause or on the basis of hardship.

The court then generated a random list of the remaining prospective jurors, which was supplied to counsel. Twelve prospective jurors were called in the order appearing on the random list and seated in the jury box, and the parties commenced exercising peremptory challenges, alternating between the prosecution and the defense. When a prospective juror was excused, the next individual appearing on the random list was seated in his or her place, until both sides were satisfied with the 12 jurors selected. This process was repeated for the four alternate jurors. Defendant exercised 16 of his 20 allotted peremptory challenges to the regular jurors and none of his four allotted peremptory challenges to the alternate jurors. The prosecutor exercised 15 peremptory challenges to the regular jurors and four as to the alternates. Defendant did not

25

request additional peremptory challenges or object to the jurors and alternates ultimately sworn.

### c. *Asserted trial court bias in voir dire*

Defendant first asserts the trial court repeatedly intervened in voir dire questioning to rehabilitate death-leaning prospective jurors who, on the basis of their questionnaire responses, would have been subject to defense challenges for cause. He argues the court's leading and suggestive questions to these prospective jurors were not designed to ferret out bias, but rather to have the prospective jurors change their questionnaire responses and hide their biases. In contrast, he urges, life-leaning prospective jurors were excused after cursory questioning without any extensive efforts at rehabilitation. He argues the court's manner of questioning allowed death-leaning prospective jurors to conceal disqualifying biases, thus preventing the reasonable exercise of defense challenges for cause; forced defendant to use peremptory challenges against prospective jurors who should have been removed for cause; "stacked" the jury pool with pro-death-penalty jurors and "skewed" it lopsidedly in favor of the state and a death penalty verdict, thus rendering the exercise of defense peremptory challenges "irrelevant" and "futile"; and deprived him of a fair and impartial jury. (See *Morgan v. Illinois* (1992) 504 U.S. 719, 729-734; *Mu'Min v. Virginia* (1991) 500 U.S. 415, 425-426.) He contends the error is "structural" (*Arizona v. Fulminante* (1991) 499 U.S. 279, 309) and requires reversal regardless of whether any particular ruling on a challenge for cause was in error.

Referring to the rule regarding forfeiture of claims of error in the denial of defense challenges for cause (see *post,* at pp. 46-47), the Attorney General initially contends defendant forfeited his claim for purposes of appeal by agreeing to the jury without exhausting his peremptory challenges. Here, however, defendant

26

raises a different argument. He asserts the court's manner of questioning was itself so biased as to be inadequate to root out juror partiality. He claims the court's questioning was not designed to uncover juror bias, but instead was designed to, and did, conceal bias, rendering it impossible for defendant to obtain a fair jury. Defendant thus raises a threshold challenge to the adequacy of the trial court's voir dire that we must address first, because it affects the validity of all of the court's rulings on challenges for cause. (See *Morgan v. Illinois, supra,* 504 U.S. at p. 729 ["part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors"]; *Mu'Min v. Virginia, supra,* 500 U.S. 415.) In the past, we have reached the merits of similar claims notwithstanding the defendant's failure to object to the assertedly disparate questioning in the trial court. (*People v. Martinez* (2009) 47 Cal.4th 399, 439, fn. 8; *People v. Thornton* (2007) 41 Cal.4th 391*,* 419-425; *People v. Navarette* (2003) 30 Cal.4th 458, 485 & fn. 2, 487-488; see also *People v. Mills* (2010) 48 Cal.4th 158, 189 [construing claim as one of judicial misconduct and assuming, without deciding, it is preserved despite defendant's failure to object in the trial court].)

In any event, here defendant did object to the trial court's manner of questioning. Toward the end of the first day of individual voir dire, following the questioning of Prospective Juror Y.C. and the court's denial of defendant's challenge for cause, the following exchange between the court and counsel took place:

Defense counsel: "My second objection is that the court's using leading questions in [an] attempt to lead the juror down the path towards rehabilitation. I mean, if it's this particular juror and in particular is a clear cut case where you can take someone who initially answering the questionnaire with no pressure on them will set out some very strong preconceived notions concerning the death penalty

and the course of trial and through skillful leading questions have them in effect do a 180 degrees turn while standing before the court. I think that basically causes the juror to hide their true biases and [prevents] a reasonable exercise of challenges for cause."

The Court: "Thanks for the 'skillful phraseology.' "

Defense counsel: "Nothing but skillful. There is nothing about that. You were skillful as a lawyer. You are skillful as a judge."

The prosecutor: "Your Honor, except as to different areas of questioning, I think I need to join [defense counsel's] objection."

The Court: "You think I'm skillful in those areas too, Mr. [Prosecutor]?"

The prosecutor: "Yes, your Honor. I think you are very skillful. That's the problem."

The Court: "Thank you. Well, thank you for your praise. But I don't think I have done anything improper."

Accordingly, defendant apprised the court that he believed it was improperly rehabilitating death-leaning prospective jurors with "skillful leading" questions. Although defendant did not, at that time or any time thereafter, object to the court's assertedly less thorough questioning of life-leaning prospective jurors, we think the implications of defendant's objection were sufficiently clear that we may review the merits of his claim.

On the merits, however, defendant's claim fails. Trial courts possess broad discretion over both "[d]ecisions concerning the qualifications of prospective jurors to serve" (*People v. Martinez, supra,* 47 Cal.4th at p. 445) and the manner of conducting voir dire (*People v. Thornton, supra,* 41 Cal.4th at p. 420 [trial court " 'possesse[s] discretion to conduct oral voir dire as necessary and to allow attorney participation and questioning as appropriate.' [Citations.]"). Indeed, decisions of the United States Supreme Court in this area "have made clear that

28

'the conduct of voir dire is an art, not a science,' so ' "[t]here is no single way to *voir dire* a juror." ' [Citations.]" (*People v. Cleveland* (2004) 32 Cal.4th 704, 737.) " 'The Constitution . . . does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury.' " (*Ibid.*, quoting *Morgan v. Illinois, supra,* 504 U.S. at p. 729.)

In evaluating claims of judicial bias during the conduct of death-qualification voir dire, we have stressed that "[t]rial courts must of course 'be evenhanded in their questions to prospective jurors . . . and should inquire into the jurors' attitudes both for and against the death penalty to determine whether these views will impair their ability to serve as jurors.' " (*People v. Mills, supra,* 48 Cal.4th at p. 189; accord, *People v. Martinez, supra,* 47 Cal.4th at p. 446.) Evenhandedness is encouraged because "[i]t is entirely possible . . . that even a juror who believes that capital punishment should never be inflicted and who is irrevocably committed to its abolition could nonetheless subordinate his personal views to what he perceived to be his duty to abide by his oath as a juror and to obey the law of the State." (*Witherspoon, supra,* 391 U.S. at p. 515, fn. 7; see *Lockhart v. McCree* (1986) 476 U.S. 162, 176 ["It is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law."].)

Nonetheless, the trial court has " 'broad discretion over the number and nature of questions about the death penalty. . . .' " (*People v. Mills, supra,* 48 Cal.4th at p. 189.) "[W]e cannot predicate a finding of error merely on the number of questions the court asks" death-leaning and life-leaning jurors. (*Id.* at p. 190, citing *People v. Thornton, supra,* 41 Cal.4th at p. 425.) Indeed, on appeal, "[a] reviewing court should not require a trial court's questioning of each prospective

juror in the *Witherspoon-Witt* context [citations] to be similar in each case in which the court has questions, lest the court feel compelled to conduct a needlessly broad voir dire, receiving answers to questions it does not need to ask." (*People v. Thornton,* at p. 425; see also *People v. Martinez, supra,* 47 Cal.4th at pp. 446-447.)

Finally, " ' "[d]espite its importance, the adequacy of *voir dire* is not easily subject to appellate review. The trial judge's function at this point in the trial is not unlike that of jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions." ' " (*People v. Holt* (1997) 15 Cal.4th 619, 661, quoting *Mu'Min v. Virginia, supra,* 500 U.S. at p. 424.) For these reasons, the court's manner of conducting voir dire will not be disturbed on appeal unless it renders the trial fundamentally unfair. (*People v. Carter* (2005) 36 Cal.4th 1215, 1250; see *Mu'Min v. Virginia, supra,* 500 U.S. at pp. 425-426.)

Here, defendant points to 23 death-leaning prospective jurors whom he asserts the court improperly rehabilitated, and 11 life-leaning prospective jurors whom he contends the court peremptorily excused without similar efforts at rehabilitation. We have carefully reviewed the questionnaire responses and voir dire transcripts of these prospective jurors and of the jurors ultimately chosen, as well as the transcript of the voir dire of all other prospective jurors who were individually questioned. Our review leads us to conclude the court did not abuse its discretion or display bias in its questioning of either death-leaning or life-leaning prospective jurors, and its voir dire was adequate to enable it to determine whether the prospective jurors' views on the death penalty qualified them to sit on a capital jury.

We begin with an analysis of the voir dire of Y.C., the prospective juror whose voir dire led to the defense objection set forth above. On her questionnaire,

30

Y.C. stated that she "strongly support[ed]" the death penalty. Asked to explain her views on the death penalty, she wrote "If 'you' think another's life is inconsequential — prepare to pay the ultimate penalty! — if 'you' decide to take that person's life —." In response to a question about her views regarding a case involving the murder of an elderly man with a shotgun during a robbery, she wrote that everyone convicted of such a murder should receive the death penalty because "The murder was probably not necessary." However, when asked whether she would base her penalty decision on the evidence and instructions presented at the penalty phase, she responded in the affirmative. Asked her views regarding the frequency with which the death penalty is imposed, she wrote that she believed the penalty was used "too seldom" because "death row is overcrowded with convicted & sentenced criminals way overdoing the appeal time — too much money spent supporting these folks!" She believed the death penalty should be mandatory for murder and murder with special circumstances, should be possible and was appropriate for "any murder," and was inappropriate for anything but murder and murder with special circumstances. She answered in the affirmative to a question asking whether she would automatically vote for the death penalty if defendant was convicted of murder with a special circumstance; but she also wrote in response to a different question that before deciding on the penalty, she would want to know "why he had such little disregard [*sic*] for another human life." In response to questions regarding her views on the "eye for an eye" principle, she wrote that she believed in that adage based on religious conviction, that to her it meant "If you sin against another & take their life prepare to lay down your own," and that she could not set aside that concept and apply the principles the court would give her. She further wrote in response to pertinent questions that she had religious or moral training regarding the death penalty from "family & church," and she did "not know" if she could set aside such training and decide the case

according to the law given by the court. She answered "no" to a question asking whether she could set aside her personal feelings regarding what the law should be and follow the law as instructed by the court. In response to a question asking whether she could agree to accept the court's representation that life without possibility of parole means the defendant would be sentenced to life without possibility of parole, she wrote "do not know." Asked whether the costs of either incarceration or the appellate process would be a consideration for her in deciding on the penalty, she answered "yes" to both. Finally, she answered "yes" to a question asking whether her feelings were such that in every case that reached a penalty phase she would automatically vote for the death penalty rather than life without possibility of parole.[9]

Defendant argues these questionnaire responses alone would have subjected Y.C. to a challenge for cause, but the court went to "extraordinary lengths to rehabilitate [her], leading her to contradict everything she had answered in the questionnaire." We conclude the court did not abuse its broad discretion in conducting the voir dire of Y.C. As defense counsel acknowledged during the voir dire of a different prospective juror, the questionnaire was "designed to get [the venireperson's] first impressions" regarding the matters discussed; the purpose of voir dire was to determine whether or not those first impressions represented "solid, firm convictions." As is readily apparent from a review of the relevant portion of the voir dire, the court's questioning was designed to do precisely that. The court began by noting what appeared to it to be a conflict

---

[9]     Y.C. also answered "yes" to a question asking whether she would in every case automatically vote for life without possibility of parole, but on voir dire she confirmed this was a "wrong answer."

32

between Y.C.'s questionnaire response indicating she thought everyone convicted of the murder of an elderly man with a shotgun during a robbery should be put to death, regardless of the evidence regarding penalty introduced by the parties, and her response indicating that if selected as a juror, she would listen open-mindedly to the penalty phase evidence and base her decision solely on the evidence and the court's instructions. This led Y.C. to volunteer that she was confused about "the first part and the penalty part," prompting the trial court to launch into a detailed explanation of the two phases of a death penalty trial and the purpose of each, the decision to be made at the penalty phase, and the meaning of "aggravation" and "mitigation." Having ascertained that Y.C. understood these concepts, the court asked whether, if the case reached the penalty phase, Y.C. would be able to vote for the death penalty if she believed the evidence in aggravation outweighed that in mitigation, and conversely, whether she would be able to vote for life in prison without possibility of parole if she felt the evidence in mitigation outweighed that in aggravation. When Y.C. hesitated in response to the latter portion of the question, and seemed at a loss for words, the court queried whether she meant she would need to hear all of the evidence before making a decision to impose life without possibility of parole, and Y.C. agreed. The court then ascertained that Y.C. would not hesitate to vote for either penalty if she believed that was what the evidence indicated.

Next, the court addressed Y.C.'s responses indicating she believed in the "an eye for an eye" principle and could not set that concept aside and apply the principles given by the court. The court asked whether Y.C. wanted to change the latter answer in light of the answers she had previously given in court, and she agreed, explaining she had had difficulty concentrating on the questionnaire given the time of day and the number of people in the jury assembly room when she filled it out. The court then moved on to Y.C.'s views on the penalty of life in

33

prison without possibility of parole. The court asked whether, if selected as a juror, Y.C. would conduct herself in the jury room as if imposing such a sentence meant defendant "will stay there without parole," and Y.C. again agreed. The court proceeded similarly with the question regarding the costs of incarceration and appeals, asking whether Y.C. meant that she would, if selected, tend to vote for the death penalty because she believed it was less expensive. When Y.C. responded in the affirmative, the court asked if she would agree to not "put dollars and [cents] either way before any other consideration." Y.C. agreed, indicating she would not "take lightly" the penalty decision. Finally, the court explored Y.C.'s response indicating she would "in every case automatically" vote for the death penalty because of her feelings. The court asked whether, based on Y.C.'s responses to the previous questions, her answer now would be "no," and she agreed, commenting she had found the questionnaire "rather tricky" and the court should "[j]ust change everything."

The court's conduct of the voir dire of Y.C. did not exceed the bounds of permissible discretion. The court asked questions testing Y.C.'s questionnaire responses that were inconsistent or indicated confusion, to clarify her beliefs and to assess how firmly Y.C. held these beliefs as a prelude to determining whether Y.C. could perform the duties of a juror. When Y.C. confirmed that she was confused about the two-phase nature of the trial, the court was well within its discretion in explaining these matters to her and ascertaining whether, in light of her new understanding, she could impose either penalty option. As we have explained, "we ordinarily defer to the court's determination that a prospective juror's answers require clarification" (*People v. Martinez, supra,* 47 Cal.4th at p. 446), and "[w]e see nothing improper in the court's explaining the law" to a prospective juror whose questionnaire responses gave rise to concerns in the court's mind. (*People v. Thornton, supra,* 41 Cal.4th at p. 423.) The court

34

similarly was within its discretion in ascertaining whether, in light of her new understanding, Y.C. wished to change her pro-death-penalty responses to other questions. "Clearly the court found it necessary to ask [Y.C.] questions to reach a decision about her, and doing so was not unfair to defendant." (*Id.* at p. 422.)

Further, although we caution against overreliance on leading questions[10] to the exclusion of more open-ended questions because the authority of the trial judge may cause a prospective juror to give what he or she perceives to be a "correct" answer rather than a considered statement of his or her true views, we conclude the court's use of leading questions here did not fall outside the wide range of its discretion. Prospective jurors unschooled in the law may have difficulty fully articulating their views or forecasting how they would conduct themselves if selected as a juror in a death penalty case, particularly when they are asked to express themselves using legal terms and concepts that may be entirely new to them. (Cf. *Uttecht, supra,* 551 U.S. at p. 7 [recognizing some venirepersons may be unable to articulate their views].) In such a situation, prompting the prospective juror with leading questions may be the only way for the court to obtain a clear answer. (See *People v. Mills, supra,* 48 Cal.4th at p. 190 ["court's occasional use of leading questions when attempting to rehabilitate 'death-leaning' jurors" did not "suggest a lack of impartiality" because "[w]e assume the trial court formulated its questions based on the individual characteristics of each juror"].) Finally, the court did not prevent defendant's

---

[10] "A 'leading question' is a question that suggests to the witness the answer that the examining party desires." (Evid. Code, § 764.)

35

counsel from engaging in follow-up questioning of Y.C. if he chose, but counsel elected not to do so.  (See Code Civ. Proc., former § 223.)[11]

The analysis is the same with respect to the remaining 22 prospective jurors whom defendant claims the court improperly rehabilitated.  A review of the questionnaire responses and voir dire of these prospective jurors indicates the court orally questioned them regarding their views on the death penalty when their written responses to critical questions were blank or appeared to the court to create a conflict or to reflect confusion or a misunderstanding of the capital trial process. In most such cases, including Prospective Jurors J.E., M.C., J.O., D.O., G.T., J.J., M.E., I.W., R.Z., C.Ph., L.H, R.L., S.W., F.G., M.A., C.Pa., E.S., M.S., L.V., the court began by noting the blank response or the apparent conflict and then engaged in an explanation of the law similar to that given to Prospective Juror Y.C., stopping at critical junctures to ascertain whether the prospective juror understood the explanation.[12]  Having ascertained that each prospective juror understood the process, the court then asked each whether he or she would have "a

---

[11]    At the time of defendant's trial in 1996, that section provided as follows: "In a criminal case, the court shall conduct the examination of prospective jurors. However, the court may permit the parties, upon a showing of good cause, to supplement examination by such further inquiry as it deems proper . . . .  [¶] . . . [¶]  The trial court's exercise of its discretion in the manner in which voir dire is conducted shall not cause any conviction to be reversed unless the exercise of that discretion has resulted in a miscarriage of justice, as specified in Section 13 of Article VI of the California Constitution."  (Code Civ. Proc., former § 233, as adopted by voters (Prop. 115, § 7) June 6, 1990.)

[12]    Two individuals included in this claim did not fit this pattern.  The court found it unnecessary to explain the phases of the case and the nature of aggravating and mitigating evidence to Juror L.G-H.  And the court's voir dire of Juror C.H. was very brief, encompassing only one transcribed page, and covered only her experience as a crime victim.  We find nothing improper in the voir dire of these jurors.

36

problem" or "any hesitancy" in voting for either penalty option if, after weighing all the circumstances, he or she believed the evidence called for it. Some prospective jurors who initially expressed reluctance to impose life in prison without possibility of parole, or who could not imagine themselves doing so if they found defendant guilty of first degree murder with special circumstances (e.g., Prospective Jurors J.E., J.O., and M.A.), changed their responses when the court explained the concept of mitigating evidence or when examples of mitigating evidence were given. Often the court found it necessary, as with Prospective Juror Y.C., to explain that it would be improper for the individual, if selected as a juror, to vote based on a belief that a person sentenced to life in prison without parole could someday be released, to consider the costs of incarceration or appeals, or to follow the "eye for an eye" adage instead of the law given by the court; the court then obtained the prospective juror's assurance that he or she would set aside his or her personal beliefs and follow the law as instructed by the court (e.g., Prospective Jurors J.J., J.M., I.W., L.G-H., R.L., M.A., C.Pa., and M.S.). Although the court often used the "do you understand" questioning format when explaining the law and sometimes employed leading questions, after defendant objected the court displayed an awareness of the issue and even caught and corrected itself during questioning of Prospective Juror R.Z. Moreover, the court often asked open-ended questions and allowed the prospective jurors to express themselves in their own way when they were willing and able to do so (e.g., Prospective Jurors F.G. and M.S.).

In sum, the record reflects the court questioned each prospective juror in a manner consistent with its assessment of that person's "individual characteristics" (*People v. Mills, supra,* 48 Cal.4th at p. 190) and asked questions and explained the law it felt necessary to come to a decision about the ability of the prospective juror to serve on the jury. (*People v. Thornton, supra,* 41 Cal.4th at pp. 422-423.)

37

As with Prospective Juror Y.C., and for similar reasons, we find no abuse of the

court's broad discretion in its manner of questioning these prospective jurors.**13**

---

**13** At oral argument, defendant's counsel identified Juror C.P. as the "most egregious" example of assertedly improper rehabilitative questioning. We conclude the trial court's manner of questioning C.P. was not an abuse of discretion. On her questionnaire, Juror C.P. expressed very strong pro-death-penalty views and some hesitancy about her ability to put aside those views. For example, she wrote that she "strongly support[ed]" the death penalty if the murder was "premeditated" and there was "past criminal history." She wrote that she was "sick and tired of appeals & paroles & shortened time served." She wrote that everyone convicted of the murder of an elderly man with a shotgun during a robbery should receive the death penalty, regardless of the evidence regarding penalty introduced by the parties, because the defendant "was armed and invaded a home with robbery planned possibly — He was armed 'in case he needed the gun.' " She wrote that if selected as a juror, she would agree to listen openmindedly to the penalty evidence and base her decision solely on such evidence and the court's instructions, but she "would have a hard time, however, if it were a 'cold-blooded' act." She felt the death penalty was used too seldom, explaining "too many prisoners released on parole or appeals — waste of tax $$" She wrote she felt the death penalty should be mandatory for "murder, violent crimes — & perhaps rape under certain circumstances." She wrote that the costs of incarceration and appeals would be a factor for her in deciding penalty because she was "fed up with tax $$ used to house inmates (& pampering them with frivo[li]ties)." Asked whether she would hesitate to vote for a verdict of guilt or a true finding on the special circumstance allegation in order to avoid the task of deciding on the penalty, she wrote she "would try to be open-minded — I simply just have a problem with compromising penalty for FIRST –Degree murder." Asked whether there was anything about defendant's appearance that would prevent her from deciding the case based upon the law and the evidence and not upon prejudice, sympathy, pity, or bias, C.P. wrote in part: "Sympathy or pity would play no part — My sympathy or pity would be reserved for the victim and family." And asked whether she had formed any opinion about this case based upon completing the questionnaire, C.P. wrote "I hope not — the term 'murder' doesn't set with me — but I'd have to hear all evidence."

C.P.'s answers, however, hinted that she misunderstood the nature of special circumstances and the function of the penalty phase. For example, she wrote she would *not* automatically vote for either a penalty of death or a penalty of life imprisonment without possibility of parole if defendant were found guilty of murder with a special circumstance, because "I would need to hear the details of

*(footnote continued on next page)*

Defendant contends, nonetheless, that the error here is not only that the court rehabilitated death-leaning prospective jurors, but that it failed to take the same steps with life-leaning prospective jurors, instead summarily excusing them after brief questioning. He contends the court failed to explain the two phases of the trial, the nature of aggravating and mitigating evidence, and the weighing

---

*(footnote continued from previous page)*

the special circumstances," and it "would depend on the special circumstances — if there were no special circumstances I would vote for the death penalty."

Given the inconsistency in some of C.P.'s questionnaire responses, her responses indicating she would not automatically impose either penalty, and her apparent confusion about the nature of special circumstances and other aspects of the trial process, the court was fully justified in attempting to educate this juror by engaging in a detailed explanation of the phases of a capital case, explaining that the defendant had not yet been found guilty and the circumstances of the crime had not yet been proved, explaining that neither penalty option was favored, and asking probing questions to determine C.P.'s true state of mind. The questioning bore out that C.P. was indeed confused. For example, when the court asked C.P. about her response indicating she would "need the hear the details of the special circumstances" in deciding penalty, C.P. responded, "I think deep down I have a question of what special circumstances are." After listening to the court's explanations and responding to further questions, C.P. affirmed she would not automatically vote for either penalty, she could follow the court's instructions, and she would not consider cost in deciding penalty. She reaffirmed these answers (as well as her initial confusion) in response to additional questioning by defendant's counsel. Defendant complains the court phrased its questions in unduly leading terms. For example, in questioning C.P. about her response on the questionnaire indicating the death penalty should be "mandatory" for certain types of crimes, the court asked "[w]hen you said 'mandatory' did you mean that it automatically [should] be imposed if a person is found guilty of it, or did you mean that it should be an available penalty?" C.P. responded, "It should be an available penalty." Again, although we caution against overreliance on leading questions, we conclude the court did not abuse its discretion by employing them here (see *People v. Mills, supra,* 48 Cal.4th at p. 190), particularly with this juror whose misunderstanding of many aspects of the trial and penalty process was so apparent.

process to such prospective jurors, and failed to determine whether they could set aside their personal views and follow the law. Defendant points to 11 prospective jurors whom he contends the court summarily dismissed in this manner.[14]

Again, we have examined the questionnaire responses and voir dire transcript related to these 11 prospective jurors — as compared to the responses and transcript related to the alleged death-leaning jurors and prospective jurors — and conclude the court's manner of questioning them was not an abuse of discretion. First, we note defendant stipulated to the excusal of Prospective Juror J.L. because his religious beliefs prohibited him from judging another person. Further, defendant expressed a willingness to stipulate to the excusal of Prospective Jurors R.R. and B.C. based on their questionnaire responses before they were even brought in for individual questioning. The court was fully justified in short-circuiting the questioning of these three prospective jurors.

For the eight remaining prospective jurors, the court's questioning generally followed a pattern similar to the questioning of Prospective Juror M.F., which we set out in full:

The Court: "Hi, Mr. [F.]. How are you? [¶] We're just going to ask you a couple of questions in this matter. [¶] You indicate that you . . . oppose the death penalty?"

Prospective Juror M.F.: "Right."

The Court: "Correct?"

---

[14] Defendant also mentions Prospective Juror D.S., whom the court excused summarily because of bias against testimony from law enforcement officers. But the court also summarily excused six other prospective jurors due to bias in favor of the testimony of law enforcement officers. Thus, defendant's mention of D.S. does not support his claim that the court exhibited bias in favor of the prosecution.

Prospective Juror M.F.: "Yes."

The Court: "Okay. Do you feel that there are any circumstances under which the — if the defendant were found guilty of the crime that he is charged with and the special circumstances are proved, do you feel that there are any circumstances which you would vote for the death penalty?"

Prospective Juror M.F.: "No, I don't."

The Court: "In other words, if the evidence, and I'm not saying that it would, showed that this crime was exceedingly vicious and callous and horrible, and if the evidence, and I'm not saying that it does, were to show that the defendant was a particularly vicious, brutal and horrible person, under no circumstances do you believe that you could impose the death penalty; is that correct?"

Prospective Juror M.F.: "I don't believe I could."

The prosecutor: "Move to excuse for cause, Your Honor."

The Court: "All right. You're excused. Thank you, Mr. [F.]."

We conclude the court's manner of questioning these prospective jurors fell within its broad discretion. The written questionnaire responses of these venirepersons left little or no cause to believe that extensive questioning would render them eligible to serve. Several — including J.B., G.F-M., N.C., O.B., and A.M. — wrote on their questionnaires that they would "never under any circumstances impose [the] death penalty, regardless of the evidence"; others, including M.F. and B.H., wrote they "oppose[d]" or "strongly oppose[d]" the death penalty. Each of these seven also wrote that they would automatically impose life in prison without possibility of parole if defendant were convicted of murder with special circumstances. Often, these prospective jurors included strong language explaining why they held these views. For example, Prospective Juror G.F-M. wrote "two wrongs do not make a right. Whoever is the executioner

41

is a murderer also."  Prospective Juror N.C. wrote "I could not live with myself if I was the cause of another person's death," repeating the same sentiment numerous times in the questionnaire.  Similarly, Prospective Juror A.M. wrote, "I don't think I could live with myself knowing I sent someone to their death."  Prospective Juror J.B. wrote, "I feel some people deserve it but I'm not going to determine it." Four of these venirepersons — J.B., N.C., G.F-M., and O.B. — wrote their opposition to the death penalty was based on religious or moral beliefs they could not set aside.  Others, such as Prospective Juror M.F., based their views on practical considerations such as cost.  Notably, the questionnaire responses of these prospective jurors were, with few exceptions, internally consistent; that is, their expressions of general feelings in opposition to the death penalty were coupled with answers indicating they could not set aside their personal moral or religious views and follow the law, and for that reason they would always vote against the death penalty regardless of the evidence.  Further, none of their questionnaire responses indicated they misunderstood the capital trial process as it had been explained to them both orally and on the questionnaire; rather, their responses suggested that regardless of the process, they personally could not or would not participate in the decision to sentence someone to death.  Under these circumstances, the court reasonably could conclude that neither extensive questioning nor an explanation of the law was "likely to render the[se] venireperson[s] qualified to sit in a capital case."[15]  (*People v. Mills, supra,* 48 Cal.4th at p. 190.)

---

[15]     The questionnaire responses of two prospective jurors identified by defendant as summarily excused did not fit this pattern.  Prospective Juror B.H.'s answers were somewhat internally inconsistent and she left many responses blank. Comparing the questionnaire and voir dire responses of this prospective juror with those of two death-leaning prospective jurors, the concurring opinion finds a "lack

*(footnote continued on next page)*

42

Here, the court orally questioned each of the identified prospective jurors regarding whether he or she could not impose the death penalty even if the evidence showed defendant had committed a horrible, vicious crime and was a horrible, vicious person. Such a formulation, while straying from what we have previously approved as satisfying the standard set forth in *Witt*, was adequate to assess whether there was any "realistic, practical possibility" the prospective jurors could impose the death penalty in this case. (*People v. Martinez, supra,* 47 Cal.4th at p. 432; cf. *ibid.* [asking prospective jurors "whether there was a realistic,

_____

*(footnote continued from previous page)*

of symmetry in the court's voir dire of pro- and anti-death-penalty jurors whose written questionnaires presented the same degree of ambiguity." (Conc. Opn., p. 12.) The concurring opinion argues that this asserted lack of symmetry "cannot itself be explained by anything having to do with the [prospective] jurors' demeanor because the disparity in questioning occurred at the very beginning of each juror's voir dire." (Conc. Opn., p. 10.) We note, however, that the trial court had an opportunity to observe B.H.'s demeanor both during the group questioning that preceded individual, sequestered voir dire, and while B.H. responded to the first five questions posed to her on individual voir dire, before it asked the question that the concurring opinion finds to be significantly different from those asked of death-leaning prospective jurors. Moreover, that the court might have had reasonable cause to explain the law to B.H. or to question her more extensively cannot establish a pattern of discriminatory questioning in violation of defendant's rights. (See *People v. Martinez, supra,* 47 Cal.4th at p. 447 [small sample of jurors allegedly disparately questioned insufficient to establish a practice of bias where court questioned over 150 venirepersons].) We discuss this prospective juror in more detail, *post.*

Prospective Juror C.Z. left many answers on the questionnaire blank, including all the questions related to the death penalty. Her oral voir dire revealed she had limited English skills, but she did clearly state, "I don't like to judge a person, how you say, I don't believe in the death penalty or anything like that," and "not for me to say, no, sir." She also affirmed that she could never vote for the death penalty under any circumstances, regardless of the nature of the crime or the defendant. Again, the trial court's manner of questioning this prospective juror appeared tailored to her "individual characteristics" and was not an abuse of discretion. (*People v. Mills, supra,* 48 Cal.4th at p. 190.)

43

practical possibility the juror could consider either penalty option" sufficient to satisfy *Witt*].)  The court had the opportunity to assess each prospective juror's demeanor, both before and during questioning, and to evaluate whether each was sincerely expressing his or her views.  Although the court did not explain the law in detail to these venirepersons, this omission was not an abuse of discretion in light of their questionnaire responses and the questions the court did ask.  (See *People v. Thornton, supra,* 41 Cal.4th at p. 425.)  Because the trial court who "observes and speaks with a prospective juror . . . gleans valuable information that simply does not appear on" the cold record (*People v. Stewart, supra,* 33 Cal.4th at p. 451), we normally defer to that court's determination that further questioning would not be fruitful (*People v. Mills, supra,* 48 Cal.4th at p. 190), and we do so again here.  Further the court here did not prevent defendant from asking follow-up questions in an effort to rehabilitate these prospective jurors.  Defense counsel did so on several occasions, but for the most part even he did not see the need to explain to these individuals the phases of a death penalty trial or the duty of a juror to set aside personal beliefs.  (Cf. *People v. McKinnon* (2011) 52 Cal.4th 610, 644 [when counsel, advised of the court's intention to excuse a prospective juror, declined an opportunity for further voir dire to clarify the prospective juror's views, we assume "counsel accepted that the record as it stood was sufficient to support the intended ruling"].)

Although the foregoing is sufficient to resolve defendant's claim of biased questioning, we additionally note the remainder of the voir dire record does not support defendant's contention.  The court excused death-leaning Prospective Jurors D.M., D.Mi. I, and L.S. without extensive efforts at rehabilitation.  The court also engaged in lengthy questioning — including an explanation of the phases of a capital case and the duty of a juror to weigh aggravating and mitigating evidence in deciding penalty — with Prospective Jurors M.V. and

44

D.Mi. II, both of whom expressed hesitation about imposing the death penalty in their written and/or oral responses. These examples illustrate the court's effort to be fair.

In sum, we reiterate that trial courts must be scrupulously " 'evenhanded' " in conducting death qualification voir dire. (*People v. Mills, supra,* 48 Cal.4th at p. 189; accord, *People v. Champion* (1995) 9 Cal.4th 879, 908-909.) Given the "broad discretion" traditionally afforded to trial courts in this context (*People v. Mills, supra,* 48 Cal.4th at p. 189), we conclude the court's manner of conducting voir dire in this case did not rise to the level of abuse of discretion, bias, lack of impartiality, or fundamental unfairness, and we reject defendant's claim that the voir dire was inadequate.

Finally, in addition to his threshold procedural claim regarding the manner of the court's voir dire, defendant also asserts the court erred substantively by applying different and more stringent criteria to evaluate life-leaning prospective jurors than it applied to death-leaning prospective jurors. As in previous cases, we address this claim on the merits notwithstanding defendant's failure to object on these precise grounds in the trial court. (*People v. Clark, supra,* 52 Cal.4th at p. 902, fn. 10; *People v. Martinez, supra,* 47 Cal.4th at p. 439, fn. 8; *People v. Thornton, supra,* 41 Cal.4th at pp. 419-425.) We conclude the claim lacks merit. The record demonstrates the court excused for cause both death-leaning and life-leaning prospective jurors whose questionnaire responses and oral voir dire, taken together, left the court with the " ' "definite impression" ' " (*People v. Abilez, supra,* 41 Cal.4th at p. 498) that they would never, under any circumstances, impose one or the other of the penalty options, and thus that their personal beliefs about the death penalty would " 'prevent or substantially impair the performance of [their] duties as a juror.' " (*Witt*, *supra*, 469 U.S. at p. 424.) Conversely, the court did not excuse prospective jurors who, although expressing serious

45

reservations about or difficulty with imposing one penalty or the other, did not leave such an impression. These included Prospective Juror R.L., who stated "I think so" and "I think I could" impose life; Prospective Juror M.A., who stated she would find it "difficult" to impose life; Prospective Juror M.V., who stated he would "struggle" with the decision to impose death; Prospective Juror D.S., who stated he "possibly" could impose death; Prospective Juror D.Mi. II, who stated imposing death would be "difficult"; Prospective Juror L.B., who said "I think I could" impose death; and Prospective Juror K.T., who said he would have "reservations" about imposing death. We find no merit to defendant's contention that the court applied disparate substantive standards when evaluating prospective jurors.

### d. Assertedly erroneous denials of defense challenges for cause

Defendant contends the court erroneously denied his challenges for cause to 15 of the prospective jurors discussed in the previous part: Prospective Jurors J.E., I.W., Y.C., M.E., J.J., J.M., R.Z., R.L., S.W., F.G., M.A., C.Pa., M.S., L.V., and G.T. He alleges the erroneous denials cumulatively "stacked" the jury pool against him, inhibited the exercise of defense peremptory challenges, and resulted in a biased and pro-death-penalty jury being chosen.

"As a general rule, a party may not complain on appeal of an allegedly erroneous denial of a challenge for cause because the party need not tolerate having the prospective juror serve on the jury; a litigant retains the power to remove the juror by exercising a peremptory challenge. Thus, to preserve this claim for appeal we require, first, that a litigant actually exercise a peremptory challenge and remove the prospective juror in question. Next, the litigant must exhaust all of the peremptory challenges allotted by statute and hold none in reserve. Finally, counsel (or defendant, if proceeding pro se) must express to the

trial court dissatisfaction with the jury as presently constituted."[16] (*People v. Mills, supra,* 48 Cal.4th at p. 186; accord, *People v. Jones, supra,* 54 Cal.4th at pp. 45-46.) "In addition, the issue may be deemed preserved for appellate review if an adequate justification for the failure to satisfy these rules is provided." (*People v. Mills, supra,* at p. 186, fn. 8; see also *People v. Wilson* (2008) 43 Cal.4th 1, 34 (conc. opn. of Werdegar, J.).)

Here, although defendant employed peremptory challenges against Prospective Jurors J.E., J.J., M.E., R.L., and L.V., he used only 16 of his 20 allotted peremptory challenges during selection of the regular jurors and none of his four allotted peremptory challenges during selection of the alternate jurors. Nor did defendant express any dissatisfaction with the jury ultimately selected, or request additional peremptory challenges. "[T]he existence of unused peremptory challenges strongly indicates defendant's recognition that the selected jury was fair and impartial." (*People v. Davis* (2009) 46 Cal.4th 539, 581.)

In an apparent attempt to justify his failure to exhaust peremptory challenges, defendant claims the court's biased questioning and assertedly erroneous denials of challenges for cause so "stacked" the pool with death-leaning jurors as to "overwhelm" the defense peremptory challenges and render their exercise "irrelevant." He speculates that even had the defense used all of its peremptory challenges, "a biased jury would still have resulted . . . due to the Court's ability and demonstrated inclination to 'seed' the panel with pro-death-biased prospective jurors in a quantity sufficient to overwhelm the defense

---

**16** All three of these requirements apply to any case tried after our decision in *People v. Crittenden* (1994) 9 Cal.4th 83, at page 121. (See *People v. Mills, supra,* 48 Cal.4th at pp. 186-187.) This case was tried in 1996; therefore, the post-*Crittenden* rule applies.

47

peremptory challenges." He asserts, "it would have been futile to challenge too many of the earlier chosen objectionable jurors, beyond the extremely biased, if the remaining eligible pool had an equal or possibly even higher proportion of objectionable jurors." Moreover, he claims, "the presence in the pool of so many 'rehabilitated' jurors with extreme pro-death-penalty biases" also prejudiced him because "challenging the moderately biased risked their substitution with the extremely biased." Thus, defendant contends, his objection to the court's questioning methodology and his challenges for cause to specific prospective jurors were sufficient in and of themselves to preserve his claim for appeal.

Defendant's argument fails both factually and legally. On a factual level, we have concluded in the previous part that the trial court did not improperly rehabilitate pro-death-penalty prospective jurors or otherwise exhibit bias in its voir dire questioning. Accordingly, defendant's assertion that the exercise of additional peremptory challenges would have been futile rests on nothing but speculation. On a legal level, we rejected a similar argument in *People v. Mills, supra,* 48 Cal.4th 158. There, the defense exercised all but one of its allotted peremptory challenges. On appeal, defendant argued his failure to exhaust peremptory challenges was justified because he needed to hold one peremptory challenge in reserve in the event he needed it to excuse a particular prospective juror, L.S., whom he claimed "was strongly pro-death-penalty." (*Id*. at p. 186.) We disagreed, reasoning "acceptance of this excuse would swallow the rule entirely, for a defense attorney might in every case wish to hold challenges in reserve for strategic reasons." (*Ibid.*) Here, defendant in essence argues he needed to hold four peremptory challenges in reserve in case he needed to challenge any of the assertedly death-leaning prospective jurors whom the court had improperly rehabilitated. *Mills,* however, forecloses the argument.

48

For the first time in the reply brief, defendant appears to modify his argument that his failure to exhaust peremptory challenges was justified. He contends, without citation to the record, that after jury selection was completed the only prospective jurors remaining in the pool were nine extremely pro-death-penalty venirepersons whom the court had improperly rehabilitated: J.O., Y.C., J.M., R.Z., S.W., F.G., M.A., C.Pa., and M.S. The court had denied defendant's for-cause challenges to eight of these prospective jurors. Thus, he claims, "no amount of challenges . . . could have improved the jury" ultimately selected.

Were defendant correct that only these nine prospective jurors remained the in the pool, and had he expressed dissatisfaction with the jury ultimately selected and requested additional peremptory challenges, we might agree that defendant's failure to exhaust his peremptories was justified and reach the merits of his claim that the trial court erroneously denied his challenges for cause. In *People v. Clark,* we reached the merits of defendant's claim that the trial court erroneously denied defense challenges for cause when defense counsel: (1) used peremptory challenges to remove some of the complained-of prospective jurors, but declined to use her final peremptory challenge because the person in line to fill the next vacancy in the jury box was a prospective juror whom defendant had unsuccessfully challenged for cause; (2) expressed dissatisfaction with the jury as then constituted; and (3) asked for additional peremptory challenges. (*People v. Clark, supra,* 52 Cal.4th at pp. 901-902.)

Our review of the record, however, does not support defendant's contention that the only persons who had not yet been called to the jury box after jury selection was completed were the nine he identifies. As noted above, following hardship excusals, the court and counsel individually questioned 158 prospective

49

jurors. During this phase, 73 were excused for cause or for hardship, leaving 85 eligible prospective jurors at the start of the exercise of peremptory challenges.[17] During selection of the 12 regular jurors, defendant exercised 16 peremptory challenges and the prosecution exercised 15, leaving 42 prospective jurors remaining when the selection of alternate jurors began. These 42 included, of course, those ultimately selected as alternate jurors: A.H., R.W., R.T., and M.L. Defendant does not claim any of these four individuals was biased or improperly rehabilitated, and he did not challenge any of them for cause. Had defendant exercised all of his peremptory challenges during selection of the regular jurors, one or more of them might have been seated on the regular jury. During the selection of alternate jurors, defendant exercised no peremptory challenges and the prosecution exercised four; one person called to the jury box was excused based on a late-developing hardship. Thus, by our calculation, even after selection of the alternate jurors, 33 venirepersons remained in the pool and on the random list. Defendant has not shown, with citations to the record, that the nine he claims were unacceptable were next in line to fill vacancies in the jury box. (Cf. *People v. Clark, supra,* 52 Cal.4th at pp. 901-902.) Accordingly, we find no merit to defendant's contention that the exercise of additional defense peremptory challenges would have been futile. His claim that the court erroneously denied defense challenges for cause is thus forfeited.

---

**17** As explained above, following the exercise of challenges for cause the court generated a "random list" of the remaining prospective jurors, which was supplied to counsel. During the exercise of peremptory challenges, prospective jurors were called to be seated in the jury box in the order appearing on the random list. The "random list" is not part of the record on appeal. Absent evidence to the contrary, we presume the random list included all 85 prospective jurors remaining after the exercise of challenges for cause.

50

Even were we to find the claim preserved for review, however, we would reject it on the merits. To prevail on this claim, "defendant must demonstrate that the court's rulings affected his right to a fair and impartial jury." (*People v. Yeoman* (2003) 31 Cal.4th 93, 114.) Here, none of the 15 identified prospective jurors sat on defendant's jury. (*Ibid.*; accord, *People v. Mills, supra,* 48 Cal.4th at p. 187.) Further, although defendant used five of his peremptory challenges to remove some of these 15 from the jury, the loss of a peremptory challenge in this manner " 'is grounds for reversal only if the defendant exhausts all peremptory challenges *and an incompetent juror is forced upon him.*' " (*People v. Hillhouse* (2002) 27 Cal.4th 469, 487, italics added, quoting *Ross v. Oklahoma* (1988) 487 U.S. 81, 89.) Here, defendant did not challenge for cause any of the 12 jurors who decided his case.[18] Moreover, as we explain *post*, none of the 12 jurors was biased against defendant. Because defendant "was not forced to tolerate an incompetent juror" as a result of having used peremptory challenges to excuse the five prospective jurors identified above, and because none of the 10 other prospective jurors whom defendant unsuccessfully challenged sat on his jury, the court's assertedly erroneous denials of challenges for cause "could not have affected [defendant's] right to be tried by a fair and impartial jury." (*People v. Mills, supra,* at p. 187.)

> e. *Assertedly erroneous excusals for cause*

Defendant contends the trial court erred by excusing Prospective Jurors M.F. and B.H. "primarily based on their written answers to the juror questionnaire . . . without making any rehabilitative efforts similar to those made for" death-

---

[18] Nor did he challenge for cause any of the alternate jurors; however, none participated in either the guilt or the penalty deliberations.

leaning prospective jurors.  He contends the court's "short and quick" questioning was designed to eliminate these prospective jurors as quickly as possible.

Prospective Juror M.F. wrote on his questionnaire that he opposed the death penalty, explaining "I feel by the time the accused is put to death he must [be] tried over & over again.  Life imprisonment seems more economical."  He wrote he did not believe everyone convicted of the shotgun robbery murder of an elderly man should be put to death.  He wrote he believed the death penalty was used too often, explaining "Don't feel we need to keep having trials to keep someone alive after he's already been given the death sentence."  When asked to identify crimes for which the death penalty was appropriate, he wrote, "I am opposed to the death penalty but I don't know how I would feel if the crime involved one of my family."  Asked to identify crimes for which that penalty was inappropriate, he wrote, "death penalty is inappropriate I believe in life imprisonment."  He wrote if defendant were found guilty of first degree murder with special circumstances he would automatically vote for life in prison without parole because it is "punishment enough," and he would not want to know anything about defendant before deciding on the penalty.  He wrote he did not believe in the "eye for an eye" principle, and although he would accept the court's assurance that the sentence of life in prison without possibility of parole meant exactly that, the costs of imprisonment and appeals would be a consideration for him in deciding penalty because "I read an article a few years back stating life imprisonment is actually more cost effective."  Tellingly, he wrote he would not listen open-mindedly to the evidence at the penalty phase and base his decision on such evidence and the court's instructions, and he could not set aside his personal feelings regarding what the penalty should be and follow the law because he "can't see spending tax dollars on [appeals] for death penalty verdicts."  Finally, he wrote that he would

52

automatically vote against the death penalty and for life in prison without parole in every case, regardless of the evidence introduced at the penalty phase.

As explained *ante,* at pages 40-41, on voir dire the court first asked M.F. whether it was correct that he opposed the death penalty, and he said "Yes." The court then asked whether, if defendant were found guilty of the charged crime and the special circumstances were found true, there were "any circumstances" under which M.F. felt he would vote for the death penalty, and he responded, "No, I don't." Probing further, the court asked whether M.F. believed he could vote for the death penalty if the evidence showed "the crime was exceedingly vicious and callous and horrible" and the defendant "was a particularly vicious, brutal, horrible person," and M.F. again responded, "I don't believe I could." The prosecutor challenged M.F. for cause, and the court excused him. Defendant did not object to the excusal; nor did he ask for the opportunity to question M.F.[19]

The record amply supports the trial court's conclusion that M.F.'s views about the death penalty would prevent or substantially impair the performance of his duties as a juror. M.F.'s written responses on the juror questionnaire were consistent and unambiguous. He consistently wrote that he would automatically vote against the death penalty and in favor of life in prison without parole if the case reached the penalty phase, and that he could not set aside his personal

---

[19] Because this case was tried before our decision in *People v. McKinnon, supra,* 52 Cal.4th 610, no objection in the trial court was required to preserve for review defendant's claim of error in excusals for cause. (See *id.,* at pp. 635-643 [adopting, prospectively only, a requirement of a contemporaneous objection to an allegedly erroneous *Witherspoon/Witt* excusal to preserve the issue for appeal], overruling *People v. Velasquez* (1980) 26 Cal.3d 425, 443.) We may consider defendant's failure to object to these excusals, however, to the extent it supports our conclusion that the excusals were proper. (*People v. McKinnon, supra,* at pp. 644, 650, 651.)

53

opposition to the death penalty in deference to the law. On oral voir dire he confirmed there were no circumstances under which he could vote to impose the death penalty, even if the evidence showed the crime to be extremely aggravated and the defendant unredeemable. Because the court had the opportunity to assess M.F.'s demeanor, we defer to its implicit assessment that his responses were credible. (*People v. Stewart, supra,* 33 Cal.4th at p. 451; see *Uttecht*, *supra*, 551 U.S. at p. 9.) On this record, we have no trouble concluding the court did not err in finding M.F. would be substantially impaired in this case.

Prospective Juror B.H. wrote on her questionnaire that she opposed the death penalty, but did not provide an explanation. She wrote that she did not believe everyone convicted of the shotgun robbery murder of an elderly man should get the death penalty. She wrote that she "do[esn't] hear" of the death penalty being used too often. Asked to identify those crimes for which she believed the death penalty should be mandatory, possible or appropriate, she wrote "No. ?" and "None. ?" She also wrote, however, that the death penalty was inappropriate "under no circumstances." She wrote that she would not automatically vote for the death penalty if defendant were convicted of murder with special circumstances, but answered "No ?" to the counterpart question asking whether she would vote automatically for life in prison without parole. She wrote that she would want to know "nothing" about defendant before deciding on the penalty, that she did not believe in the "eye for an eye" principle, and that she could accept the court's assurance that a sentence of life in prison without parole would mean exactly that. She wrote that the costs of incarceration for life would be a consideration in her penalty decision, explaining "I feel it would be better [than] the death penalty." She further wrote that she would vote against a verdict of guilt, or against finding the special circumstances true, in order to avoid having to decide the penalty because "I feel against the death penalty." She also wrote

that she would automatically vote against the death penalty in every case, regardless of the evidence, because "[I'm] against the death penalty." Notably, however, B.H. wrote that she could set aside her personal feelings regarding what the penalty should be, listen to the evidence, and follow the law and the court's instructions.

The voir dire of Prospective Juror B.H. proceeded as follows:

The Court: "All right. First of all, in answer to Question 9, you indicated that you oppose the death penalty, correct?"

Prospective Juror B.H.: "Yes."

The Court: "And then in 10 and 11 . . . you were asked to explain your views on the death penalty. You left that blank."

Prospective Juror B.H.: "Uh-huh."

The Court: "And can you explain either, A, why you left it blank, or B, what your views are?"

Prospective Juror B.H.: "Because I didn't know what to put down."

The Court: "Okay. So you just weren't sure what to say?"

Prospective Juror B.H.: "Uh-huh."

The Court: "And have your views on the death penalty changed over time?"

Prospective Juror B.H.: "No."

The Court: "I'm not clear here on some of your answers exactly what you feel here. [¶] Is your feeling about the death penalty such that under no circumstances could you vote to approve it?"

Prospective Juror B.H.: "Under no circumstances."

The Court: "None whatsoever?"

Prospective Juror B.H.: "None whatsoever."

The Court: "Okay. So if — even if this were the most horrible crime in history?"

Prospective Juror B.H.: "Even if."

The Court: "And even if the defendant was the worst person in history, you could not — "

Prospective Juror B.H.: "I don't believe in it."

The Court: "All right. Thank you, ma'am. You're excused."

Defense counsel did not object to the excusal; nor did he ask for the opportunity to question B.H.

The record amply supports the trial court's conclusion that B.H.'s views regarding the death penalty would prevent or substantially impair the performance of her duties as a juror in this case. Although her written questionnaire responses were somewhat ambiguous, her answers on oral voir dire made it quite clear that because of her beliefs, she was unwilling to vote to impose the death penalty under any circumstances, even if this were the most "horrible crime in history." Again, the court had the opportunity to assess B.H.'s demeanor, and we defer to its implicit assessment that her responses were credible. (*People v. Stewart, supra,* 33 Cal.4th at p. 451; see *Uttecht*, *supra*, 551 U.S. at p. 9.) No abuse of discretion appears.

Defendant argues deference to the trial court's rulings on these challenges for cause is unwarranted because the court ruled primarily on the basis of the written questionnaires, without any in-depth questioning. He likens this case to *Stewart,* in which we concluded the trial court had erred by excusing five prospective jurors for cause based solely on their written responses to the juror questionnaire. (*People v. Stewart, supra,* 33 Cal.4th at pp. 440-454.) In doing so, we did not defer to the trial court's assessment because it was "informed by no more information than the cold record of the five prospective jurors' check marks

56

and brief handwritten comments — the exact same information" we had before us. (*Stewart, supra,* at p. 451; accord, *United States v. Chanthadara* (10th Cir. 2000) 230 F.3d 1237, 1270 ["because the trial court here was not in a position to observe [the prospective juror's] demeanor, it was in no better position than an appellate court to assess her answers"].) Defendant argues the same reasoning applies here because the court's oral questioning was so brief.

We disagree. Unlike in *Stewart,* here the court did not base its decision solely on M.F.'s and B.H.'s written responses to the questionnaire. Instead, the court questioned them orally and in person, outside the presence of other jurors. It thus had the opportunity to assess their demeanor, both before and during questioning, as well as the sincerity of their responses. Even a brief session of oral voir dire such as occurred here provides valuable information to the trial court that is unavailable from a review of the cold record. Here, the court had a sufficient opportunity to observe the prospective jurors' demeanor, tone of voice, apparent level of confidence, facial expressions and body language. (See *People v. Stewart, supra,* 33 Cal.4th at p. 451; see also *Uttecht*, *supra*, 551 U.S. at p. 9; *Witt, supra,* 469 U.S. at p. 426 ["deference must be paid to the trial judge who sees and hears the juror"].) Moreover, as explained above, we defer to the trial court's implicit determination that additional questioning would not have rendered these prospective jurors eligible to serve. (*People v. Mills, supra,* 48 Cal.4th at p. 190; *People v. Martinez, supra,* 47 Cal.4th at p. 446.) We do so because that determination itself was based on all the circumstances, including the individual's questionnaire responses, his or her responses on oral voir dire, and his or her demeanor in court. It follows that we likewise must defer to the trial court's ultimate assessment of the credibility of statements the prospective jurors made in response to the court's questioning.

Defendant contends, nonetheless, that the evidence cited above failed to establish a proper basis for excusing M.F. and B.H.  Relying on the proposition that prospective jurors "who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law" (*Lockhart v. McCree, supra,* 476 U.S. at p. 176), he complains these prospective jurors were not given the opportunity to state they could set aside their personal beliefs.  We disagree.  Here, Prospective Juror M.F. twice wrote on his questionnaire that he would be unable to set aside his personal beliefs and apply the law.  The trial court, having assessed M.F.'s demeanor, was entitled to credit those responses.  Although B.H. stated on her questionnaire that she could set aside her personal views, her clear answers on oral voir dire contradicted those statements.  The trial court, "aided as it undoubtedly was by its assessment of [B.H.'s] demeanor, was entitled to resolve [any ambiguity] in favor of the State." (*Witt, supra,* 469 U.S. at p. 434.)  Defendant also notes that in *Stewart* we held the prospective jurors' "bare written response[s]" were insufficient to establish a basis for exclusion for cause absent clarifying follow-up questioning "during which the court would be able to *further explain the role of jurors in the judicial system*, examine the prospective juror's demeanor, and make an assessment of that person's ability to weigh a death penalty decision." (*People v. Stewart, supra,* 33 Cal.4th at p. 448, italics added.)  By this statement, we did not suggest that a trial court is in all instances *required* during oral questioning to explain the role of jurors in the judicial system.  Rather, as explained above, trial courts possess considerable discretion to formulate the questions to be asked on voir dire and to tailor those questions to the needs of each individual prospective juror.  (*People v. Mills, supra,* 48 Cal.4th at pp. 189-190; *People v. Martinez, supra,* 47 Cal.4th at p. 446; *People v. Thornton, supra,* 41 Cal.4th at pp. 419-425.)  Here, the trial court

58

reasonably could have concluded an explanation of the role of jurors in the judicial system was not "likely to render [M.F. and B.H.] qualified to sit in a capital case." (*People v. Mills, supra,* at p. 190.)

Finally, relying on *People v. Heard* (2003) 31 Cal.4th 946, defendant asserts the trial court "could easily have followed up with additional questions designed to probe beneath the surface questionnaire responses," and could have "provided an explanation of the governing legal principles" and explored M.F.'s and B.H.'s ability to follow them. In *Heard,* we determined that a prospective juror's response to a single question on the questionnaire was insufficient to support his removal for cause when the juror later changed that response on oral voir dire after an explanation of the governing legal principles. (*Id.,* at pp. 964-965.) We further noted that the prospective juror's responses on oral voir dire did not support a conclusion that his views regarding the death penalty would prevent or substantially impair the performance of his duties as a juror, and added, "[i]f the trial court remained uncertain as to whether [Prospective Juror] H.'s views concerning the death penalty would impair his ability to follow the law or to otherwise perform his duties as a juror, the court was free, of course, to follow up with additional questions." (*Id.* at p. 965.) Here, by contrast, M.F. and B.H. were not excused based on questionnaire responses that were contradicted on voir dire. To the contrary, M.F.'s written and oral responses were consistent. Although B.H.'s oral responses contradicted some of her written ones, like M.F.'s they were sufficient to remove any uncertainty from the trial court's mind regarding whether she was unfit to serve as a juror in this case, and also were adequate to support the court's conclusion that her views would substantially impair the performance of her duties. Under such circumstances, further questioning was not required.

### f.   Assertedly biased jury

Defendant finally contends his jury was composed of biased and pro-death jurors.  Relying principally on the questionnaire responses of the 12 sitting jurors, defendant contends that all either expressed views that would make the death penalty mandatory in all murder cases or had a strong bias in favor of the death penalty.  He further asserts that four jurors had been crime victims or had family members who were crime victims, five had connections with law enforcement, two had "opinions" regarding mental health testimony, and all 12 had personal experience with alcohol and/or drugs.

Defendant did not challenge for cause any of the seated jurors; nor did he exhaust his peremptory challenges or object to the jury as constituted at the completion of jury selection.  His claim therefore fails unless he can prove actual bias.  (*People v. Foster* (2010) 50 Cal.4th 1301, 1325, citing *Johnson v. Armontrout* (8th Cir. 1992) 961 F.2d 748, 754.)  " 'Actual bias' is 'the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party.' " (*People v. Foster, supra,* at p. 1325, quoting Code Civ. Proc., § 225, subd. (b)(1)(C).)

Our review of the record reflects none of the 12 jurors who decided defendant's case exhibited actual bias against him.  Defendant relies primarily on the jurors' questionnaire responses in claiming they held disqualifying views on the death penalty and other matters.  But as noted above (*ante,* at p. 32), the parties and the court in this case considered the questionnaire to be merely the starting point for the court's assessment of prospective jurors' fitness to serve.  Here, the trial court questioned each of the jurors about most of the questionnaire responses defendant identifies as signifying bias, and both the defense and the prosecution were given the opportunity to question them about any additional areas of

60

concern.[20]  Each juror satisfied the court and apparently counsel on voir dire that he or she could be fair despite holding strong opinions on the death penalty, or having been the victim of a crime, or having relatives or friends in law enforcement, or having personal experience with or opinions about drugs, alcohol, or psychiatric testimony.  Moreover, we have concluded above that the trial court did not exhibit a lack of impartiality in conducting voir dire, thus rejecting defendant's claim that the voir dire was insufficient to uncover juror bias.  On this record, we find no evidence that any juror was actually biased against defendant.

### 2.   *Asserted prosecutorial misconduct*

Defendant contends the prosecutor engaged in misconduct during the voir dire of Prospective Juror T.P.  He asserts that this and other instances of misconduct occurring throughout the trial (see *post,* pts. II.B.2. and II.C.2.), collectively violated his rights to due process of law, to equal protection of the laws, to trial before an impartial jury, and to a reliable sentencing determination under the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution and parallel provisions of the California Constitution, warranting reversal of the guilt, special circumstances and penalty verdicts.

The standards governing this claim are well established.  A prosecutor's conduct violates the federal Constitution when it infects the trial with such unfairness as to make the resulting conviction a denial of due process.  Conduct by a prosecutor that does not rise to this level nevertheless violates California law if it involves the use of deceptive or reprehensible methods to attempt to persuade

---

[20]    To the extent defendant contends his counsel rendered ineffective assistance by conducting a voir dire that was inadequate to uncover juror bias, his claim is more appropriately raised in a petition for writ of habeas corpus.  (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

either the court or the jury. (E.g., *People v. Ayala* (2000) 23 Cal.4th 225, 283-284; accord, *People v. Clark, supra,* 52 Cal.4th at p. 960.) To preserve a prosecutorial misconduct claim for appeal, the defendant " 'must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety' " unless doing so would be futile or an admonition would not cure the harm. (*Clark,* at p. 960.) As we shall explain, we conclude defendant has forfeited several of his claims, and in any event fails to establish any misconduct occurred.

During the individual, sequestered, portion of the voir dire, Prospective Juror T.P. mentioned he had problems with reading and writing, and also with remembering names. T.P. said he could remember the substance of what witnesses said, however, and would be able to avoid confusion by asking other jurors during deliberations to identify witnesses by what they said or by their physical characteristics. T.P. also indicated he would not feel bad asking other jurors for help if he had difficulty reading any of the exhibits. The prosecutor then asked, "Assuming, sir, that at some point in the trial you got handed . . . a stack, oh yay-high, of documentary evidence, primarily court papers. Is your difficulty with reading such that you would not be able to read those for yourself?" T.P. responded, "I don't think so. But it would take me a long time to do it." After further discussion of T.P.'s problems with name confusion, T.P. volunteered, "My biggest problem would be a big stack if — if I didn't have enough time to go through it." T.P. agreed it would take him "a while" to read such papers.

After the trial court denied the prosecutor's challenge for cause, the following exchange occurred in the presence of T.P.:

The prosecutor: "May I address the point, Your Honor?"

The Court: "Briefly."

The prosecutor: "Thank you. [¶] The Court has indicate[d] to Mr. [P.] twice that he can get the assistance of other jurors to tell [him] what the evidence is. And I don't think he gets the services of a reader in jury deliberations to decide on the validity of the prior convictions. That troubles me greatly."

The Court: "Well —"

Defense counsel: "Now I'm going to have to challenge for cause because the subject of prior convictions has come up in voir dire."

The Court: "Okay."

The prosecutor: "I apologize. I didn't realize I had said it that way."

The Court: "All right, sir. You're excused."

Defendant contends that even if the prosecutor's comment was inadvertent, it compromised the fairness of the trial because it caused the defense to lose a prospective juror it had previously passed for cause, allowed the prosecution to remove a prospective juror it had unsuccessfully challenged for cause, and contributed to the overall asserted pro-death bias of the jury.

Defendant's claim fails. Defendant's right to a fair and impartial jury did not entitle him to a jury composed of any particular individuals. (*People v. Thomas* (1990) 218 Cal.App.3d 1477, 1486, citing *People v. Howard* (1930) 211 Cal. 322, 325.) Moreover, the prosecutor's comment did not render the trial fundamentally unfair. No other prospective juror was exposed to the comment; T.P. himself was excused; and as we have concluded above, defendant has not established that either the process of jury selection or the jury itself lacked impartiality.

**B. Guilt Phase Issues**

### 1. Accomplice corroboration

Section 1111 prohibits a conviction based "upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense." Defendant raises several contentions based on this provision. Specifically, he asserts the trial court erred by denying his motion for a directed verdict based on insufficient non-accomplice corroborating evidence. He further contends the court erred by failing to instruct the jury that John Richie was an accomplice as a matter of law and that it was to view the testimony of the accomplices with distrust. He argues these errors deprived him of his rights under state law and to due process of law and fundamentally fair and reliable guilt and penalty determinations under the Fifth, Eighth and Fourteenth Amendments to the federal Constitution, and require that we set aside his convictions for first degree murder and robbery as well as the jury's special circumstances and penalty determinations. As we shall explain, we conclude defendant's claims lack merit.

### a. Sufficiency of the evidence

Defendant's accomplices, Melissa Fader and Michelle Joe, provided the primary testimony regarding what occurred at the Nebraska Avenue house on the night Sherman Robbins was killed. John Richie testified about events occurring before the robbery and murder, and both he and Rick Saso testified about events occurring afterward.

At the conclusion of the presentation of the prosecution's guilt phase case-in-chief, defendant moved for a judgment of acquittal under section 1118.1, based

on assertedly insufficient nonaccomplice corroborating evidence.[21]  Defense counsel pointed out that the parties had assumed Richie's testimony that defendant had admitted the murder to him would corroborate the testimony of Joe and Fader. And yet, counsel asserted, because Richie had testified he was aware of a plan to commit a burglary, and Joe testified Richie gave her a pair of gloves, Richie was an aider and abettor whose testimony could not be used to corroborate the other accomplices.  Counsel further argued there was no other independent, uncontradicted evidence connecting defendant either to the stolen property or to the murder.  In response, the prosecutor conceded that Richie "might fall into the category of maybe he's a co-conspirator, but he doesn't fall into the category of he's clearly a co-conspirator."  In any event, the prosecutor continued, Saso's testimony that he gave drugs to defendant in exchange for "stolen property coming out of" the burglary was sufficient independent corroboration to connect defendant to the robbery and murder of Robbins.  The trial court denied the section 1118.1 motion, concluding that the evidence did not establish Richie was an accomplice, and that Saso's testimony provided "further corroboration."

Defendant contends the court's ruling was error; we disagree.  "In ruling on a motion for judgment of acquittal pursuant to section 1118.1, a trial court applies the same standard an appellate court applies in reviewing the sufficiency of the evidence to support a conviction, that is, ' "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence

---

[21]    Section 1118.1 provides in pertinent part:  "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

of the existence of" ' " the elements of the charged offense. (*People v. Cole* (2004) 33 Cal.4th 1158, 1212-1213; accord, *People v. Dement* (2011) 53 Cal.4th 1, 46.) Substantial evidence is defined as "evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Cole, supra,* at p. 1212; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320; *People v. Johnson* (1980) 26 Cal.3d 557, 578.) " 'Where the section 1118.1 motion is made at the close of the prosecution's case-in-chief, the sufficiency of the evidence is tested as it stood at that point.' [Citation.]" (*People v. Cole, supra,* at p. 1213.) "We review independently a trial court's ruling under section 1118.1 that the evidence is sufficient to support a conviction." (*Ibid.*)

An accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.) The testimony of accomplices must be corroborated by "such other evidence as shall tend to connect the defendant with the commission of the offense." (*Ibid.*) Such evidence may not come from, or require " 'aid or assistance' " from, the testimony of other accomplices or the accomplice himself. (*People v. Davis* (2005) 36 Cal.4th 510, 543; *People v. Perry* (1972) 7 Cal.3d 756, 769.) The evidence, however, need not corroborate every fact to which the accomplice testifies. (*People v. Davis, supra,* at p. 543; *People v. Gurule* (2002) 28 Cal.4th 557, 628.) " 'Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense. [Citations.]' . . . The evidence 'is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' [Citation.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 370.)

The trial court instructed the jurors that Joe and Fader were accomplices as a matter of law and it was up to them to decide if Richie was an accomplice. Here, ample evidence connected defendant to the robbery and murder of Robbins independently of the testimony of any and all of these witnesses.

First, Detective Giles New testified that upon his arrest on April 7, 1994, defendant spontaneously blurted, " 'I was expecting to get picked up sooner or later. Sometimes the best place to hide is right under your noses.' " The jury could have concluded this statement was an admission by defendant of his connection to the robbery and murder. (Evid. Code, § 1220; *People v. Davis, supra,* 36 Cal.4th at pp. 537-538 & fn. 10; *People v. Horning* (2004) 34 Cal.4th 871, 898, fn. 5.) This statement alone was sufficient independent corroboration tying defendant to the crimes to render admissible the testimony of Fader, Joe, and Richie if the jury found Richie was an accomplice.[22] (See *People v. Davis, supra,* at pp. 537-538 & fn. 10, 546 [defendant's admissions and adoptive admissions on jailhouse tape linking him to charged crimes of murder, robbery and kidnapping provided sufficient legal corroboration of accomplice testimony]; *People v. Brown* (2003) 31 Cal.4th 518, 556 [defendant's admissions to crimes of robbery and murder supplied corroborating evidence].)

---

[22] Relying on Richie's testimony that defendant was on parole when the charged offenses occurred, defendant argued to the jury that New's testimony was insufficient to corroborate the accomplice testimony because the jury reasonably could conclude defendant was referring to his status as a parole absconder and not to the robbery and murder. Defendant does not repeat the argument here, and with good reason. Although the jury was instructed that if two reasonable inferences arise from circumstantial evidence, it must accept the inference that points to innocence, on appeal we draw all reasonable inferences in support of the judgment. (*People v. Wader* (1993) 5 Cal.4th 610, 640.) Here, it is reasonable to infer that defendant was referring to the Robbins murder.

Second, Rick Saso testified that he negotiated directly with defendant regarding the amount of drugs he would supply in exchange for two guns, a .22-caliber rifle and a shotgun, located in Richie's apartment. Saso testified he offered defendant 1/16 of an ounce of methamphetamine for the guns, but defendant demanded an "eight-ball." Saso eventually "cheated" defendant "a little bit" and gave him 1.5 grams — less than 1/16 of an ounce. Saso was "sure" he gave the drugs to defendant, not Richie. This evidence, which connected defendant to possession of property stolen from the Nebraska Avenue house, including possibly the murder weapon, also was strong corroboration tying defendant to the robbery and murder of Robbins. (See *People v. Fauber* (1992) 2 Cal.4th 792, 834-835 [nonaccomplice witness's testimony that defendant gave him property proved to have belonged to the victim constituted independent corroboration of accomplice witness].)

Defendant argues Saso's testimony did not tie defendant to the robbery and murder because there was no independent proof that the guns Saso bought at Richie's apartment were the guns stolen from the Nebraska Avenue house. He emphasizes that Saso testified he sold the guns about a week after acquiring them, and the guns themselves were never introduced into evidence. The evidence, however, was sufficient for the jury to infer, independent of the testimony of Fader, Joe and Richie, that the guns Saso bought were taken from the Nebraska Avenue house. Saso described purchasing two guns: a ".22" and a shotgun that he "guess[ed]" was "maybe a 20-gauge." Bill Robbins testified similar guns — a .22-caliber rifle and a Remington 870 12-gauge shotgun — were missing when he returned home from Ireland. Saso also testified that while he was looking at the guns in Richie's living room, he noticed other property including a microwave oven and a "boom box"; Bill Robbins testified that similar property was stolen from his house. The similarity of the guns Saso bought to those stolen from the

Nebraska Avenue house, and their proximity to other property similar to that stolen from the house, supported the conclusion that the guns were proceeds of the crimes. Saso further testified that Joe was acting strangely on the day he bought the guns; she was pacing around the apartment, and seemed "scared," "antsy" and "worried" in a way that was different from how people usually act when they are waiting for their dope. He testified there was "tension" in the air at the apartment, and people were "running around" for the first 45 minutes after his arrival, until defendant emerged from the bedroom and "just wanted to hurry up and get . . . some dope." The jury could have inferred the unusual behavior Saso described indicated consciousness of guilt on the part of Joe and the other occupants of the apartment, further tying the goods sold to Saso to the robbery and murder of Robbins. (Cf. *People v. Avila* (2006) 38 Cal.4th 491, 563 [evidence of defendant's consciousness of guilt may constitute corroborating evidence].)

The evidence also strongly suggested one of the guns sold to Saso was the murder weapon. Saso said one of the guns was "maybe a 20-gauge" shotgun; criminalist Duane Lovaas testified the murder weapon was likely a 12-gauge shotgun through which both 12-gauge and 20-gauge shells had been fired. And Saso testified, without objection from defendant, that the reason he sold the guns was that Richie told him defendant had shot someone with them.

Because the foregoing evidence was sufficient to link defendant to the robbery and murder of Robbins and thus to corroborate the testimony of any and all accomplices, we need not decide whether the trial court properly considered Richie's testimony about defendant's admissions to him as additional corroboration. Finally, to the extent defendant contends the evidence was insufficient as a matter of law to corroborate the accomplice witnesses, his claim fails for the reasons described above.

69

### b.    *Asserted error in accomplice jury instructions*

With regard to accomplices, the court began with lengthy instructions on the general principles of accomplice corroboration.[23]  It then instructed the jury in relevant part as follows:  "If the crime[s] of murder and robbery were committed by anyone, the witnesses Michelle Joe and Melissa Fader were accomplices as a matter of law, and their testimony is subject to the rule requiring corroboration.  [¶]  You must determine whether the witness John Richie was an accomplice as I have defined . . . that term. . . .  [¶]  The defendant has the burden of proving by a preponderance of the evidence that Mr. Richie was an accomplice in the crime charged against the defendant.  [¶] . . . [¶]  Testimony of an accomplice ought to be viewed with distrust.  This does not mean that you may arbitrarily disregard such testimony, but you should give it the weight . . . to which you find it to be entitled after examining it with care and caution and in the light of all the evidence

---

[23]    Thus, the court instructed the jury that an accomplice is a person subject to prosecution for the identical offense charged against the defendant (CALJIC No. 3.10); that a defendant cannot be found guilty based on the testimony of an accomplice unless that testimony is corroborated by other evidence that tends to connect the defendant with the commission of the offense (CALJIC No. 3.11); that to corroborate the testimony of an accomplice, there must be evidence of some act or fact related to the crime which, if believed, by itself and without aid, interpretation or direction from the testimony of the accomplice, tends to connect the defendant with the commission of the crime, but it is not necessary that the evidence establish every element of the crime charged or corroborate every fact to which the accomplice testifies (CALJIC No. 3.12); that the required corroboration may not be supplied by the testimony of other accomplices (CALJIC No. 3.13); and that merely assenting to or aiding or assisting in the commission of a crime without knowledge of the unlawful purpose of the perpetrator and without the intent or purpose to commit, encourage or facilitate the commission of the crime does not make one an accomplice (CALJIC No. 3.14).

70

in the case." These instructions tracked the language of CALJIC Nos. 3.16, 3.19, and 3.18.[24]

Defendant contends the court erred by failing to instruct on its own motion that Richie was an accomplice as a matter of law.[25] An accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.) "To be so chargeable, the witness must be a principal under section 31. That section defines principals as '[a]ll persons concerned in the commission of a crime, whether . . . they directly commit the act constituting the offense, or aid and abet in its commission . . . .' (§ 31.) An aider and abettor is one who acts with both knowledge of the perpetrator's criminal purpose and the intent of encouraging or facilitating commission of the offense. Like a conspirator, an aider and abettor is guilty not only of the offense he intended to encourage or facilitate, but also of any reasonably foreseeable offense committed by the perpetrator he aids and abets." (*People v. Avila, supra,* 38 Cal.4th at p. 564, citing *People v. Hayes* (1999) 21 Cal.4th 1211, 1271, fns. 19 & 20.) "Unless there can be no dispute concerning the evidence or the inferences to be drawn from the evidence, whether a witness is an accomplice is a question for the jury. On the other hand, the court should instruct

---

**24** The court concluded the accomplice portion of the instructions by defining principals (CALJIC No. 3.00) and aiders and abettors (CALJIC No. 3.01), and by describing the "natural and probable consequences" doctrine (CALJIC No. 3.02).

**25** Defendant also contends the court erred by failing to instruct on its own motion that Fader and Joe were accomplices as a matter of law. But as defendant acknowledges, the court instructed the jurors that "[i]f the crime[s] of murder and robbery were committed by anyone, the witnesses Michelle Joe and Melissa Fader were accomplices as a matter of law, and their testimony is subject to the rule requiring corroboration." This instruction was sufficient to satisfy the court's obligation to instruct that Joe and Fader were accomplices as a matter of law.

71

the jury that a witness is an accomplice as a matter of law when the facts establishing the witness's status as an accomplice are ' " 'clear and undisputed.' " ' " (*People v. Williams* (2008) 43 Cal.4th 584, 636; see also *People v. Fauber, supra,* 2 Cal.4th at p. 834.)

Defendant argues that the evidence establishes Richie aided and abetted the burglary of the Nebraska Avenue residence and therefore was chargeable with the reasonably foreseeable robbery and murder of Robbins. He points out that Richie testified he overheard Joe speaking with defendant about a planned burglary when she came over to his apartment on the morning of March 21, 1994, and Joe testified Richie thereafter supplied her with a pair of gloves. Richie further testified that he agreed to babysit Joe's child that evening. Defendant contends Richie's testimony establishes he was aware of Joe's purpose, and argues that because it was not cold that day, Richie's intent in giving Joe the gloves, as well as in agreeing to watch her child, must have been to facilitate the burglary.

We disagree. Neither the facts defendant relies upon nor the inferences to be drawn therefrom were undisputed. (See *People v. Fauber, supra,* 2 Cal.4th at p. 834; see also *People v. Williams, supra,* 43 Cal.4th at pp. 636-637.) First, Joe testified inconsistently regarding who gave her the gloves. On direct examination, Joe said the gloves "came from" Kathy Sisk, but she did not get them from Sisk "personally." Further, she was "not sure" if she got the gloves from Richie, and she also was "not sure" if defendant handed them to her. On cross-examination, Joe said that neither Sisk nor defendant gave her the gloves; rather, she got them from Richie. Richie was not asked and did not testify about whether he gave Joe a pair of gloves. Thus, it was up to the jury to determine who, if anyone, gave Joe a pair of gloves. Moreover, Richie testified that after hearing about the planned burglary he "pleaded" with defendant not to participate, and defendant assured Richie he would not. Thus, even if the jurors concluded Richie gave Joe a pair of

72

gloves and agreed to babysit Joe's child, the evidence defendant describes merely "supports, but does not dictate the conclusion" that Richie acted with the intent to encourage or facilitate the commission of the burglary. (*People v. Fauber, supra,* at p. 834.) The trial court therefore properly instructed the jury to decide whether Richie was an accomplice. (*Ibid.*; accord, *People v. Avila, supra,* 38 Cal.4th at p. 565.)

Defendant argues Richie's involvement in supplying both a buyer for the stolen goods and a location for their sale, and in sharing in the proceeds of the crimes, also supports the conclusion that he was an accomplice. But Richie's sharing in drugs exchanged for the stolen items says little about his intent before the crimes occurred. Further, assisting with the sale of stolen property after the crimes were completed might have subjected Richie to prosecution as an accessory. (See § 32 [An accessory is "[e]very person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony . . . ."].) But an accessory is not liable to prosecution for the identical offense as a principal, and therefore is not an accomplice. (*People v. Horton* (1995) 11 Cal.4th 1068, 1114-1116 [witness's actions after the crime, including retrieving items from defendant's abandoned vehicle and driving defendant to a bus depot, might have implicated witness as an accessory, but did not subject him to accomplice liability]; *People v. Fauber, supra,* 2 Cal.4th at pp. 833-834.)

In any event, even assuming the trial court erred by failing to instruct on its own motion that Richie was an accomplice as a matter of law, such failure was harmless if there was sufficient corroborating evidence in the record. (*People v. Williams, supra,* 43 Cal.4th at pp. 636-638; *People v. Brown, supra,* 31 Cal.4th at p. 556.) As we have explained, ample evidence connected defendant to the crimes

of robbery and murder apart from the testimony of Richie, Fader, and Joe. Any error did not prejudice defendant.

Defendant finally contends the trial court erred by failing to instruct the jury to view with distrust the accomplice testimony of Fader, Joe and Richie. An instruction to view with "distrust" accomplice testimony given on behalf of the prosecution was required in 1996, when this case was tried.[26] (E.g., *People v. Zapien* (1993) 4 Cal.4th 929, 982.) The court, however, instructed that the testimony of accomplices must be viewed with distrust, and further instructed that Fader and Joe were accomplices as a matter of law and that it was up to the jury to determine if Richie was an accomplice. Considering the instructions as a whole, as we must (*People v. Moore* (2011) 51 Cal.4th 1104, 1140), we conclude the jurors would have understood they were to view with distrust the testimony of Fader, Joe, and — if they determined he was an accomplice — Richie. No error appears.

### 2. *Asserted prosecutorial misconduct*

Defendant points to three instances of asserted prosecutorial misconduct that either occurred during the guilt phase or affected the guilt phase. We conclude these claims lack merit.

#### a. *Asserted misconduct during the examination of John Richie*

During the prosecutor's direct examination of John Richie, the following exchange occurred:

---

[26] Two years later we modified this requirement prospectively, holding that henceforth juries should be instructed to view with "caution" the testimony of an accomplice to the extent it "tends to incriminate the defendant." (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.)

The prosecutor: "And Mr. Richie, are you acquainted with the defendant, Daniel Whalen, sitting at the far end of counsel table?"

Richie: "I have known him a very short time."

The prosecutor: "When did you first meet him?"

Richie: "At a place called Butler's Camp years ago."

The prosecutor: "About — how many years ago? Roughly?"

Richie: "Five."

The prosecutor: "Could it have been a little earlier than that, in '87 or '88?"

Richie: "I'm not sure. It was during my — I was living there."

The prosecutor: "Was there some gap of time between the last time you saw him four or more years ago and when you saw him in 1994?"

Richie: "Yes. He — he mysteriously disappeared."

Defense counsel: "Objection, Your Honor. Move to strike all after 'yes.' "

The Court: "Sustained."

Defendant contends the prosecutor engaged in misconduct by questioning Richie about the "gap of time" in his acquaintance with defendant, while knowing the court had ruled references to defendant's prior convictions and incarceration were improper. He argues the jurors would have "readily concluded" defendant's "mysterious disappearance" referred to a period of incarceration.

The prosecutor's questions were proper because they were directed at the length and nature of Richie's relationship with defendant, an area of inquiry relevant to Richie's credibility in testifying against defendant. The questions were designed to show Richie had known defendant only a short period of time and the two were not close — despite the circumstance that they had initially met several years before the crime occurred — and the prosecutor could not reasonably have anticipated Richie's answer. Moreover, the jury would not necessarily have

understood "mysterious disappearance" to refer to a period of incarceration, and in any event the trial court struck the comment on defendant's request. No misconduct, prejudice. or unfairness appears.

### b. *Failure to turn over expert's handwritten notes and photographs*

Department of Justice criminalist John Miller testified that he participated in the investigation of the crime scene on March 23, 1994. Among other tasks, Miller made some sketches, took photographs, collected ballistics evidence, and reconstructed the trajectory of the shot that killed Robbins. Miller concluded that the fatal shot was probably fired from within a few inches of the victim, at an angle of about 30 degrees relative to the floor, and the victim was probably shot in the position in which his body was found.

During cross-examination, defense counsel asked Miller whether he had with him any of the sketches he had made at the crime scene. Miller responded that he had "a single sketch without measurements in my notes." Upon defense counsel's request, Miller produced the sketch along with his notes. Defense counsel attempted to renew his cross-examination, but soon stopped, explaining, "Well, I'm sorry, Your Honor. Despite numerous requests for all handwritten notes, this is the first time I've ever seen this file. I can't adequately cross-examine this witness without having time to review these notes." The court directed Miller to step down, indicating defense counsel could recall him if counsel had any further cross-examination he wished to conduct.

Later that same day, defendant moved for a mistrial, based in part on the prosecution's failure to produce Miller's notes in a timely manner. Defense counsel explained that while copying the notes for defendant's investigator, Miller had discovered seven rolls of film that had been developed but not printed. Counsel pointed out that neither Miller's notes nor the photographs had been

76

"forthcoming" in response to either his letter to the prosecution requesting informal discovery or to the court's order, issued several months before trial, that the prosecution provide discovery of all photographs and handwritten notes. Counsel conceded he was "convinced" the prosecutor had turned over all of the photographs in his possession, which did not include prints from the seven recently discovered rolls of film. Nonetheless, he argued that the failure to turn over the notes and photographs earlier had prejudiced the defense because its investigator had not had an opportunity to determine the evidentiary or exculpatory value of the seven rolls of film and, "oh, half an inch thick sheet of handwritten notes." He continued, "[e]specially I did not have the benefit of those handwritten notes at the time that I consulted with a defense criminalist," and "[h]ad those notes been available to me at that time, I may have been able to direct the criminalist in a new direction." Counsel argued that without the notes, "the criminalist was unable to reach any conclusion other than that which Duane Lovaas [the prosecution's expert] had reached" — that is, that a 12-gauge shotgun shell had been loaded behind a 20-gauge shell and fired into the victim. He added the notes might support alternate theories, such as the theory that two rounds had been fired.

The court denied the mistrial motion, explaining, "we have some time yet in this trial. I would suggest you take those films, have them looked at by your investigator, and if necessary, by your criminalist, and we will see what develops. If it turns out there's some exculpatory evidence there, we'll take a look at it at that time." Defense counsel objected, pointing out, "a number of these photographs are of shoe prints that were apparently taken at the scene of the crime. If we'd have had those back early on, we may have been able to track down some shoes. [¶] Now you're talking two years later. . . . There's not much chance we're going to be able to find those shoes." Finally, regarding Miller's notes,

77

counsel noted that after his criminalist had examined the physical evidence, it had been "packaged up" and returned to the sheriff's department. The court responded that the problem was "not insoluble" and continued, "I would suggest that you let [the defense criminalist] take a look at this stuff, and if he thinks there's anything that he can do about it, certainly [you] can make arrangements for him to do whatever it is he thinks he needs to do."

Defense counsel did not raise the discovery matter again. The defense completed its cross-examination of Miller six days later.

Defendant contends the prosecutor's failure to timely disclose Miller's handwritten notes and the seven rolls of unprinted film prevented effective cross-examination of Miller and amounted to misconduct. We generally analyze such claims under the rubric of *Brady v. Maryland* (1963) 373 U.S. 83, and its progeny. (E.g., *Strickler v. Greene* (1999) 527 U.S. 263; *Kyles v. Whitley* (1995) 514 U.S. 419; *United States v. Bagley* (1985) 473 U.S. 667.) We recently summarized the governing principles: "The federal due process clause prohibits the prosecution from suppressing evidence materially favorable to the accused. The duty of disclosure exists regardless of good or bad faith, and regardless of whether the defense has requested the materials. [Citations.] The obligation is not limited to evidence the prosecutor's office itself actually knows or possesses, but includes 'evidence known to the others acting on the government's behalf in the case, including the police.' [Citation.] [¶] For *Brady* purposes, evidence is favorable if it helps the defense or hurts the prosecution, as by impeaching a prosecution witness. [Citations.] Evidence is material if there is a reasonable probability its disclosure would have altered the trial result. [Citation.] Materiality includes consideration of the effect of the nondisclosure on defense investigations and trial strategies. [Citations.] Because a constitutional violation occurs only if the suppressed evidence was material by these standards, a finding that *Brady* was not

78

satisfied is reversible without need for further harmless-error review. [Citation.]" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1132-1133 (*Zambrano*).)

Because Miller participated in the investigation of the Robbins murder and was employed by an investigating agency, he was part of the prosecution team, and the prosecutor therefore had a constitutional duty to disclose exculpatory, material evidence in Miller's possession regardless whether the prosecutor was personally aware of the existence of the evidence. (See *Zambrano, supra,* 41 Cal.4th at p. 1133; see also *Kyles v. Whitley, supra,* 514 U.S. at p. 437.) Defendant has not, however, met his burden on appeal to affirmatively show that the belatedly disclosed evidence was either exculpatory or material. (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) We cannot ourselves make that determination, because the notes and photographs were not filed or lodged with the trial court and are not part of the record on appeal. (See Cal. Rules of Court, rule 8.610(a)(3).) Nor has defendant established that the delayed disclosure of the notes and photographs denied him a chance to investigate and present a defense. Defendant had several days to review the evidence and to consult with his criminalist before he completed his cross-examination of Miller, and the court left open the possibility that it might grant additional time for investigation, including time for retrieving the ballistics evidence from the sheriff's department, should defendant indicate a need. Defendant has not shown that these measures were insufficient to allow him to effectively cross-examine Miller. Moreover, defendant has not identified any particular evidence he was unable to develop without the notes.

Further, although defendant is likely correct that he lost the opportunity to attempt to match the photographs developed from the seven belatedly discovered rolls of film with an existing pair of shoes, the claim that he could have done so had the film been turned over earlier is speculative at best. (See *Zambrano, supra,*

79

41 Cal.4th at p. 1135.) On cross-examination, Miller testified that all of the photographs depicted shoe prints left near the brush pile on the Nebraska Avenue property. Although the photographs were of sufficient quality to determine the general characteristics of the shoes that left the prints, and one of the print patterns was "distinctive," the photographs probably could not be matched to a particular shoe. Miller further testified he could not determine from the photographs when the shoe prints were made; they could have been left before the crime or after the crime. Accordingly, defendant has not established a reasonable probability of a different result at trial had the notes and photographs been disclosed earlier.[27]

In the reply brief, defendant disavows reliance on *Brady* and its progeny and insists his claim is simply one of prosecutorial misconduct, citing *Berger v. United States* (1935) 295 U.S. 78. We fail to see how this strengthens his claim. *Berger* involved improper examination of witnesses and misleading prosecutorial argument (see *id.* at pp. 85-88) and had nothing to do with the failure to disclose exculpatory information or to comply with a discovery order. In any event, as we have explained, prosecutorial misconduct warrants reversal of a judgment only if it so infects the trial with unfairness as to result in a denial of due process, or involves the use of deceptive or reprehensible methods. (*People v. Ayala, supra,* 23 Cal.4th at pp. 283-284.) Here, defendant conceded below that the prosecutor

---

[27] Defendant also had an independent, statutory right to discovery of "[a]ll relevant real evidence seized or obtained as a part of the investigation of the offenses charged" (§ 1054.1*,* subd. (c)) and "[a]ny exculpatory evidence" (*id.,* subd. (e)). That right, however, extended only to "evidence 'in the possession of the prosecuting attorney or [known by] the prosecuting attorney . . . to be in the possession of the investigating agencies.' (§ 1054.1.)" (*Zambrano, supra,* 41 Cal.4th at p. 1133.) Here, defense counsel conceded the prosecutor did not possess the undisclosed evidence and was not aware of it until it was mentioned during the cross-examination of Miller. No statutory violation appears.

had been unaware of the existence of the undisclosed photographs until they were discovered during trial, and there is no evidence the prosecutor had been aware of the notes; therefore there was nothing deceptive or reprehensible about the prosecutor's conduct. Moreover, for the reasons explained, defendant has not demonstrated that the failure to disclose the notes and photographs in a timely fashion rendered his trial fundamentally unfair. His claim therefore fails.

### c. *Failure to disclose evidence of defendant's alleged rape of Melissa Fader*

Nellie Thompson testified on behalf of the prosecution that in March 1994, Melissa Fader lived in a rented trailer on Thompson's property. According to Thompson, one day that month, Fader came crying to Thompson's door and asked Thompson to give her $5 for a grinder. Thompson did not want the grinder, but gave Fader $5 anyway. Fader left the grinder by Thompson's door. Fader later told Thompson that she had been crying that day because she had been raped.

A short time after Thompson finished testifying, Fader took the stand. Fader testified that after the methamphetamine received from Saso had been divided up, she and defendant ingested some of the drug in Richie's bathroom. Fader returned to the bedroom and began rolling pennies. Defendant entered the room and wanted to "mess around." Fader told defendant she did not want to "mess around," but defendant said " 'you're gonna.' " Fader was afraid of defendant after having heard the gunshot and after defendant pointed a gun at her at the Nebraska Avenue house. She therefore complied with defendant's demand "under force" for the five to 10 minutes required to complete the sex act. Defendant left the bedroom, and Joe took Fader home. About a week later, Fader told Thompson that defendant had raped her on the day she got the grinder, but she did not tell anyone else about it.

81

During a break in Fader's testimony, defendant moved for a mistrial based on the prosecutor's failure to disclose the alleged rape to the defense. Defense counsel argued it was clear from Fader's testimony that the prosecutor was aware Fader would testify that defendant had raped her. Counsel explained, "it's clear from the line of questioning that [the prosecutor] used to get to that point, he knew what was coming, and he didn't tell me anything about it." Counsel argued that the "hidden" testimony was highly prejudicial because defendant had not been charged with rape, and there was no mention of a rape in any police reports that had been provided to the defense.

The prosecutor denied any prior awareness, explaining "I had no clue. All I was doing, as I went through [direct examination], was finding out in as much detail as possible where she was and what she was doing. Because I felt that one of the things I needed to do with Melissa Fader was to corroborate John Richie in terms of setting the time and where different people were at various times. And so I was being as precise with her in that apartment as I was everywhere else. [¶] The first time that I knew about the word rape at all in this case was when Nellie Thompson testified this morning. And I had no idea it had any connection with — to this case. I thought she was just rambling on. [¶] Melissa Fader testified on the stand, I think, the next question or so after she said that — what I asked her was, 'Have you ever told anybody about this?' [¶] And she said, 'No, with the exception of Nellie Thompson.' [¶] There are no reports, because we didn't know."

The trial court denied the mistrial motion concluding, "I'm not convinced and don't believe that [the prosecutor] intentionally sandbagged the defense with this information."

Defendant contends the prosecutor engaged in misconduct and violated both constitutional and statutory duties of disclosure by failing to disclose to the

defense that Fader would testify defendant had raped her. We disagree. The record supports the trial court's conclusion that the prosecutor was unaware of Fader's accusation and did not intentionally hide it from the defense. Fader testified she had never told anyone other than Thompson about the alleged rape. Sheriff's Department Sergeant Darryl Freitas, who retrieved the grinder from Thompson, testified that Thompson did not mention any rape. And defense investigator Alan Peacock testified that Thompson never mentioned the alleged rape to him until the morning she testified. Defendant's argument that the issue "inevitably would have come up" during trial preparation is speculative. As the prosecutor argued, "I don't believe [it] is at all unusual under any circumstances that when a woman gets raped it doesn't get reported." Nor does the prosecutor's pattern of questioning suggest prior knowledge. Rather, the record supports the prosecutor's explanation that he asked Fader detailed questions about the sequence of events throughout her testimony in order to corroborate other witnesses. Accordingly, there is no evidence that the prosecutor knew, or should have known, of the information (cf. *Zambrano, supra,* 41 Cal.4th at pp. 1132-1133 [*Brady* encompasses information about which the prosecutor knows or should know]; § 1054.1 [duty to disclose information "in the possession of the prosecuting attorney or [known to be] in the possession of the investigating agencies"]), and there also is no evidence the prosecutor's methods were deceptive or reprehensible or so unfair as to render the resulting conviction and sentence a denial of due process (see *People v. Ayala, supra,* 23 Cal.4th at pp. 283-284).

In any event, defendant fails to show prejudice. Defense counsel was able to cast doubt on the veracity of Fader's accusation by highlighting its late disclosure and Thompson's motive to help Fader. Further, the evidence of guilt — consisting of eyewitness testimony corroborated by defendant's own admissions — was strong. The prosecutor did not even mention the rape in his opening guilt

phase summation, and addressed it only briefly in rebuttal in response to defense counsel's argument questioning Fader's credibility. At the penalty phase, although the prosecutor during argument briefly mentioned the rape while arguing defendant lacked remorse (see *post*, pt. II.C.2.a.), he did not dwell on it, but rather focused on the lack of mitigating evidence, defendant's prior crimes, the other circumstances of the offense and the impact on the victims. Given the strong evidence of defendant's guilt and other evidence of his callous behavior both during and after the crime, we are satisfied the alleged rape played no role during the jury's guilt phase deliberations and did not weigh heavily in the jury's penalty calculus.

### 3. Asserted jury instruction error

#### a. Asserted error in failing to instruct on theft as a lesser included offense of robbery

The trial court instructed the jury on the elements of robbery (CALJIC No. 9.40), first degree murder under a robbery-felony-murder theory (CALJIC Nos. 8.10, 8.21), first degree premeditated murder (CALJIC No. 8.20), and the robbery-murder special circumstance. (CALJLIC No. 8.80.) The court further instructed on the crime of receiving stolen property as a lesser offense of robbery. (CALJIC No. 14.65.) Defendant did not request, and the trial court did not give, instructions regarding theft.

Defendant now contends the trial court had a duty to instruct on its own motion regarding theft as a lesser included offense of robbery. He contends the error violated state law and deprived him of his rights to a fair jury trial, to due process of law, and to reliable guilt and penalty determinations under the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution and parallel provisions of the California Constitution, requiring that we vacate the guilt, special circumstances and penalty determinations.

84

" 'The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request.' [Citations.] 'That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser.' [Citations.]" (*People v. Rogers* (2006) 39 Cal.4th 826, 866; see *People v. Breverman* (1998) 19 Cal.4th 142, 154 [sua sponte duty]; *People v. Flannel* (1979) 25 Cal.3d 668, 684 [duty upon request].) "Nevertheless, 'the existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense . . . .' [Citation.] Such instructions are required only where there is 'substantial evidence' from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense. [Citations.]" (*People v. DePriest* (2007) 42 Cal.4th 1, 50.)

Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) In general, theft is the felonious taking, carrying, stealing, leading, or driving away of the personal property of another, or the appropriation of property, labor or money by fraudulent means. (§ 484.) "The greater offense of robbery includes all of the elements of theft, with the additional element of a taking by force or fear. [Citation.] If the defendant does not harbor the intent to take property from the possessor at the time he applies force or fear, the taking is only a theft, not a robbery. [Citations.]" (*People v. Davis, supra,* 36 Cal.4th at p. 562.)

Defendant argues he was entitled to a theft instruction because there was substantial evidence from which the jury could have concluded that the guns — the main proceeds of the crimes and the only proceeds to be taken by defendant personally and exchanged for drugs — were removed from the house after the

victim was shot.  Defendant argues the jury could have concluded that he decided to steal the guns only as an afterthought, after killing the victim.  Defendant further contends the jury reasonably could have ascribed the taking of other items to Joe and Fader alone; accordingly, there was evidence from which the jury could have absolved him of robbery, but convicted him of theft.

We disagree.  We acknowledge that there was evidence from which the jury could have concluded defendant formed the intent to steal the guns after killing the victim, and therefore, as to the guns, he was guilty only of theft.  (See *People v. Davis, supra,* 36 Cal.4th at p. 562 [if defendant formed the intent to steal after killing the victim, the offense is theft, not robbery].)  Joe and Fader both testified that after they had removed property from the house and were waiting in or near the car, they heard a shot.  Defendant emerged from the house carrying a shotgun.  After placing that gun in the car, defendant returned to the house and retrieved a second gun.

Nonetheless, there was no evidence from which the jury could have concluded that only Joe and Fader, but not defendant, were liable for the taking of the other property from the house.  As defendant concedes, Joe and Fader testified that defendant, while pointing a gun at the still-living victim, demanded to know the location of his wallet, ordered Fader to tie him up, and directed the women to take property from the house to the car.  Joe and Fader further testified that they carried various items of property — including a microwave oven, a typewriter, a jar of pennies, and a "stereo" or "radio" or "boom box" — to the car while the victim was still alive.  Thus, if the jury believed Joe and Fader at all, there was no substantial evidence from which the jury reasonably could have concluded that the taking of the microwave oven, typewriter, jar of pennies, and boom box was anything less than a robbery.  Similarly, there was no substantial evidence from which the jury could have ascribed responsibility for the robbery solely to Joe and

86

Fader. To the contrary, all of the available evidence suggested defendant was a major participant in the robbery and that he personally both engaged in conduct intended to evoke fear (pointing the gun at the victim) and directed the application of force (directing Fader to tie the victim's hands) with the intent to facilitate the taking of property from the house.

For similar reasons, even were we to conclude the court erred by failing to instruct the jury regarding the lesser included offense of theft, we would find the error harmless under any standard. The evidence that defendant robbed the victim by applying force and fear while Joe and Fader removed various items of property from the house was extremely strong, and defendant points to no evidence to the contrary. The prosecutor argued the robbery occurred when property was "loaded into the car while the gun [was] being held on Sherman Robbins"; defendant did not seriously contest that theory. Under these circumstances, it is not reasonably probable (*People v. Watson* (1956) 46 Cal.2d 818, 836-837) that the jury would have concluded defendant was guilty of theft but not also guilty of robbery, and indeed, any error was harmless beyond a reasonable doubt (see *Chapman v. California* (1967) 386 U.S. 18, 24).

> ### b. *Instructions assertedly undermining the requirement of proof beyond a reasonable doubt*

Defendant contends that 10 standard jury instructions given in his case — CALJIC Nos. 1.00, 2.01, 2.21.1, 2.21.2, 2.22, 2.27, 2.51, 2.90, 8.83 and 8.83.1 — individually and collectively allowed the jury to convict him based upon proof insufficient to satisfy the constitutionally required "beyond a reasonable doubt" standard. (*In re Winship* (1970) 397 U.S. 358, 364.) He argues that the error violated his right to due process of law under the federal Constitution and requires reversal without an inquiry into prejudice. (See *Sullivan v. Louisiana* (1993) 508 U.S. 275, 278.) As defendant concedes, we have rejected this precise argument on

occasions too numerous to recite. (E.g., *People v. Tate* (2010) 49 Cal.4th 635, 697-698; *People v. Kelly* (2007) 42 Cal.4th 763, 792.) As we have explained, each of these instructions "is unobjectionable when, as here, it is accompanied by the usual instructions on reasonable doubt, the presumption of innocence, and the People's burden of proof." (*People v. Nakahara* (2003) 30 Cal.4th 705, 715.) Defendant invites us to revisit the issue, but provides no persuasive reason to do so.

### c. Motive instruction

The trial court instructed the jury pursuant to former CALJIC No. 2.51, as follows: "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish guilt. Absence of motive may tend to establish innocence. You will therefore give its presence or absence, as the case may be, the weight to which you find it to be entitled." Defendant contends this instruction: (1) permitted the jury to determine guilt based on motive alone; (2) shifted the burden of proof to him to show an absence of motive to establish his innocence; and (3) lessened the prosecution's burden of proof in violation of his federal and state constitutional rights to a fair jury trial, due process of law, and reliable guilt and penalty verdicts. He contends the error was not harmless beyond a reasonable doubt and requires reversal of the guilt and penalty verdicts.

The first of these subclaims goes to the clarity of the instruction. Because defendant did not request clarification at trial, his subclaim is forfeited. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1134; *People v. Cleveland, supra,* 32 Cal.4th at p. 750.) Substantively, we have held in prior cases that all of the same subclaims lack merit. (E.g., *People v. Kelly, supra,* 42 Cal.4th at p. 792; *People v. Guerra, supra,* at pp. 1134-1135; *People v. Cleveland, supra,* at p. 750; *People v. Cash*

(2002) 28 Cal.4th 703, 738-739; *People v. Hillhouse, supra,* 27 Cal.4th at pp. 503-504.)  Again, we decline to revisit these conclusions.

### C. Penalty Phase Issues and Miscellaneous Claims

*1.  Asserted error in denying defendant's motion to strike the notice of aggravation*

On October 17, 1995, before the start of jury selection, the prosecution filed a notice of aggravation pursuant to section 190.3, identifying evidence it intended to introduce and rely upon at the penalty phase.  Among other things, the notice stated the prosecution would introduce "documentary and necessary testimonial evidence" regarding five prior felony convictions (see § 190.3, factor (c)), and identified the date and county of each conviction and the offense involved.  The notice also stated the prosecution would introduce evidence of seven prior instances of "criminal activity by the defendant involving the use or attempted use of force or violence or the express or implied use of force or violence" (see § 190.3, factor (b)), and identified the approximate date and location of each incident, the type of criminal activity involved, and the names of potential witnesses.  The noticed incidents included all of the incidents actually presented in aggravation at the penalty phase.  (See *ante,* at p. 19.)

Two days later, defendant moved to strike the notice of aggravation. Defendant argued the notice was deficient because the prosecution had not provided discovery of the facts and circumstances surrounding the incidents described in the notice and because "[t]he notice does not list the addresses of witnesses the prosecution intends to call."  He argued that because the notice did not provide sufficient knowledge of what defendant had to defend against and imposed no limits on the prosecution, it was inadequate to enable him to prepare his case.  Defendant asked the court to strike the notice and order the prosecution to provide him with timely notice of the "actual evidence" to be presented in

89

aggravation.  Around the same time, defendant also filed a motion seeking discovery under section 1054, in which he requested, inter alia, "[t]he names, addresses and telephone numbers of all witnesses that are known to the prosecution and/or investigating authorities, including penalty phase witnesses."[28]

The prosecution opposed the motion to strike, but did not oppose defendant's request for discovery of the names, addresses and telephone numbers of witnesses.

At the hearing on these motions, defense counsel acknowledged the motion to strike the notice of aggravation was intertwined with the discovery issues in the case.  He argued nonetheless the notice was deficient because it did not specifically identify which witnesses the prosecution intended to call, and "under [section] 1054 we haven't been provided with any addresses or any other way of following up an investigation."  The prosecutor responded that he had provided the defense with the addresses of witnesses to the extent he had them, and had provided police reports as to several of the listed convictions and incidents of

---

[28]    Contemporaneously, defendant also filed a motion to strike his 1971 and 1976 robbery convictions based on the failure of the presiding trial courts to properly advise him of his federal constitutional rights before accepting his guilty pleas.  (See *Boykin v. Alabama* (1969) 395 U.S. 238; *In re Tahl* (1969) 1 Cal.3d 122, 132-133.)  The trial court denied this motion.  Although defendant includes this motion in the heading to the present argument and mentions it in the text of his opening brief, he provides no argument or authority supporting his contention that the motion was wrongly denied.  Accordingly, the issue is forfeited.  (See *People v. Stanley* (1995) 10 Cal.4th 764, 793.)  Similarly, defendant appears to contend the court erroneously denied his motion to have the jury make special findings on aggravating and mitigating factors.  Although there is no record of any corresponding written motion in the clerk's transcript, such a motion was discussed and denied at the hearing.  Again, however, defendant provides no argument or authority supporting his contention that the denial of the motion was in error.  This issue is forfeited as well.

criminal activity.  He further noted that although some of the addresses listed in the police reports were 20 or more years old, the prosecution was trying to track down current addresses, and "as soon as we have addresses [the defense] will have addresses."  He finally explained that to the extent the notice was overinclusive, he intended to narrow it as more information became available.  The court denied the motion to strike.  Noting the prosecutor was still in the process of preparing for trial, the court "assume[d]" he would provide witnesses' addresses and telephone numbers to the defense as soon as he was able to locate them, and commented, "I think that's appropriate."  The court further ordered the prosecution to "continue to comply with discovery statutes and or any other discoverable items of the court."

Defendant contends the court erred under state law by denying his motion to strike the notice of aggravation.  He asserts the notice was insufficient to enable him to prepare his defense, in that it failed to provide the locations and addresses of witnesses so that his investigator could interview them.  He further asserts the notice failed to adequately describe the facts and circumstances of the prior convictions and other alleged criminal activity, which hampered his ability to conduct voir dire of potential jurors.

Defendant is mistaken.  Section 190.3 provides that except for rebuttal evidence and evidence in proof of the capital offense or special circumstances that subject the defendant to the death penalty, "no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial."  "The purpose of the notice required by section 190.3 is to advise the accused of the evidence against him so that he may have a reasonable opportunity to prepare a defense at the penalty phase.  [Citation.]  'A capital defendant is entitled to notice of other violent crimes or prior felony convictions

91

offered in the prosecution's penalty case-in-chief before the cause is called to trial or as soon thereafter as the prosecution learns the evidence exists. [Citations.] However, the prosecutor is not prevented from introducing all the circumstances of a duly noticed incident or transaction simply because each and every circumstantial fact was not recited therein. [Citations.] The notice is sufficient if it gives defendant "a reasonable opportunity" to prepare a defense to the allegations. [Citation.]' " (*People v. Hart* (1999) 20 Cal.4th 546, 639.)

The notice of aggravation that defendant received satisfied the requirements of section 190.3. The notice identified the alleged prior convictions by date, county of conviction, and type of offense. It also identified the alleged other criminal activity by date or approximate date, location, and type of offense, and included the names of potential witnesses as well as other possible evidence. We repeatedly have held this form of notice is sufficient (e.g., *People v. Hart, supra,* 20 Cal.4th at pp. 638-639; see also *People v. Lewis and Oliver, supra,* 39 Cal.4th at p. 1051; *People v. Ledesma* (2006) 39 Cal.4th 641, 733-734; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 108-109; *People v. Pride* (1992) 3 Cal.4th 195, 258-259), particularly when, as apparently was the case here, the notice is supplemented by pertinent police reports (*People v. Jenkins, supra,* 22 Cal.4th at pp. 1028-1029). Defendant was not entitled under section 190.3 to a summation of the witnesses' expected testimony (*People v. McDowell* (2012) 54 Cal.4th 395, 421; *People v. Roberts* (1992) 2 Cal.4th 271, 330); nor was the prosecution required, under that section, to identify which among the noticed incidents of other criminal activity it would actually present evidence concerning, or which among the many potential witnesses listed it would actually call to testify. (*People v. Keenan* (1988) 46 Cal.3d 478, 525 [§ 190.3 does not require the prosecution to "present evidence on all matters as to which pretrial notice was given"].) Defendant's argument that the lack of specificity in the notice deprived him of the

opportunity to voir dire prospective jurors is misplaced. " 'The purpose behind the notice requirement . . . is to permit the defendant to prepare a defense at the penalty trial, not to question prospective jurors about every bit of evidence they might hear.' " (*People v. Howard* (2008) 42 Cal.4th 1000, 1016.) Finally, defendant cites no authority for the proposition that he was entitled, under section 190.3, to the addresses of potential witnesses. Because the notice contained sufficient information to give defendant a "reasonable opportunity" to prepare his penalty phase defense, the trial court did not abuse its discretion in denying defendant's motion to strike it. (*People v. Hart, supra,* at p. 639.)

To the extent defendant means to contend there was some error involving discovery, he points to nothing in the record suggesting the prosecution failed to comply with its discovery obligations. Indeed, at the hearing on defendant's motions the trial court found no evidence that the prosecutor was "hiding the ball." Accordingly, defendant's claim fails.

### 2. *Asserted prosecutorial misconduct*

Defendant points to two instances of asserted prosecutorial misconduct occurring during the penalty phase. Because defendant failed to object to the asserted misconduct on the specified (or any) grounds, and makes no claim that objections would have been futile, his claims are forfeited for purposes of appeal. (*People v. Clark, supra,* 52 Cal.4th at p. 960.) On the merits, we reject the claims, as follows.

#### a. *Assertedly improper comment on defendant's right to remain silent*

During closing argument at the penalty phase, the prosecutor argued that "[e]vidence of defendant's remorse which is nonexistent" constituted "another aggravating factor." Defendant asserts the comment indirectly touched on his right under the Fifth Amendment to the federal Constitution to remain silent. We

93

repeatedly have held, however, that the prosecution may comment upon the defendant's lack of remorse, as long as in doing so it does not refer to the defendant's failure to testify. (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1346; *People v. Boyette* (2002) 29 Cal.4th 381, 453-454.) Here, after the prosecutor made the challenged remark, he went on to explain, "You've got a couple of things here. In the same conversation in which John Richie was told by the defendant that I told the old man to get right with God, I'll be back in a minute and when I came back I shot him. [¶] In that same conversation John Richie says, 'How can you do such a thing?' and the defendant's response to him is, 'It was nothing. Nothing.' And how do you know that's true? 'Cause within two hours he's having sex with Melissa Fader. Within two hours he's over having murdered a bound, helpless 67 year old man in his own home and is ready for sex." Accordingly, the jury would have understood the challenged remark as referring not to defendant's failure to testify, but rather to his statements and conduct during and after the crime, which were not remorseful. (*People v. Castaneda, supra,* at p. 1346; *People v. Boyette, supra,* at p. 455.) Alternatively, the jury might have understood the remark as referring to defendant's failure to produce evidence of his remorse from friends and family. (*People v. Castaneda, supra,* at pp. 1346-1347; *People v. Brady* (2010) 50 Cal.4th 547, 585.) The prosecutor's comment did not amount to misconduct.

> b.  *Assertedly improper counting and double-counting of aggravating factors*

Section 190.3, factor (a), permits the jury determining penalty to consider, as an aggravating circumstance, "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true . . . ." During his penalty phase closing argument, the prosecutor discussed that factor as follows: "Last, 'the circumstances of the

94

crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true but don't count it twice.' So you had the existence of this happened during a robbery. [¶] You also have each of the other circumstances around the crime. These include facts about Sherman Robbins. [¶] An aggravating factor is the fact that Sherman Robbins was a 67 year old man. [¶] An aggravating factor is the fact that at the time he was murdered, Sherman Robbins was a diabetic. [¶] An aggravating factor at the time he was murdered, Sherman Robbins had a useless left hand. He could not even draw his own insulin for his diabetes. [¶] . . . [¶] Sherman Robbins was in a residence, not his residence but a family residence, his brother's residence. The robbery, okay, you can't count that twice but the fact that the robbery occurred inside of a person's home rather than out on the street, that's an aggravating factor. . . . [¶] A circumstance in this case is all that Sherman Robbins was trying to do at the time that he was murdered, all he was doing was he was giving a place to stay to two women who told him their car had broken down someplace nearby . . . . [¶] That's the circumstance in this case. Sherman Robbins was trying to help folks out. Just like Sharon Robbins said he usually did. [¶] . . . [¶] You may consider as a factor in aggravation the fact that Sherman's hands were tied behind his back at the time that he was murdered and that he was helpless on that account. [¶] You may consider what the last 10 or 15 minutes of that man's life was like. . . . [¶] As far as we know, the last thing he ever heard was 'Get right with God. I'll be back in a minute,' and then his longest minute started. That's an aggravating factor. [¶] Here's another aggravating factor. Evidence of defendant's remorse which is nonexistent. . . . [¶] . . . [¶] Here's another circumstance of the offense that you can consider as you go through the weighing process. You can consider the impact of this crime not just on Sherman Robbins 'cause Sherman Robbins had himself a really ugly last 10 or 15 minutes of his life and with luck has gone to

95

a better world.  But you may also consider the impact on his family.  [¶]  You may consider the impact on his brother, Bill Robbins, and his wife Alvina.  [¶]  You many consider the impact on Sharon Robbins and her husband[,] Sherman's nephew Gary.  [¶]  So let's talk about those fundamentally decent people for a little bit.  [¶] . . . [¶]  That experience for those people mopping up his blood off of the floor, off of the couch, off of wherever it splattered in that room, that's a factor in aggravation.  [¶]  And there's a factor in aggravation for Sharon Robbins.  Sharon Robbins, on the morning of the 22d of March 1994, . . . walks in and she sees that he's lying dead on the couch. . . .  [¶] . . . [¶]  I'm asking you to go into the jury deliberation room, weigh the factors in mitigation, which are nearly nonexistent, against the factors in aggravation, and bring back the appropriate verdict."

Defendant argues that the form of the prosecutor's argument encouraged the jury to double-count aggravating factors, and that the argument improperly relied on unconstitutionally vague aggravating factors as well as aggravating factors that duplicated elements of the offense.  We disagree.

Defendant first claims the prosecutor's argument was improper because it encouraged the jury to double-count various circumstances of the offense as aggravating circumstances.  He explains the prosecutor's argument, which "specifically labeled" each of the identified circumstances of the offense as a separate aggravating factor, "virtually demanded" that the jury consider each circumstance separately and keep a "running numerical tally" of the factors.  He argues the consideration of such duplicative and cumulative factors skewed the weighing process and created a risk the sentence would be imposed in an arbitrary and capricious manner in violation of the Eighth Amendment to the federal Constitution.  (Cf. *United States v. McCullah* (10th Cir. 1996) 76 F.3d 1087, 1111-1112 [under a weighing scheme, the use of duplicative aggravating factors creates

96

an unconstitutional skewing of the weighing process, which necessitates a reweighing of the aggravating and mitigating factors].)

We find nothing improper in the prosecutor's argument. All the prosecutor did was point out various aspects of the offense that the jury reasonably might have considered aggravating — that is, circumstances "attending the commission of the crime which increase[ed] its guilt or enormity or add[ed] to its injurious consequences." (CALJIC No. 8.88.) This was permissible, as section 190.3, factor (a), specifically enumerates the "circumstances of the crime" as an aggravating factor.

Defendant's reliance on cases involving the jury's consideration of invalid or duplicative aggravating circumstances pursuant to erroneous *instructions* (e.g., *United States v. McCullah, supra,* 76 F.3d at pp. 1111-1112; see also *Stringer v. Black* (1992) 503 U.S. 222, 232) is misplaced. Defendant's argument here is not that the jury instructions themselves created a risk that the jury might improperly double-count factors or weigh invalid factors in its penalty determination. Rather, he contends the prosecutor's argument created such a risk. We are not convinced. Of course, it is misconduct for a prosecutor, during argument, to misstate the law (*People v. Hill* (1998) 17 Cal.4th 800, 829), or to invite or encourage the jury to do what the law prohibits (e.g., *People v. Love* (1961) 56 Cal.2d 720, 730 [a prosecutor may not use evidence offered for a limited purpose to argue inferences for which the evidence is inadmissible], disapproved on other grounds in *People v. Morse* (1964) 60 Cal.2d 631, 637, fn. 2; *People v. Morales* (1992) 5 Cal.App.4th 917, 928 [it is improper to urge a jury to render a verdict based on public opinion or to protect the community]). Here, however, we conclude the prosecutor's argument was not designed — and would not have been understood by the jury — as an invitation to consider each of the various circumstances of the offense as a separate aggravating factor, and then to determine whether the aggravating factors

97

simply outnumbered the mitigating factors. The prosecutor expressly disavowed any such purpose, explaining to the jury in introductory remarks at the outset of his argument, "Oh, one other thing. [¶] The mitigating and aggravating factors. *You don't count them, okay. You weigh them.* And the judge already instructed you that any mitigating factors might outweigh all of the aggravating factors, okay. He also instructed you that what you are to do in the final analysis is to weigh the totality of the mitigating circumstances against the totality of the aggravating circumstances. And it's okay if there is one mitigating circumstance, just one mitigating circumstance and the totality of that one mitigating circumstance outweighs the aggravating circumstances in their totality, then the proper sentence is life without possibility of parole."

Moreover, as discussed in more detail below, the trial court properly instructed the jury that it was not to "double weigh any circumstances of the offense which are also special circumstances"; nor was it to double weigh "any prior conviction" it had already considered as "criminal activity by the defendant . . . which involve[d] the use or attempted use of force or violence or the express or implied threat to use force or violence." Finally, the trial court gave the jury the standard instructions explaining the weighing process (see CALJIC No. 8.88), including the admonishment that "[t]he weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale or the arbitrary assignments of weight to any of them. You are free to assign whatever mor[al] or sympathetic value you [deem] appropriate to each and all of the various factors you are permitted to consider." Considering the prosecutor's argument and the jury instructions as a whole, we conclude there was no risk that the jury was misled as to how it was to weigh the aggravating and mitigating evidence.

98

Defendant's claim that the prosecutor's argument created the risk that the jury would rely on unconstitutionally vague aggravating factors, or factors that duplicated elements of the offense, likewise fails. Although to survive a vagueness challenge statutory factors used in sentence selection must have "a commonsense core of meaning that criminal juries should be capable of understanding" (*People v. Lawley* (2002) 27 Cal.4th 102, 168, citing *Tuilaepa v. California* (1994) 512 U.S. 967, 975), the prosecutor here was not purporting to define the section 190.3 statutory sentence selection factors, but to point out "circumstances of the offense" the jury might consider aggravating under section 190.3, factor (a). Similarly, any constitutional requirement that aggravating factors not duplicate elements of the offense applies only to the factors used by a state to determine who is eligible for the death penalty. (See *Lowenfield v. Phelps* (1988) 484 U.S. 231.) In California, that death-eligibility function is performed by the special circumstances outlined in section 190.2. (*People v. Bacigalupo* (1993) 6 Cal.4th 457, 468.) Defendant cites no case holding that the sentence selection factors outlined in section 190.3 are subject to similar limitations, and in any event, as we have explained, the prosecutor's argument did not purport to define the sentence selection factors, but rather pointed to various aggravating aspects of the offense. Accordingly, the prosecutor's argument did not encourage the jury to misapply the law, and defendant's claim fails.

### c. Cumulative prejudice

Defendant contends the cumulative effect of the prosecutor's asserted misconduct at the jury selection, guilt and penalty phases infected the trial with unfairness and deprived him of a fair trial. Because we have found no misconduct, there is no prejudice to cumulate.

## 3. Asserted jury instruction error

Defendant raises several challenges to California's death penalty statutes governing the penalty selection process, and to the corresponding standard jury instructions given in his case, CALJIC Nos. 8.85 and 8.88, arguing they violated his rights to a fundamentally fair trial, to due process of law, to equal protection of the laws, to protection from double jeopardy, to trial by a fair and impartial jury, to the assistance of counsel, to presentation of a defense, and to a reliable and non-arbitrary sentencing determination under the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution and parallel provisions of the California Constitution. Defendant also raises several challenges to the specific instructions given in his case. As defendant acknowledges, we have rejected most of his standard contentions; because defendant provides no persuasive reason to revisit our conclusions, we likewise reject them here. We also reject defendant's claims that are specific to his case. Our analysis follows.

## a. CALJIC No. 8.85 and related instructions

Before final arguments commenced, and pursuant to section 190.3 and a modified version of CALJIC No. 8.85 proposed by defendant, with further modifications by the court, the court instructed the jury regarding its consideration of aggravating and mitigating circumstances. Thus, the court informed the jurors that in determining the penalty, they were to consider all of the evidence received in the case except as they might be instructed later, and that they were to consider, take into account, and be guided by "the following factors if applicable." The court then listed the aggravating and mitigating factors set forth in section 190.3, informing the jurors that as to factor (a), they were not to "double weigh" any circumstances of the offense that were also special circumstances, and that as to factor (c), they were not to "double weigh" any prior conviction that they had also considered as other criminal activity under factor (b). Pursuant to a modification

100

proposed by defendant, the court also informed the jurors that only section 190.3, factors (a) through (c) could be considered aggravating.[29]

---

[29] "In determining which penalty is to be imposed upon the defendant, you shall consider all of the evidence which has been received during any part of the trial of this case except as you may be hereafter instructed.  You may consider and take into account and be guided by the following factors if applicable:  [¶]  A, The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true.  [¶] However, you may not double weigh any circumstances of the offense which are also special circumstances.  That is, you may not weigh the special circumstances more than once in your sentencing determination.  [¶]  B, The presence or absence of criminal activity by the defendant other than the crime for which the defendant has been tried in these present proceedings which involve the use or attempted use of force or violence or the express or implied threat to use force or violence.  [¶] C, [T]he presence or absence of any prior felony conviction other than the crimes for which the defendant has been tried in the present proceedings.  [¶]  Again you may not [double weigh] any prior conviction which may also be a circumstance which you have considered under (b) above.  [¶]  The factors in the above list which you determine to be aggravating circumstances are the only ones that the law permits you to consider.  You're not allowed to consider any other fact or circumstance as the basis for deciding that the death penalty would be appropriate punishment in this case.  [¶]  The list of circumstances which you may consider in penalties [*sic*] continues as follows:  [¶]  In determining penalties continuing [*sic*] as follows:  [¶]  D[,] Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance, [¶]  E[,] Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.  [¶]  F[,] Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.  [¶]  G[,] Whether or not the defendant acted under extreme duress or the substantial domination of another person.  [¶]  H[,] Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease or defect or the effects of intoxication.  [¶]  I[,] The age of the defendant at the time of the crime.  [¶]  J[,] Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.  [¶]  K[,] Any other circumstances which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence

*(footnote continued on next page)*

Immediately after this instruction, the court gave the following additional instruction proposed by defendant, as modified by the court: "Mitigating circumstances that I have read to you for your consideration are given merely as examples of some of the factors that a juror may take into account as reasons for deciding not to impose a death sentence in this case. A juror should pay careful attention to each of these factors. Any one of them may be sufficient, standing alone, to support a decision that death is not the appropriate punishment in this case, but a juror should not limit his or her consideration of mitigating circumstances to these specific factors. [¶] A juror may also consider any other circumstances relating to the case or the defendant as shown by the evidence as reasons for not imposing the death penalty. [¶] If the mitigating evidence gives rise to compassion or sympathy for the defendant, the jury may, based upon such sympathy or compassion alone, reject that as a penalty." This instruction was based in part on an instruction given in *People v. Wharton* (1991) 53 Cal.3d 522. (See *id.* at p. 600, fn. 23.)

Defendant now contends the trial court erred in several respects in giving these instructions. We examine each of these contentions below.

### i.    Factor (a)

Defendant first contends the section 190.3, factor (a) instruction to consider "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be

---

*(footnote continued from previous page)*

less than death, whether or not related to the offense for which he is on trial. You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this [principle]."

102

true," as applied in his case, was unconstitutional because it did not provide an objective standard to channel the jury's discretion and allowed each juror to impose the death penalty based on his or her "idiosyncratic assessment" of the offensive aspects of the crime. We disagree. (*People v. Osband* (1996) 13 Cal.4th 622, 703; *People v. Cain* (1995) 10 Cal.4th 1, 68.) To the extent defendant contends the prosecutor's argument exploited the instruction's ambiguity by enumerating "virtually unlimited" aggravating factors, he has forfeited the claim and it lacks merit in any event. (See *ante,* pt. II.C.2.b.) Defendant further contends the instruction's reference to special circumstances unfairly "weighted" the jury's decision in favor of death. We have rejected this claim as well. (*People v. Cain, supra,* at pp. 68-69.)

Defendant further contends this instruction was misleading in that it suggested the jury could consider the fact of defendant's first degree murder conviction with special circumstances as an aggravating circumstance of the crime. He asserts the trial court had a duty, on its own motion, to instruct that the jury's finding of first degree murder with special circumstances was not itself an aggravating circumstance, and that the jury could examine only the facts and circumstances of defendant's criminal conduct, not the conviction and special circumstances findings themselves. He contends such an instruction was necessary to avoid erroneous inflation of the case in aggravation, and that the prosecutor's argument (see *ante,* pt. II.C.2.b.) exploited the ambiguity in the instructions.

Although defendant essentially contends the instruction was ambiguous, he did not request a clarifying instruction at trial. Accordingly, he has forfeited his claim for purposes of appeal. "A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction

103

forfeits the claim of error for purposes of appeal . . . ." (*People v. Lee* (2011) 51 Cal.4th 620, 638.) Here, the instruction was based on CALJIC No. 8.85, which tracks the language of section 190.3, factor (a). As such, the instruction accurately stated the law. If defendant believed the instruction required elaboration or clarification, he was obliged to request such elaboration or clarification in the trial court. (*People v. Lee, supra,* at p. 638.)

Defendant argues we can review the merits of this issue notwithstanding his failure to object or request clarification, because the claim presents a pure question of law based on undisputed facts and involves important issues of public policy as well as constitutional error that fundamentally affected the judgment. (See *Hale v. Morgan* (1978) 22 Cal.3d 388, 394.) Even were we inclined to agree, we would find defendant's claim lacks merit. We repeatedly have rejected claims that an instruction such as defendant proposes should have been given, even upon request, because: (1) other standard instructions adequately convey that the jury is required to consider not merely the existence of the conviction and special circumstances findings, but also the facts underlying them, and (2) the proposed instruction is misleading to the extent it contradicts instructions directing the jury to consider the circumstances of the crime and the existence of any special circumstances found true. (*People v. Ervine* (2009) 47 Cal.4th 745, 812; *People v. Farley* (2009) 46 Cal.4th 1053, 1131-1132; *People v. Lenart* (2004) 32 Cal.4th 1107, 1132-1133.)

Finally, we note this case involved none of the risk of double counting that we highlighted in *People v. Melton* (1988) 44 Cal.3d 713. In *Melton,* we acknowledged the language of section 190.3, factor (a), which tells the jury to consider both the "circumstances" of the crime and the "special circumstances" found true, presented a "theoretical problem" and that a jury given no clarifying instructions might conceivably double-count any circumstances that were also

104

special circumstances.  We held that, upon defendant's request, a trial court should instruct the jury not to do so.  (*People v. Melton, supra,* at p. 768.)  Here, defendant requested and received an instruction that the jury not "double weigh any circumstances of the offense which are also special circumstances.  That is, you may not weigh the special circumstance more than once in your sentencing determination."  Accordingly, there was no theoretical problem for the prosecutor to exploit.

### ii.      Factor (b)

Defendant next contends the section 190.3, factor (b) instruction to consider "[t]he presence or absence of criminal activity by the defendant other than the crime for which the defendant has been tried in these present proceedings which involve the use or attempted use of force or violence or the express or implied threat to use force or violence" was unconstitutional because it allowed the prosecution to present evidence of convictions that were years — sometimes decades — old.  We disagree.  (*People v. Tafoya* (2007) 42 Cal.4th 147, 185-186.)  Nor did the instruction fail to provide a reliable, nonarbitrary, nonvague, objective standard to guide the jury's discretion.  (*People v. Dement, supra,* 53 Cal.4th at p. 56; *People v. Watson* (2008) 43 Cal.4th 652, 701; *People v. Cain, supra,* 10 Cal.4th at pp. 69-70.)  Defendant contends reliance on factor (b) was unconstitutional in the absence of instructions identifying the relevant criminal conduct, defining the elements of the relevant crimes, advising the jury to consider only conduct violating a Penal Code provision, and defining "force" and "violence."  Defendant overlooks that the instructions *did* identify the relevant

criminal conduct,[30] and advised that "before a juror may consider any of such criminal acts as an aggravating circumstance in this case a juror must first be satisfied beyond a reasonable doubt that the defendant did in fact commit such criminal acts. A juror may not consider any evidence of any other criminal act as an aggravating circumstance." These instructions were adequate. Further, absent a request from defendant, the trial court was not required to define the elements of the relevant crimes (*People v. Osband, supra,* 13 Cal.4th at p. 704); there was no requirement at all that the court define "force" or "violence" (cf. *People v. Dunkle* (2005) 36 Cal.4th 861, 922 [no requirement to define " 'express or implied threat to use force or violence' "]); and defendant points to no authority requiring the court to instruct, either on its own motion or upon request, that only conduct violating a penal statute may be considered.

### iii. *Miscellaneous contentions*

Defendant asserts the court erred by failing to instruct the jury regarding which of the listed circumstances were aggravating and which mitigating. Although no such instruction was required (*People v. Lewis* (2008) 43 Cal.4th 415, 532; *People v. Rogers, supra,* 39 Cal.4th at p. 897), defendant's contention has no application to this case, because the instruction given *did* state that the first three factors were the only "aggravating circumstances . . . the law permits you to consider," and that the jury was not allowed to consider any other circumstance

---

**30** Thus, the court instructed, "[e]vidence has been introduced for the purpose of showing that the defendant has committed the following criminal acts: Robbery in Tulare County on or about December 20, 1970, assault with a deadly weapon on a peace officer in Tulare County on or about December 20, 1970, robbery in Los Angeles County on or about November 4, 1975. And attempted robbery in Stanislaus County on or about may 26th, 1988 which involved the express or implied use of force of violence or the threat to use force or violence."

"as the basis for deciding that the death penalty would be appropriate punishment in this case." The instruction then listed the remaining factors, immediately followed by the paragraph based on *People v. Wharton, supra,* 53 Cal.3d 522, beginning "[the] [m]itigating circumstances that I have read to you for your consideration are given merely as examples . . . ." (See *ante*, p. 102.) The jurors thus would have understood that section 190.3, factors (d) through (k) were "the mitigating circumstances" and that they could be considered solely in mitigation.

Even if the jurors would not have so understood, defendant has no cause to complain. Defendant proposed the modified version of CALJIC No. 8.85 that was given. During discussion of jury instructions, defense counsel explained that he had inserted a paragraph in the instruction between factors (c) and (d) "designed to delineate between circumstances in aggravation and circumstances in mitigation." In response, the court remarked, "But there's nothing in there that says, 'And now these are the circumstances in mitigation.' " Defense counsel simply responded "No," without proposing any additional modification. Defendant therefore has forfeited his claim. (*People v. Lee, supra,* 51 Cal.4th at p. 638.)

Defendant next complains that the modified version of CALJIC No. 8.85, as read to the jurors, was confusing because the court inserted the sentence "the list of circumstances you may consider in penalties continues as follows" between factors (c) and (d). This sentence was not in the written instruction defendant proposed. Defendant argues the language "in penalties," coupled with the lack of a contemporaneous definition of mitigation, would have suggested that the jurors could consider the mitigating circumstances as aggravating. We disagree. As noted below, the court did define mitigation later on, with the final concluding instructions, after closing arguments and immediately before the jury retired to deliberate. Because defendant consented to giving the instructions in this order, he forfeited the issue for appeal. In any event, in the context of the instructions as a

107

whole, including the admonition that factors (a) through (c) were the only aggravating factors the jury could consider, the jury could not have been misled.

Defendant next argues the court erred by omitting three paragraphs of his proposed instruction based on *People v. Wharton, supra,* 53 Cal.3d 522. We cannot determine the content of the three omitted paragraphs, however, because they are blacked out in the version of the instruction included in the clerk's transcript. Pointing to defense counsel's comment during the jury instruction discussions, defendant asserts the three paragraphs were intended to "delineate between circumstances in aggravation and circumstances in mitigation." As the analysis above makes clear, however, defense counsel's remark referred to the modified version of CALJIC No. 8.85, not the instruction based on *Wharton.* Because defendant has not supplied a record adequate to review this claim, it fails. (*People v. Carter* (2010) 182 Cal.App.4th 522, 531, fn. 6 [it is appellant's burden to present a record adequate for review and to affirmatively demonstrate error], citing *Denham v. Superior Court, supra,* 2 Cal.3d at p. 564.)

Defendant next contends the court erred by failing to give an additional instruction he proposed regarding aggravating and mitigating factors, which read as follows: "The permissible aggravating factors which you may consider are limited to those aggravating factors upon which you have been specifically instructed. Therefore, the evidence which has been presented to you regarding defendant's background which does not fall into one of the limited aggravating factors may only be considered by you as mitigating evidence." The court did not err, because the requested instruction was "largely duplicative." (*People v. Carter* (2003) 30 Cal.4th 1166, 1230.)

We also reject defendant's assertion the court violated his right to due process of law under the federal Constitution by failing to give his proposed instruction that the jury "may consider the fact that defendant's accomplices

108

received a more lenient sentence as a mitigating factor." We have consistently rejected the contention that a jury must be directed to consider the relative severity of an accomplice's sentence as a mitigating factor. (E.g., *People v. Moore, supra,* 51 Cal.4th at pp. 1141-1143; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1188-1189; *People v. Morris* (1991) 53 Cal.3d 152, 225, overruled on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)

Defendant's remaining arguments regarding these instructions also lack merit. The trial court was not required to delete seemingly inapplicable factors from the instruction. (*People v. Fuiava* (2012) 53 Cal.4th 622, 733; *People v. Lewis, supra,* 43 Cal.4th at p. 532.) Nor was it required to instruct on its own motion that the only aggravating factors the jury could consider were those specified in section 190.3 (*People v. Lewis, supra,* at p. 532), although in this case, as we have explained, the instructions given adequately conveyed that concept. Defendant's claim that the trial court was required to define "circumstances" and "criminal activity" lacks merit. A trial court is not required to define "commonly understood" terms (*People v. Malone* (1988) 47 Cal.3d 1, 55) such as these. The use of the terms "extreme," "substantial," and "at the time of the offense" in section 190.3, factors (d), (g) and (h) did not unconstitutionally restrict the jury's consideration of relevant mitigating evidence, render the factors impermissibly vague, or otherwise result in an arbitrary or capricious penalty determination. (*People v. Fuiava, supra,* at p. 732; *People v. Lewis, supra,* at p. 532.) "Additionally, 'the statutory instruction to the jury to consider "whether or not" certain mitigating factors were present did not unconstitutionally suggest that the absence of such factors amounted to aggravation.' " (*People v. Jones, supra,* 54 Cal.4th at p. 87; see *People v. Cowan* (2010) 50 Cal.4th 401, 509.)

Defendant contends that, in light of the instructions, it is reasonably likely the jurors considered his methamphetamine use as aggravating. (See *People v.*

*Moore, supra,* 51 Cal.4th at p. 1140 [" ' "reasonable likelihood" ' " test applies to ambiguous instructions].) We disagree. As explained, the instructions expressly told the jury that only section 190.3, factors (a) through (c) could be considered aggravating, and no one — least of all the prosecutor — ever suggested defendant's drug use was an aggravating "circumstance of the crime." To the contrary, the prosecutor discussed defendant's methamphetamine use only in conjunction with his discussion of section 190.3, factor (h) (whether or not at the time of the offense the defendant's capacity to appreciate the criminality of his conduct or to conform it to the law was impaired by the effects of intoxication), and simply emphasized there was no evidence regarding "how intoxicated [defendant] was" or whether his intoxication "put [defendant] in such a state of mind that he could not appreciate the nature of his conduct." Moreover, the prosecutor clearly explained "you can't have aggravation" based on section 190.3, factors (d) through (k). We find no reasonable likelihood the jurors were misled.

Finally, "[h]aving admonished the penalty jury to consider 'any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial,' and to 'disregard any [conflicting] instruction [from] the guilt or innocence phase of this trial,' the court was not required to instruct the jury further to consider all sympathetic mitigating factors . . . and nonstatutory mitigating factors, nor was it required to caution expressly that the 'anti-sympathy' instruction given only at the guilt phase (CALJIC No. 1.00) did not apply at the penalty phase." (*People v. Boyer* (2006) 38 Cal.4th 412, 486-487.) Although the court subsequently erred by repeating the instruction to "not

be influenced by mere . . . sympathy" in its oral instructions[31] (*People v. Easley* (1983) 34 Cal.3d 858, 876), the error was harmless under any standard.  (Cf. *People v. Taylor* (2001) 26 Cal.4th 1155, 1176 [error in giving jury written copy of anti-sympathy instruction during penalty deliberations did not prejudice defendant].)  The other instructions informed the jury that it could consider sympathy in the penalty determination, and no one suggested in argument that sympathy was not an appropriate basis upon which to impose a sentence less than death.[32]

### b.    CALJIC No. 8.88 and related instructions

After the penalty phase closing arguments had concluded, the court instructed the jury regarding the process of weighing aggravating and mitigating circumstances pursuant to CALJIC No. 8.88.[33]  Defendant contends the court

---

[31]    It appears the court misspoke, because the word "sympathy" is crossed out in the written version of the instruction.

[32]    As defendant points out, the court also misspoke when giving his additional sympathy instruction based on *People v. Wharton, supra,* 53 Cal.3d 522.  The written instruction read in pertinent part, "If the mitigating evidence gives rise to compassion or sympathy for the defendant, the jury may, based upon such sympathy or compassion alone, reject death as a penalty."  In the oral instructions, the court substituted the word "that" for "death," stating "If the mitigating evidence . . . the jury may . . . reject *that* as a penalty."  In context, we think the jury would have understood the "that" referred to "the death penalty," which was mentioned in the immediately preceding paragraph.

[33]    "It's now [your] duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed upon the defendant.  After having heard all of the evidence and after having heard and considered the arguments of counsel you shall consider, take into account and be guided by the applicable factors of aggravating and mitigation circumstances upon which you have been instructed.  [¶]  An aggravating factor is any fact, condition or event [at]tending the commission of the crime which increases its guilt or enormity or adds to its injurious consequences which is

*(footnote continued on next page)*

111

erred by failing to give the instruction before closing arguments, at the same time it instructed pursuant to CALJIC No. 8.85. He asserts this failure prejudiced him because the jury was not warned against "mechanical counting" of the factors until after the prosecutor's assertedly prejudicial closing argument. (See *ante,* pt. II.C.2.b.) Defendant, however, consented to this sequence of events; he therefore has forfeited the issue for purposes of appeal. In any event, we fail to discern any prejudice. It is equally likely defendant benefitted from the jury hearing the admonishment against mechanical counting of factors immediately before it retired to deliberate.

Defendant next contends the trial court erred by failing to define the terms "aggravating" and "mitigating" for the jury. He contends the terms have technical meaning and in the absence of instructional definitions, the jury might fail to recognize that a fact is not aggravating unless it renders a murder more deserving of punishment than an "ordinary" murder.

---

*(footnote continued from previous page)*

beyond the elements of the crime itself. [¶] A mitigating circumstance is any fact, condition or event which []as such does not constitute a justification or excuse for the crime in question but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty. [¶] The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale or the arbitrary assignments of weight to any of them. You are free to assign whatever mor[al] or sympathetic value you [deem] appropriate to each and all of the various factors you are permitted to consider. [¶] . . . In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. [¶] To return a judgment of death each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without possibility of parole."

Although we repeatedly have held that the terms "aggravating" and "mitigating" are commonly understood and need not be defined for the jury (e.g., *People v. Williams* (1997) 16 Cal.4th 153, 267), here the trial court did provide standard definitions pursuant to CALJIC No. 8.88. (See *ante,* fn. 33.) These instructions adequately defined the terms (see *People v. Lee, supra,* 51 Cal.4th at p. 652; *People v. D'Arcy* (2010) 48 Cal.4th 257, 304), and we presume the jurors understood and followed them. (*People v. Lee, supra,* at p. 652.)

Defendant further contends the trial court erred by failing to instruct the jury on its own motion that a sentence of life imprisonment without possibility of parole meant that defendant would never be considered for parole. We repeatedly have held, however, that trial courts are not required — either upon request, or on the court's own motion — to instruct that a sentence of life without possibility of parole will inexorably be carried out, because such an instruction would be an incorrect statement of the law. (See, e.g., *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 203-204 [collecting cases]; *People v. Holt, supra,* 15 Cal.4th 619, 688-689 [instruction advising jury that a defendant sentenced to life without possibility of parole could never be released on parole would be erroneous].) We likewise have rejected the suggestion that *Simmons v. South Carolina* (1994) 512 U.S. 154, and its progeny mandate such an instruction. (*People v. Letner and Tobin, supra,* at p. 207; *People v. Arias* (1996) 13 Cal.4th 92, 172-173.) Defendant provides no persuasive reason to revisit these conclusions.

Even were we to assume error, we would find it harmless under any standard. Question No. 28 on the voir dire questionnaire specifically asked whether each prospective juror, if selected to serve on this case, would "agree to accept the court's representation that life without the possibility of parole means exactly that, that the sentence would be life without the possibility of parole?" Those prospective jurors whose responses raised concerns were questioned on the

113

topic; among those questioned, those who could not assure the court that the possibility that defendant would be released on parole would not enter into their penalty deliberations were excused for cause. Tellingly, none of the sitting jurors answered "no" to question No. 28, and the subject came up only once during the oral voir dire of the jurors. Upon questioning, Juror C.P. assured the court and counsel she had "no problem" accepting that "life without parole means life without parole." Further, during closing argument, defense counsel explained, "life without possibility of parole doesn't condone or doesn't excuse [defendant] for this horrible crime. But when he leaves this county to go to state prison sentenced to life without possibility of parole, it's as though they put a big sign over the prison door just as Dante said, 'Abandon hope all ye who enter here.' Because life without possibility of parole is a sentence without hope. There is no hope for ever seeing the outside of the prison." Finally, "[t]here was no evidence of jury confusion or concern in the present case, nor do we accept defendant['s] arguments that 'empirical studies' establish that jurors typically are confused or concerned with these questions even when they do not expressly bring up the issue." (*People v. Letner and Tobin, supra,* 50 Cal.4th at p. 207.)

Defendant's remaining complaints about this instruction also lack merit. The court was not required to instruct the jury that: (1) it could return a verdict of life imprisonment without possibility of parole even if the circumstances in aggravation outweighed those in mitigation; (2) it was required to return a verdict of life without possibility of parole if it found that the aggravating factors did not outweigh the mitigating factors or that death was not the appropriate punishment; or (3) it could return a verdict of life without possibility of parole even in the complete absence of mitigating evidence. (*People v. Fuiava, supra,* 53 Cal.4th at p. 733; *People v. Lee, supra,* 51 Cal.4th at p. 652; *People v. Lewis, supra,* 43 Cal.4th at p. 533.) The term "so substantial" as used in CALJIC No. 8.88 is not

114

unconstitutionally vague (*People v. Lewis, supra,* at p. 533) and does not improperly direct a verdict in favor of death if the jury finds aggravation outweighs mitigation (cf. *People v. Carter, supra,* 30 Cal.4th at p. 1226 [" 'so substantial' " language does not create unconstitutional presumption in favor of death]).  Defendant complains the instruction "deprived [him] of an important procedural protection that California law affords noncapital defendants" in violation of due process of law, but his claim fails because he does not identify any assertedly analogous noncapital procedural protection.

Finally, we have rejected claims that the "multiple use and counting" of various facts and circumstances of the murder — for example, the circumstance that it was committed during a robbery — as a theory of first degree murder, a basis for the special circumstance, and an aggravating factor pursuant to section 190.3, factor (a), "artificially inflate[s] the statutory factors favoring death" (*People v. Hughes* (2002) 27 Cal.4th 287, 405; see *People v. Taylor, supra,* 26 Cal.4th at p. 1183), or otherwise violates federal constitutional guarantees against double jeopardy and the imposition of cruel and unusual punishments.  (*People v. Webster* (1991) 54 Cal.3d 411, 455-456.)  In any event, as noted above here the jury was repeatedly admonished in both instructions and argument not to "double weigh" the various facts and circumstances.

4.   *Asserted unconstitutionality of the death penalty statute*

Defendant raises a number of challenges to the constitutionality of California's death penalty scheme, based on the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.  As he acknowledges, we have consistently rejected these contentions in prior cases.  Presented with no reason compelling reconsideration, we adhere to those decisions, as follows.

115

Section 190.2 — setting out the special circumstances that, if found true, render a defendant eligible for the death penalty — adequately narrows the category of death-eligible defendants and is not impermissibly overbroad, thus conforming to the requirements of the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution. (*People v. Jones*, *supra,* 54 Cal.4th at p. 85; *People v. Blair, supra,* 36 Cal.4th at p. 752.)

Section 190.3, factor (a) — designating the circumstances of the crime as a factor the jury may consider in assessing the appropriate penalty — is not impermissibly vague on its face and does not allow for arbitrary and capricious sentencing in violation of the Fifth, Sixth, Eighth or Fourteenth Amendments to the federal Constitution. (*People v. Jones, supra,* 54 Cal.4th at p. 85; *People v. Blair, supra,* 36 Cal.4th at pp.752-753; see also *Tuilaepa v. California, supra,* 512 U.S. 967 [factor (a) not unconstitutionally vague on its face].)

There is no requirement under either the Sixth Amendment's jury trial guarantee, or the Eighth Amendment's proscription against cruel and unusual punishments, or the Fourteenth Amendment's due process clause, that the jury unanimously find beyond a reasonable doubt the existence of aggravating factors or that the aggravating factors outweigh the mitigating factors or that death is the appropriate penalty. (*People v. Clark, supra,* 52 Cal.4th at p. 1007; *People v. Blair, supra,* 36 Cal.4th at p. 753.) Neither those constitutional provisions, nor Evidence Code section 520, require in the alternative that the jury be instructed to employ the "preponderance of the evidence" standard of proof. (*People v. Castaneda, supra,* 51 Cal.4th at p. 1355; see also *People v. Cowan, supra,* 50 Cal.4th at p. 509.) The federal Constitution does not compel that the jury be instructed, for purposes of "tie-breaking," that the prosecution bears the burden of proof or persuasion at the penalty phase, or that neither party bears the burden of proof. (*People v. Castaneda, supra,* at p. 1355; *People v. Cowan, supra,* at

116

p. 509.)  The failure of the statute to require that the jury provide written findings as to the existence of aggravating factors or a written statement of its reasons for imposing the death penalty does not render it defective under the Eighth or Fourteenth Amendments.  (*People v. Lewis, supra,* 43 Cal.4th at pp. 533-534; *People v. Rogers, supra,* 39 Cal.4th at p. 893.)  Nothing in the United States Supreme Court's recent jurisprudence interpreting the Sixth Amendment's jury trial guarantee — from *Apprendi v. New Jersey* (2000) 530 U.S. 466, through *Cunningham v. California* (2007) 549 U.S. 270 — alters these conclusions. (*People v. Fuiava, supra,* 53 Cal.4th at p. 732; *People v. Cowan, supra,* at p. 509.) Further, there is no violation of equal protection of the laws due to the statutes' failure to afford capital defendants some of the procedural safeguards guaranteed to noncapital defendants.  (*People v. Fuiava, supra,* at p. 732; *People v. Clark, supra,* at p. 1008.)

"The jury's reliance on unadjudicated criminal activity as a factor in aggravation under section 190.3, factor (b), without unanimously agreeing on its existence beyond a reasonable doubt, does not deprive a defendant of any rights guaranteed by the federal Constitution, including the Sixth Amendment right to jury trial." (*People v. Clark, supra,* 52 Cal.4th at p. 1007; accord, *People v. Blair, supra,* 36 Cal.4th at p. 753.)

Contrary to defendant's contention, intercase proportionality review is not required by the due process, equal protection, fair trial, or cruel and unusual punishment clauses of the federal Constitution.  (*People v. Rogers, supra,* 39 Cal.4th at p. 894; see also *People v. Clark, supra,* 52 Cal.4th at p. 1008.)

"On the other hand, a capital defendant is entitled under the California Constitution to *intra*case proportionality review to determine whether the penalty of death is disproportionate to the defendant's culpability." (*People v. Rogers, supra,* 39 Cal.4th at p. 894.)  To the extent defendant contends his sentence was

disproportionate in this sense, we disagree. "To determine whether defendant's sentence is disproportionate to his individual culpability, we examine the circumstances of the offense, including its motive, the extent of defendant's involvement, the manner in which the crime was committed, the consequences of defendant's acts, and defendant's personal characteristics including age, prior criminality, and mental capabilities." (*Id.* at p. 895.) Here, the jury determined that defendant participated with his two accomplices in a scheme to enter the residence of his elderly victim by ruse for the purpose of stealing property therein. Once inside, defendant directed his accomplices to restrain the helpless victim — who had been trying only to help the accomplices — and then shot him to death. Although defendant did not instigate the burglary that led to the murder, the jury could have found that he willingly and actively participated in it and at some point assumed control over the actions of his accomplices, in part by the use of threats and intimidation. The jury further could have concluded that defendant alone intended to and did kill the victim, doing so because he believed the victim could identify him as a perpetrator of the burglary and robbery, crimes which in the end netted defendant and his cohorts less than an "eight-ball" of methamphetamine and a few other items of little apparent value. Based on the above facts, the jury reasonably could have determined that defendant was more culpable than his accomplices who did not receive the death penalty. Further, defendant was a mature man in his 40's at the time of the crimes with a long criminal record who, as a result of his prior crimes, had spent the bulk of his adult life in a locked facility. There was no evidence defendant was mentally incapacitated or severely intoxicated at the time of the offenses. These facts do not demonstrate disproportionality. (See *ibid.*)

Finally, because "California does not employ the death penalty as a ' "regular punishment for substantial numbers of crimes," ' " its imposition does

118

not violate international norms of decency rendering it violative of the Eighth Amendment. (*People v. Clark, supra,* 52 Cal.4th at p. 1008; accord, *People v. Castaneda, supra,* 51 Cal.4th at p. 1356.) Nor does imposition of the death penalty violate the federal Constitution " 'inasmuch as international law is part of our law.' " (*People v. Blair, supra,* 36 Cal.4th at pp. 754-755.) Neither the International Covenant on Civil and Political Rights nor any other provision of international law prohibits a death sentence rendered — as was defendant's sentence — in accordance with state and federal constitutional and statutory requirements. (*People v. Castaneda, supra,* at p. 1356; *People v. Lewis, supra,* 43 Cal.4th at p. 538.)

### 5. *Cumulative error*

Defendant contends the cumulative effect of the errors that occurred at the guilt and penalty phases of his trial denied him due process of law, equal protection of the laws, and a fundamentally fair and reliable trial in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution and parallel provisions of the California Constitution, requiring reversal of the guilt and penalty judgments. We have found only one error: the trial court's repeating, during penalty phase instructions, the directive that the jury "not be influenced by mere . . . sympathy." We have concluded, however, that the error was harmless under any standard. (See *ante,* at p. 111.) Because there were no additional errors to cumulate, this claim fails.

### III. DISPOSITION

For the foregoing reasons, we affirm the judgment in its entirety.

CANTIL-SAKAUYE, C. J.

WE CONCUR:

KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.

**CONCURRING OPINION BY LIU, J.**

I join the court's opinion except as to the issue of the trial court's disparate treatment of a small number of prospective jurors whose written questionnaires showed ambiguity concerning their ability to follow the court's instructions despite their personal views on the death penalty. Although the trial court's actions did not ultimately result in a skewed jury panel and thus do not constitute reversible error, I write separately to underscore the obligation of trial courts to proceed " 'evenhanded[ly]' " when exercising their broad discretion to conduct death-qualification voir dire. (*People v. Thornton* (2007) 41 Cal.4th 391, 425.)

## I.

The process of selecting a jury in a capital case is as important as it is difficult, as the record before us illustrates. Jury selection in this case took over seven days; the record from voir dire alone consumed more than 1,000 pages of the approximately 2,500 total pages in the trial court transcript. The majority of that time was spent reviewing the written questionnaires and conducting individual questioning of the 158 members of the jury pool who remained after hardship excusals. Based on this extensive record, it is clear that the trial court conducted voir dire in a conscientious manner, and today's opinion rejects defendant's claims regarding jury selection by undertaking a careful and thorough examination of the record. (Maj. opn., *ante*, at pp. 21–63.)

1

I agree with the court that the record does not support defendant's claim of systematic bias in the trial court's conduct of voir dire. (Maj. opn., *ante*, at pp. 43–46). At the same time, however, it is apparent that the trial court made more extensive efforts to rehabilitate some jurors who supported the death penalty than it did to rehabilitate at least one juror who opposed the death penalty, even though the written questionnaires of those jurors showed the same degree of ambiguity concerning their ability to set aside their personal views and follow the law. Below I compare the trial court's treatment of two pro-death penalty jurors (Y.C. and C.Pa.) with its treatment of one of the anti-death penalty jurors (B.H.). So that readers can come to their own conclusions regarding the trial court's treatment of these jurors, I have included at the end of this opinion the responses of each juror to Questions 9 through 32 of the written questionnaire (the questions that ask directly about the death penalty) as well as the transcript of the trial court's questioning of each juror during voir dire.

***Prospective Juror Y.C.*** The answers given by Y.C. to the written questionnaire were strongly supportive of capital punishment. Y.C. repeatedly answered "yes" to whether she would automatically vote for the death penalty, regardless of the penalty phase evidence, if a defendant was convicted of first degree murder and a special circumstance (Questions 19, 32). She answered "yes" to whether everyone convicted of murder for killing an elderly man with a shotgun during a robbery should receive the death penalty, regardless of the evidence regarding the penalty introduced by the People and the defendant (Question 12). She also said the death penalty should be mandatory for "Murder & murder/special circumstance" (Question 15). Y.C. answered "yes" to whether she believed in the adage "an eye for an eye" (Question 22), and despite the questionnaire's statement that California law has not adopted the "eye for an eye" principle, she answered "no" to whether she could put that concept out of her mind

2

and apply the principles given by the court (Question 23). In addition, Y.C. answered "no" to whether she could set aside her own personal feelings regarding what the law should be regarding the death penalty and follow the court's instructions (Question 27) and "Do not know" to whether she could set aside any religious or moral training regarding the death penalty and decide the case according to the law given by the court (Question 25). Y.C. also answered "Do not know" to whether she could accept the court's representation that life without the possibility of parole means exactly that (Question 28), and she answered "yes" to whether the cost of keeping someone in jail for life and the cost of providing the appellate process would be considerations for her in deciding the penalty (Question 29). On the other hand, Y.C. answered "yes" to whether she would listen open-mindedly to any evidence submitted about the penalty and base her decision about the penalty solely on such evidence and instructions (Question 13).

The trial court's questioning focused on this inconsistency, providing Y.C. with the opportunity to confirm that, despite her strongly held beliefs in favor of the death penalty, she could set aside those personal beliefs and follow the law as instructed by the trial court. The trial court began by instructing Y.C. on the distinction between the guilt phase and penalty phase of a capital trial. The court then explained that in the event of a penalty phase, the jury would hear aggravating and mitigating evidence. When asked whether she could vote for the death penalty if the evidence in aggravation outweighed the evidence in mitigation, Y.C. said "I believe I could." When asked whether she could vote for life without the possibility of parole if the factors in mitigation outweighed the factors in aggravation, Y.C. said "I really don't[,] I really don't know at this point, Your Honor" and then said "I could. Okay. You know. I just." The court followed up: "THE COURT: You have to hear the evidence? [¶] Y.C.: That's right. I'd have to hear something before I can say. [¶] THE COURT: So in other

3

words, you couldn't make that decision until you'd listen to both sides?  [¶]  Y.C.: That's right."

The court proceeded to ask Y.C. about her answers to Questions 22 and 23 of the questionnaire, where Y.C. said she could not set aside the principle of "an eye for an eye" and follow the law:  "THE COURT:  . . . Based on the answers that you've given me to the previous questions do you want to change that answer?  [¶]  Y.C.:  Yes.  [¶]  THE COURT:  Okay.  And your answer to that is now yes that you would be able to follow the court's instructions and base your decision on what you hear in court?  [¶]  Y.C.:  Yes, sir. . . ."  Further, when asked whether, despite answering "do not know" to Question 28, she could now accept the court's representation that life without the possibility of parole means exactly that, Y.C. said "Yes, sir."  The court then examined Question 29 where Y.C. said the cost of jailing a person for life and providing the appellate process would be considerations for her in deciding the penalty:  "THE COURT:  Well, are you going to let that influence you in deciding which penalty to decide on?  [¶]  Y.C.: No, I don't think so.  [¶]  THE COURT:  In other words, you're not going to put dollars and [cents] either way before any other consideration?  [¶]  Y.C.:  No, sir. This is important.  Not something I take lightly."  Regarding Y.C.'s answer to Question 32 that she would automatically vote for the death penalty regardless of the evidence, the court inquired:  "You answered that one 'Yes,' and based on your answers to the questions I previously answered would that be no also?"  Y.C. replied:  "I believe so."  At the end of the voir dire, Y.C. said:  "Those questions are rather tricky.  [¶]  . . .  Get you thinking one way.  [¶]  . . .  Just change everything."

***Prospective Juror C.Pa.***  Like Y.C.'s answers, the answers C.Pa. gave to the written questionnaire were strongly supportive of the death penalty.  C.Pa. indicated that she "[w]ould always impose" the death penalty "regardless of the

4

evidence" (Question 9) and that her view on the death penalty was "take a life / pay the price" (Question 10). She answered "yes" and "Non-negotiable" to whether everyone convicted of robbery murder should receive the death penalty, regardless of the evidence (Question 12). C.Pa. also answered "yes" to whether she believed in the adage "an eye for an eye" (Question 22), and she answered "no" to whether she could put that concept out of her mind and apply the principles given by the court (Question 23). In addition, C.Pa. answered "no" to whether she would agree to accept the court's representation that life without the possibility of parole means exactly that (Question 28), and she answered "yes" to whether, if there was a penalty phase of a trial, she would in every case automatically vote for the death penalty rather than life in prison without the possibility of parole (Question 32). On the other hand, C.Pa. answered "yes" to whether she could set aside her personal feelings regarding what the law should be regarding the death penalty and follow the law as instructed by the court (Question 27).

Noting the inconsistency, the trial court extensively instructed C.Pa. on the applicable law and asked numerous leading questions, including the following: "THE COURT: Okay. Do you understand that if you got to the penalty phase evidence would be introduced in aggravation, factors indicating that the death penalty is appropriate, and mitigation factors, indicating that it is not and that you as a juror would be asked to weigh those factors one against another under the instructions on the law that's given to you by the court and decide which is the appropriate punishment. [¶] You understand that? [¶] C.Pa.: Yes. [¶] THE COURT: Okay. And you understand that as the law stands in the State of California, the death penalty is not automatic upon conviction of the crime of this nature. It's simply one of the two available punishments and it's up to the jury to decide what the appropriate punishment is under the instruction given by the

5

court? [¶] C.Pa.: Yes. [¶] THE COURT: Okay. Understanding that, do you feel that you would be able to follow the court's instructions and fairly evaluate the evidence in favor of the death penalty and against the death penalty and arrive at a rational decision? [¶] C.Pa.: Yes." When defense counsel followed up, C.Pa. stated that if she were the defendant "I would not feel it was fair to put someone with my mind set on the death penalty on this type of jury," but that "[w]ith the judge's definitions I would have an open mind." The trial court denied defendant's challenge for cause "based on the answers here in court. The juror has assured the court that she can follow the court's instructions and did not fully understand the original answers given."

***Prospective Juror B.H.*** Now compare the trial court's treatment of Y.C. and C.Pa. with its treatment of B.H. On her questionnaire, B.H. indicated she opposed the death penalty but did not check the option indicating "Strongly oppose" or "Will never under any circumstances impose death penalty, regardless of the evidence" (Question 9). B.H. answered "None. ?" to the question asking under what circumstances, if any, she believes the death penalty is appropriate (Question 17). She answered "yes" to whether she would hesitate to vote for first degree murder or for a special circumstance, even if proven beyond a reasonable doubt, just to avoid the task of deciding the penalty, explaining "I feel against the death penalty" (Question 30). And she answered "yes" to whether she would in every case automatically vote against the death penalty regardless of the evidence, explaining "I [am] against the death penalty" (Question 31). On the other hand, like Y.C., B.H. answered "yes" to whether she would listen open-mindedly to any evidence submitted about the penalty and base her decision about the penalty solely on such evidence and instructions (Question 13). And like C.Pa., B.H. answered "yes" to whether she could set aside her personal feelings regarding what the law should be regarding the death penalty and follow the law as

6

instructed by the court (Question 27).  In short, B.H.'s questionnaire was no less ambiguous than C.Pa.'s or Y.C.'s.

But the trial court's voir dire of B.H. was starkly different from its voir dire of Y.C. and C.Pa.  In its entirety, the trial court questioned B.H. as follows:  "THE COURT:  All right.  [B.H.], we just have a couple questions for you based on your answers to the questionnaire.  And I don't think we'll be detaining you too long.  Okay?  [¶]  All right.  First of all, in answer to Question 9, you indicated that you oppose the death penalty, correct?  [¶]  B.H.:  Yes.  [¶]  THE COURT:  And then in 10 and 11, you were asked — 10 you were asked to explain your views on the death penalty.  You left that blank.  [¶]  B.H.:  Uh-huh.  [¶]  THE COURT:  And can you explain either, A, why you left it blank, or B, what your views are?  [¶]  B.H.:  Because I didn't know what to put down.  [¶]  THE COURT:  Okay.  So you just weren't sure what to say?  [¶]  B.H.:  Uh-huh.  [¶]  THE COURT:  And have your views on death penalty changed over time?  [¶]  B.H.:  No.  [¶]  THE COURT:  I'm not clear here on some of your answers exactly what you feel here.  [¶]  Is your feeling about the death penalty such that under no circumstances could you vote to approve it?  [¶]  B.H.:  Under no circumstances.  THE COURT:  None whatsoever?  [¶]  B.H.:  None whatsoever.  [¶]  THE COURT:  Okay.  So if — even if this were the most horrible crime in history?  [¶]  B.H.:  Even if.  [¶]  THE COURT:  And even if the defendant was the worst person in history, you could not — [¶]  B.H.:  I don't believe in it.  [¶]  THE COURT:  All right.  Thank you, ma'am.  You're excused."

Although there was no difference in the degree of ambiguity in C.Pa.'s and Y.C.'s questionnaires on the one hand and B.H.'s questionnaire on the other, there was a clear difference in how the trial court went about resolving the ambiguity.  With respect to C.Pa. and Y.C., the trial court from the outset carefully and methodically instructed each juror on the applicable law and asked each juror if

7

she could follow each aspect of the law set forth by the court. By contrast, the trial court did not give B.H. any instruction on the applicable law. After five brief initial questions, the court asked B.H. whether "your feeling about the death penalty [is] such that under no circumstances could you vote to approve it." The fact that B.H. answered "Under no circumstances" and "None whatsoever" is no more (or less) probative of B.H.'s ability to follow the law than the comparably categorical answers that C.Pa. and Y.C. would have given (and *did* give on their questionnaires) if the court had simply asked them whether "your feeling about the death penalty is such that you would automatically vote for it in every first degree murder case." By instructing C.Pa. and Y.C. on the applicable law, the court impressed upon them the important distinction between one's personal views on the death penalty and the law governing the death penalty. The court did not impress upon B.H. this crucial distinction and did not inquire whether B.H. could set aside her personal views and follow the law, even though B.H. had indicated on her questionnaire that she could do so.

" '[T]rial courts should be evenhanded in their questions to prospective jurors during the "death-qualification" portion of the voir dire, and should inquire into the jurors' attitudes both for and against the death penalty to determine whether these views will impair their ability to serve as jurors.' [Citation.]" (*People v. Thornton*, *supra*, 41 Cal.4th at p. 425.) Trial courts are afforded broad discretion in conducting voir dire, a process that relies heavily on observing the demeanor of prospective jurors and merits deference from reviewing courts. (See maj. opn., *ante*, at pp. 23–24; see also *People v. Martinez* (2009) 47 Cal.4th 399, 445; *Uttecht v. Brown* (2007) 551 U.S. 1, 9.) But there is no reason to think that prospective jurors who oppose the death penalty are any less capable of following the law than prospective jurors who strongly support the death penalty. Precedent makes this clear: "It is entirely possible, of course, that even a juror who believes

8

that capital punishment should never be inflicted and who is irrevocably committed to its abolition could nonetheless subordinate his personal views to what he perceived to be his duty to abide by his oath as a juror and to obey the law of the State." (*Witherspoon v. Illinois* (1968) 391 U.S. 510, 514–515, fn. 7; see *Lockhart v. McCree* (1986) 476 U.S. 162, 176 (*Lockhart*) ["It is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law."].)

Separating one's personal views from one's fidelity to the law is as familiar as it is essential to our justice system. That is the core duty of every person vested with the privilege and responsibility of serving as a judge, and it is also the most basic obligation of every citizen when he or she is called to civic duty as a juror. Just as we expect individuals who serve as judges to set aside their personal views and faithfully apply the law, the law presumes that citizens who resolutely support or resolutely oppose the death penalty are capable of setting aside their personal views when serving as jurors. (See *Lockhart*, *supra*, 476 U.S. at p. 176.) Here, the voir dire of Y.C., C.Pa., and B.H. appeared to proceed on the premise that it is possible, through careful instruction on the law, to rehabilitate jurors who say the death penalty should be "mandatory" for murder or who say they would "automatically" vote for the death penalty in every case, but not possible to rehabilitate a juror who says she would vote for the death penalty "under no circumstances." By not instructing B.H. on the law or asking whether B.H. could follow the law despite her personal beliefs — while doing exactly that in the case of C.Pa. and Y.C. — the court did not proceed in an evenhanded manner.

9

It is possible to posit, as today's opinion does (maj. opn., *ante*, at pp. 42–43, fn. 15; *id.* at pp. 55–56), that the trial court observed something in B.H.'s demeanor that suggested it would have been pointless to question B.H. further. I do not disagree that this is adequate to establish that the excusal of B.H. for cause, *considered by itself*, was not an abuse of discretion. But deference to the trial court's observation of demeanor is not responsive to the claim that the trial court did not conduct voir dire evenhandedly. In the face of ambiguity in C.Pa.'s questionnaire, the trial court did not begin voir dire by asking C.Pa.: "Is your feeling about the death penalty such that you would always impose the death penalty regardless of the evidence?" And in the face of ambiguity in Y.C.'s questionnaire, the trial court did not begin voir dire by asking Y.C.: "Is your feeling about the death penalty such that you would automatically vote for the death penalty in every first degree murder case?" Had the trial court asked such questions — parallel to those the court asked B.H. — there is no reason to think C.Pa. and Y.C. would have given any different answers than what they indicated in their questionnaires, and on the basis of their answers and demeanor, the trial court might well have concluded that there would no point in questioning C.Pa. and Y.C. further. But we will never know because the trial court examined the ambiguity in C.Pa.'s and Y.C.'s questionnaires through a markedly different line of questioning than what the trial court used to examine the ambiguity in B.H.'s questionnaire.

Moreover, this differential treatment cannot itself be explained by anything having to do with the jurors' demeanor because the disparity in questioning occurred at the very beginning of each juror's voir dire. Although today's opinion notes that the trial court had the opportunity to assess each juror's demeanor "both *before* and during questioning" (maj. opn., *ante*, at pp. 43, 56, italics added; see *id.* at pp. 42–43, fn. 15), it is hardly clear what aspects of a juror's demeanor before

10

questioning would have enabled the court to determine that Y.C. and C.Pa., but not B.H., were potentially receptive to instruction on the law and, in particular, to the obligation to set aside one's personal views on the death penalty. While our cases have often counseled deference to perceptions of demeanor when a juror gives conflicting or equivocal answers "[d]uring voir dire" (*People v. Jones* (2012) 54 Cal.4th 1, 41; see *People v. Duenas* (2012) 55 Cal.4th 1, 11–12; *People v. Hamilton* (2009) 45 Cal.4th 863, 890; *People v. Stewart* (2004) 33 Cal.4th 425, 451), today's opinion does not (because it cannot) cite any precedent of this court that has placed much reliance, if any, on a trial court's unstated perceptions of demeanor before questioning. This is not surprising, for such a precedent would tend to erode appellate review in this context almost to the vanishing point.

Thus, the trial court, while generally careful and conscientious in the jury selection process, was not evenhanded in its voir dire of prospective jurors Y.C., C.Pa., and B.H. In those instances, the trial court seemed to proceed on the impermissible assumption that jurors who oppose the death penalty are less capable of fulfilling their civic duty than jurors who support the death penalty.

The trial court's disparate treatment of those jurors, however, does not warrant reversal of the death judgment because it did not render defendant's trial " 'fundamentally unfair.' " (*People v. Carter* (2005) 36 Cal.4th 1215, 1250.) Defense counsel did not seek an opportunity to question B.H., nor did he object to the court's excusal of B.H. Although B.H. was not given the same opportunity as C.Pa. and Y.C. to declare her ability to follow the law, it is possible that defense counsel either agreed with the court's implicit evaluation of B.H.'s demeanor once voir dire began or had some other reason for agreeing to the court's excusal of B.H. (Or it is possible, though not relevant on direct appeal, that defense counsel should have objected but failed to do so.) Meanwhile, the trial court did not abuse its discretion in denying defense counsel's for-cause challenges to C.Pa. and Y.C.

11

because both jurors ultimately confirmed that they could set aside their personal beliefs and follow the law as instructed by the court. Moreover, the record as a whole shows that the trial court's disparate treatment of Y.C., C.Pa., and B.H. did not result in a biased jury. (See maj. opn., *ante*, at pp. 44–45.)

In sum, the problem here is not with the outcome of the death-qualification process, but rather with the lack of symmetry in the court's voir dire of pro- and anti-death penalty jurors whose written questionnaires presented the same degree of ambiguity. Although the discretion of trial courts to conduct death-qualification voir dire is broad, it must be exercised evenhandedly.

## II.

Defendant further contends that the trial court improperly used leading questions to rehabilitate pro-death penalty jurors like Y.C. and C.Pa., whereas it relied on limited, closed-ended questions with anti-death penalty jurors like B.H. I agree with today's opinion that the trial court's use of leading questions fell within its broad discretion. (See maj. opn., *ante*, at pp. 28, 35–36.) I further find that the disparity between the two modes of questioning did not result in a biased jury. However, I would underscore the court's "caution against overreliance on leading questions to the exclusion of more open-ended questions." (Maj. opn., *ante*, at p. 35, fn. omitted.)

We addressed the subject of leading questions in *People v. Mills* (2010) 48 Cal.4th 158, which involved an "evenhandedness" claim similar to the one raised here: improper rehabilitation of pro-death penalty jurors in contrast to cursory examination and dismissal of anti-death penalty jurors. In rejecting the claim, we said: "Nor does the court's occasional use of leading questions when attempting to rehabilitate 'death-leaning' jurors suggest a lack of impartiality. We trust our trial courts understand and appreciate the importance of the voir dire procedure and the need to be 'evenhanded' in questioning prospective jurors in a capital case.

12

[Citation.] We assume the trial court formulated its questions based on the individual characteristics of each juror, including the juror's questionnaire answers and in-court demeanor. To second-guess these choices would encourage the trial court to engage in substantially the same questioning of all prospective jurors irrespective of their individual circumstance, something we have declined to do." (*Id.* at p. 190.)

I have explained above why the trial court's different approaches to questioning C.Pa. and Y.C. on one hand, and B.H. on the other, cannot be explained by the jurors' questionnaires, in-court demeanor, or any other individual circumstance apparent on the record. In this case, the trial court's use of leading questions seemed to blur the line between probing a juror's true views and suggesting there were right and wrong answers to the court's questions. The entire voir dire of Y.C., for example, contains little in the way of Y.C. expressing her views in her own words. It consists almost entirely of "yes" or "no" answers to lengthy leading questions in which the court recites the law and asks if Y.C. can follow it. The voir dire begins with Y.C. speaking somewhat informally ("Uh-huh." "Right." "Okay." "Um-hmm."), but as the voir dire proceeds, Y.C. increasingly responds to the court with greater deference ("Yes, sir." "No, sir."). In the latter half of the voir dire, she repudiates several answers on her questionnaire, and she concludes by saying: "Those questions are rather tricky. [¶] . . . Get you thinking one way. [¶] . . . Just change everything."

By the end of the voir dire, Y.C. appears to be telling the judge what she thinks he wants to hear or what she believes the "correct" answers are. This is hardly surprising. Most people called to jury duty are, and conceive of themselves as, law-abiding citizens. "Given the formality of the setting of a superior court, over which the trial judge presides in a commanding display of authority" (*People v. Guerra* (2009) 176 Cal.App.4th 933, 943), it is natural for a prospective juror to

13

accord deference to the judge and to answer "yes" when the judge individually instructs the juror on the law and asks "can you follow my instructions?" On one hand, this seems problematic to the extent that Y.C.'s answers, given with increasing deference to the judge, might not reveal her real views. On the other hand, it is possible that the judge, through his leading questions, has succeeded in impressing upon Y.C. the distinction between following one's personal views and following the law, as well as the duty of jurors to do the latter and not the former. The same can fairly be said of the trial court's questioning of C.Pa. But if that is the case, then it only underscores the court's inconsistency in not questioning B.H. in the same manner.

I believe the following guidance offered by a sister high court is well-taken: "We have disapproved close-ended questions that predetermine answers or elicit narrow 'yes' and 'no' responses. [Citation.] We have encouraged the formulation of additional questions that will provide insight into a juror's views on the controversy. Obviously, a court must control *voir dire* examination, but in doing so it must remain neutral. The court must not proselytize; it must not indicate its views of the 'right' or 'wrong' answers to *voir dire* questioning. The *voir dire* should be probing, extensive, fair and balanced." (*State v. Papasavvas* (2000) 163 N.J. 565, 585 (*Papasavvas*).) In approving the trial court's conduct of voir dire in *State v. Perry* (1991) 124 N.J. 128, the court observed: "There was nothing perfunctory about the process; rather, the trial court's mixture of open-ended initial questioning and more-particularized follow-up questioning nicely meshed the duty to probe sufficiently with allowing a juror to use his or her own words." (*Id.* at p. 157.)

This is not to say that leading questions have no place in a process that requires prospective jurors to give detailed answers on issues that are not typically part of everyday conversation. But because leading questions tend to be "close-

14

ended questions that predetermine answers or elicit narrow 'yes' and 'no' responses" (*Papasavvas*, *supra*, 163 N.J. at p. 585), and because the authority of the trial judge may cause a juror to give what she thinks is a "correct" answer rather than a considered statement of her true views, trial courts should be careful to avoid over-reliance on leading questions to the exclusion of more open-ended questions that allow jurors to state their views in their own words.

LIU, J.

**Y.C.: Juror Questionnaire (Questions 9–32)**
The prospective juror's responses are in italics. Where the prospective juror was asked to select among multiple pre-printed responses, the juror's selections are indicated by an "**X**."

9. Check the entry which best describes your feeling about the death penalty:

> \_\_\_ Would always impose regardless of the evidence
> **X** Strongly support    \_\_\_ Oppose
> \_\_\_ Support    \_\_\_ Strongly oppose
> \_\_\_ Will consider
> \_\_\_ Will never under any circumstances impose death penalty, regardless of the evidence.

10. Please explain your views on the death penalty:

> *If "you" think another's life is inconsequential—prepare to pay the ultimate penalty! — if "you" decide to take that person's life —*

11. In what ways, if any, have your views about the death penalty changed over time?

> *Has always been the same.*

12. In this case, the defendant is charged with murder for killing an elderly man with a shotgun. Do you think everyone convicted of such a murder committed during a robbery should receive the death penalty, regardless of the evidence regarding penalty which is introduced by the People and the defendant?

> Yes **X** No \_\_\_ Please explain:
>
> *The murder was probably not necessary*

13. If you were selected as a juror in this case and if the jury got to a penalty phase, would you agree to listen open-mindedly to any evidence submitted about the penalty, and base your decision about the penalty solely on such evidence and instructions?

> Yes **X** No \_\_\_ Please explain:

14. Do you feel that the death penalty is used too seldom or too often? Please explain:

> *Too seldom — death row is overcrowded with convicted & sentenced criminals way overdoing the appeal time — too much money spent supporting these folks!*

15. Do you feel that the death penalty should be mandatory for any particular type of crime? Please explain:

> *Yes. Murder & murder/special circumstance.*

16. Do you feel that the death penalty should be a possible sentence for any crime other than first degree murder with special circumstances? Please explain:

> *Yes. Any murder.*

17. Under what circumstances, if any, do you believe that the death penalty is appropriate?

> *See question # 15.*

18. Under what circumstances, if any, do you believe that the death penalty is inappropriate?

> *For anything but murder & murder/special circumstance.*

19. If a defendant was convicted of first degree murder with a special circumstance, do you feel that you would automatically vote for the death penalty and against life imprisonment without possibility of parole? Please explain:

> *Yes. See question # 14.*

20. Do you feel that if a defendant was convicted of first degree murder and a special circumstance, that you would automatically vote against the death penalty and for life without possibility of parole? Please explain:

> *No.*

21. What would you want to know about the defendant before deciding whether to impose the death penalty or life imprisonment without possibility of parole? Please explain:

> *Why he had such little disregard for another human life.*

22. Do you believe in the adage: "An eye for an eye"?

> Yes **X** No ___

> What does the adage "An eye for an eye" mean to you?

> > *If you sin against another & take their life prepare to lay down your own.*

> Is your belief in this adage based upon a religious conviction?

> Yes **X** No ___

23. California law has not adopted the "eye for an eye" principle. Will you be able to put the "eye for an eye" concept out of your mind and apply the principles the Court gives you?

> Yes ___ No **X**

24. Have you had any religious or moral training regarding the death penalty?

> Yes **X** No ___ Source:

> *From family & church*

25. Could you set aside any such training and decide this case according to the law which the Court will give to you?

> Yes ___ No ___ Please explain:

> *Do not know.*

26. Do you belong to any organization that either advocates for the death penalty or the abolition of the death penalty?

> Yes ___ No **X**

A-3

If yes, what organization(s):

27. Could you set aside your own personal feelings regarding what you think the law should be regarding the death penalty, and follow the law as the Court instructs you?

Yes ___ No **X**

Please comment:

28. If you are selected as a juror in this case and if the jury got to a penalty phase, would you agree to accept the court's representation that life without the possibility of parole means exactly that, that the sentence would be life without the possibility of parole?

Yes ___ No ___ Please explain:

*Do not know.*

29. In deciding penalty — that is, life in prison without the possibility of parole or death — would the costs of keeping someone in jail for life be a consideration for you?

Yes **X** No ___ Please explain:

Would the costs of providing the appellate process be a consideration?

Yes **X** No ___ Please explain:

30. Knowing that a first degree murder verdict, with a special circumstance found true, could cause the jury to enter a second, "penalty" phase, and cause the jury to have to consider life without the possibility of parole, or death, would you, for any reason, hesitate to vote for first degree murder, or for a special circumstance, if the evidence proved either such thing true, beyond any reasonable doubt, just to avoid the task of deciding the penalty?

Yes ___ No **X** Please explain:

31. If you found the defendant guilty of first degree murder and found the special circumstance to be true, would you, regardless of the evidence, because of your feelings about the death penalty, in every case automatically vote against the death penalty?

Yes  **X**  No  ___  Please explain:

32.  Are your feelings about the death penalty such, that if there was a penalty phase of a trial, you would in every case automatically vote <u>for</u> the death penalty rather than life in prison without the possibility of parole?

Yes  **X**  No  ___  Please explain:

**Y.C.:  Voir Dire**

THE COURT:  Okay.  Just a couple of questions off your questionnaire here and after we're through with that you'll be all done.

Number one, you indicated that in your answer to question number seven you said that you had heard something about this case, general information in the newspaper?

Y.C.:  Some small — I don't believe I even read the whole article.

THE COURT:  Okay. And you don't — as you sit here right now you didn't form any opinion based on what you read about the guilt or innocence of the defendant in this matter?

Y.C.:  No, sir.  I didn't.

THE COURT:  And can you promise us that regardless of what you may have read if anything does come back to you at some point that you'll base your decision on what you hear here in court, not what you read in the Bee?

Y.C.:  Yes.

THE COURT:  Thank you.

With reference to question 12 you indicated that the defendant was charged with murder of killing an elderly — I'm going to read the question to you.

"In this case the defendant is charged with murder for killing an elderly man with a shotgun.  Do you think everyone convicted of such a murder during the commission of the robbery should receive the death penalty regardless of the evidence regarding penalty which is introduced by the People and the defendant?" You answered, "Yes.  The murder was probably not necessary."

Then in the next question 13 it said, "If you were selected as a juror in this case and if the jury got to the penalty phase, would you agree to listen open

A-5

mindedly to any evidence submitted about the penalty and base your decision solely on such evidence and instructions." And you also answered yes to that.

Okay. So that —

Y.C.: See, I've got a confusion about the first part and the penalty part. That's where I'm getting confused.

THE COURT: That's why I wanted to explore that with you.

You understand there are two phases possible here in this trial?

Y.C.: Yes.

THE COURT: Okay.

Y.C.: Uh-huh.

THE COURT: And you get the first phase is called the guilt phase?

Y.C.: Okay.

THE COURT: And within the guilt phase evidence would be introduced to show whether the defendant did nor did not commit the crime that he is charged with having committed. And whether the special circumstances alleged in that crime are true or not?

Y.C.: Okay.

THE COURT: And in this case the special circumstances are that the murder was committed during the course of a robbery, right?

Y.C.: Right.

THE COURT: Okay. You understand that so far?

Y.C.: Yes.

THE COURT: Okay. Then if you and the other jurors found beyond a reasonable doubt that the defendant was guilty as charged and the special circumstances were true, you would then move in to what's called the penalty phase. You understand?

Y.C.: Um-hmm.

THE COURT: And in the penalty phase there would be evidence that would be presented which is called aggravation, which means factors which the prosecution believes would tend to indicate that the death penalty should be imposed, or mitigation, which means factors that the defendant believes would indicate that the death penalty should not be imposed, life without possibility of parole should be the sentence. You understand?

Y.C.: Um-hmm.

THE COURT: Okay. Understanding that would you be able to listen to the evidence and if the evidence in aggravation outweighed the evidence in mitigation, would you be able to vote for the death penalty?

Y.C.: I believe I could.

THE COURT: Yes?

Y.C.: Yes.

THE COURT: And on the other hand, if you listen to the evidence and you believe that the factors in mitigation outweigh the factors in aggravation, could you vote for the sentence of life without possibility of parole?

Y.C.: I really don't I really don't know at this point, your Honor.

THE COURT: Well, you —

Y.C.: I could. Okay. You know. I just.

THE COURT: You have to hear the evidence?

Y.C.: That's right. I'd have to hear something before I can say.

THE COURT: So in other words, you couldn't make that decision until you'd listen to both sides?

Y.C.: That's right.

THE COURT: And determine whether in your mind there were more factors indicating that the death penalty should be imposed then factors indicating that they should not?

Y.C.: Yes.

THE COURT: Or vise versa?

Y.C.: Yes.

THE COURT: Right?

Y.C.: Right.

THE COURT: Okay. And do you have any hesitancy either way in voting either way if you believe that that's what the evidence indicates?

Y.C.: No.

THE COURT: No?

Y.C.: I do.

THE COURT: Okay. You indicated that in answer to question 22 you believe in the adage an eye for an eye. You said if you yes, you said what does it mean. You said, "If you sin against other and take the life then prepare to lay down your own." And you said, "Is that based on religious conviction?" You said yes. And then you said, "California law has not adopted an eye for an eye principle."

"Would you be able to put that concept out of the mind and apply the principle that the court gives you," and the answer to that said no.

Based on the answers that you've given me to the previous questions do you want to change that answer?

Y.C.: Yes.

THE COURT: Okay. And your answer to that is now yes that you would be able to follow the court's instructions and base your decision on what you hear in court?

Y.C.: Yes, sir. At the time of the day and people in the jury assembly room it was a little hard to concentrate on the questions.

THE COURT: Okay. In a couple of places here you indicated that in deciding, well, actually the question 28 you said, "If selected as a juror in the case and the jury got to the penalty phase would you agree to accept the court's representation that life without possibility of parole means exactly that that the sentence would be life without the possibility of parole?" And you said "Don't know."

Are you willing to accept right now if your concept — if you get in there as a juror that you would — will conduct yourself as if life without possibility of

parole means exactly that that the defendant, if he's sentenced to life without the possibility of parole, will be sentenced to life in prison and will stay there without parole.  Are you willing to accept that concept?

Y.C.: Yes, sir.

THE COURT:  And are you you willing to so conduct yourself in the jury room?

Y.C.:  Yes, sir.

THE COURT:  Okay.  Thank you.

And 29 and 30.  You said, "In deciding penalty that it's life in prison without possibility of parole or death would the cost of keeping someone in jail for life be a consideration?"  You said "Yes."

"And would the cost of providing appellate process be a consideration" and you answered yes.

Did you mean that by that that you would — when you got back there and you were thinking about whether this case if you got to that point deserved the death penalty or life without possibility of parole that you would tend to vote for the death penalty because that way you would save some dollars for the state because the defendant wouldn't have to be warehoused?

DEFENSE COUNSEL:  Well, Your Honor, I'll object to that because I think the studies have shown that life without possibilities of parole is in fact cheaper.

THE COURT:  Well, that's not — I'm asking the juror's concept, not yours, Mr. Spokes.

Y.C.:  That was my reasoning behind my answer, yes.

THE COURT:  Well, are you going to let that influence you in deciding which penalty to decide on?

Y.C.:  No, I don't think so.

THE COURT:  In other words, you're not going to put dollars and sense either way before any other consideration?

Y.C.:  No, sir.  This is important.  Not something I take lightly.

A-9

THE COURT: And on the other hand, with regard to the appellate process if you were to vote for the death penalty would you be swayed to vote the other way because of the cost of an appeal if that is the situation?

Y.C.: No.

THE COURT: No?

Y.C.: No.

THE COURT: Okay.

Then on answer to 31 you said, "If you found the defendant guilty of first-degree murder and found special circumstances to be true, would you regardless of the evidence because of your feelings about the death penalty automatically vote against the death penalty." And you said yes. Is that a wrong answer?

Y.C.: I believe so.

THE COURT: So your answer to that question is actually no?

Y.C.: Would be a no.

THE COURT: Correct?

Y.C.: Yes, correct.

THE COURT: And with respect to question 22 — 32 you said, "Are your feelings about the death penalty such that if there was a penalty phase you would in every case vote automatically for the death penalty?" You answered that one "Yes," and based on your answers to the questions I previously answered would that be no also?

Y.C.: I believe so. Those questions are rather tricky.

THE COURT: Kind of confusing?

Y.C.: Yes. Get you thinking one way.

THE COURT: All right.

Y.C.: Just change everything.

***

THE COURT: Either side have any questions?

A-10

DEFENSE COUNSEL:  I have no questions.

PROSECUTOR:  No questions, Your Honor.

Pass for cause.

DEFENSE COUNSEL:  I'd enter a challenge based on the answers to questions 12, 19, 23, 28, 29 and 32.

THE COURT: Denied.


**C.Pa.:  Juror Questionnaire (Questions 9–32)**
The prospective juror's responses are in italics.  Where the prospective juror was asked to select among multiple pre-printed responses, the juror's selections are indicated by an "**X**."

9.  Check the entry which best describes your feeling about the death penalty:

    **X**   Would always impose regardless of the evidence
    ___   Strongly support                    ___   Oppose
    ___   Support                             ___   Strongly oppose
    ___   Will consider
    ___   Will never under any circumstances impose death penalty, regardless of the evidence.

10.  Please explain your views on the death penalty:

     *Take a life / pay the price*

11.  In what ways, if any, have your views about the death penalty changed over time?

     *None*

12.  In this case, the defendant is charged with murder for killing an elderly man with a shotgun.  Do you think everyone convicted of such a murder committed during a robbery should receive the death penalty, regardless of the evidence regarding penalty which is introduced by the People and the defendant?

     Yes  **X**  No  ___   Please explain:

     *Non-negotiable*

A-11

13.  If you were selected as a juror in this case and if the jury got to a penalty phase, would you agree to listen open-mindedly to any evidence submitted about the penalty, and base your decision about the penalty solely on such evidence and instructions?

Yes  _**X**_  No  ___  Please explain:

14.  Do you feel that the death penalty is used too seldom or too often? Please explain:

[C.Pa. circled the words "too seldom" in the printed question.]

15.  Do you feel that the death penalty should be mandatory for any particular type of crime?  Please explain:

*yes, i.e., first degree murder, victim death because of assault — such as heart attack*

16.  Do you feel that the death penalty should be a possible sentence for any crime other than first degree murder with special circumstances?  Please explain:

*no, i.e., crime of passion*

17.  Under what circumstances, if any, do you believe that the death penalty is appropriate?

*Willful intent, planned.*

18.  Under what circumstances; if any, do you believe that the death penalty is inappropriate?

*no victim loss of life.*

19.  If a defendant was convicted of first degree murder with a special circumstance, do you feel that you would automatically vote for the death penalty and against life imprisonment without possibility of parole?  Please explain:

*the special circumstance wld have to be considered w/in parameter of judicial interpretation*

A-12

20.  Do you feel that if a defendant was convicted of first degree murder and a special circumstance, that you would automatically vote against the death penalty and for life without possibility of parole?  Please explain:

*unknown w/o all info.*

21.  What would you want to know about the defendant before deciding whether to impose the death penalty or life imprisonment without possibility of parole?  Please explain:

*I wld hope to be considering crime only, & not unfortunate childhood, etc.*

22.  Do you believe in the adage: "An eye for an eye"?

Yes  **X**  No  ___

What does the adage "An eye for an eye" mean to you?

*Take a life, give your own.*

Is your belief in this adage based upon a religious conviction?

Yes  ___  No  **X**

23.  California law has not adopted the "eye for an eye" principle.  Will you be able to put the "eye for an eye" concept out of your mind and apply the principles the Court gives you?

Yes  ___  No  **X**

24.  Have you had any religious or moral training regarding the death penalty?

Yes  ___  No  **X**  Source:

25.  Could you set aside any such training and decide this case according to the law which the Court will give to you?

Yes  ___  No  ___  Please explain:

*N/A*

A-13

26. Do you belong to any organization that either advocates for the death penalty or the abolition of the death penalty?

Yes ___ No _**X**_

If yes, what organization(s):

27. Could you set aside your own personal feelings regarding what you think the law should be regarding the death penalty, and follow the law as the Court instructs you?

Yes _**X**_ No ___

Please comment:

28. If you are selected as a juror in this case and if the jury got to a penalty phase, would you agree to accept the court's representation that life without the possibility of parole means exactly that, that the sentence would be life without the possibility of parole?

Yes ___ No _**X**_ Please explain:

29. In deciding penalty — that is, life in prison without the possibility of parole or death — would the costs of keeping someone in jail for life be a consideration for you?

Yes _**X**_ No ___ Please explain:

Would the costs of providing the appellate process be a consideration?

Yes ___ No _**X**_ Please explain:

30. Knowing that a first degree murder verdict, with a special circumstance found true, could cause the jury to enter a second, "penalty" phase, and cause the jury to have to consider life without the possibility of parole, or death, would you, for any reason, hesitate to vote for first degree murder, or for a special circumstance, if the evidence proved either such thing true, beyond any reasonable doubt, just to avoid the task of deciding the penalty?

Yes ___ No _**X**_ Please explain:

31. If you found the defendant guilty of first degree murder and found the special circumstance to be true, would you, regardless of the evidence,

A-14

because of your feelings about the death penalty, in every case automatically vote against the death penalty?

Yes   ___   No   **_X_**   Please explain:

32. Are your feelings about the death penalty such, that if there was a penalty phase of a trial, you would in every case automatically vote <u>for</u> the death penalty rather than life in prison without the possibility of parole?

Yes   **_X_**   No   ___   Please explain:


**C.Pa.: Voir Dire**

THE COURT: Good morning, [C.Pa.]. How are you?

C.Pa.: Thank you. Fine.

THE COURT: Just a couple of questions here based on your questionnaire.

In answer to question 9 you said, which was check the entry which best describes your feelings about the death penalty: "Should — would always impose regardless of the evidence."

Okay. And then in answer to question 27 you said, "Could you set aside your personal feeling regarding the death penalty what you think the law should be regarding the death penalty, follow the law as the court instruct you" and you said yes.

So I need to talk with you about this.

C.Pa.: Okay.

THE COURT: A little bit.

As the law stands in California at the present time in order to have the death penalty be available as a punishment a couple things have to happen. First of all, it has to be a first-degree murder committed and second, it has to be committed under what's called special circumstances.

Special circumstances are a number of things. It could be during the killing of a law enforcement officer, it could be during a robbery, it could be during a rape, it could be during a kidnapping or laundry list of types of crimes that could cause the death penalty to be available.

A-15

You understand that?

C.Pa.: (Nods head.)

THE COURT: You need to answer out loud if you would.

C.Pa.: Yes.

THE COURT: Okay. Thanks.

A couple of phases to a death penalty case. One is the guilt phase where the evidence would be presented to show whether the defendant did or did not commit the crime that he is charged with.

Whether the circumstances are true or not, special circumstances that is, that it was during a robbery in this case.

You understand that?

C.Pa.: Yes.

THE COURT: You understand that only if you found the defendant guilty and the special circumstances to be true would you move to the penalty phase where you would have to decide between the death penalty and life without possibility of parole.

You understand that?

C.Pa.: Yes.

THE COURT: Okay. Do you understand that if you got to the penalty phase evidence would be introduced in aggravation, factors indicating that the death penalty is appropriate, and mitigation factors, indicating that it is not and that you as a juror would be asked to weigh those factors one against another under the instructions on the law that's given to you by the court and decide which is the appropriate punishment.

You understand that?

C.Pa.: Yes.

THE COURT: Okay. And you understand that as the law stands in the State of California, the death penalty is not automatic upon conviction of the crime of this nature. It's simply one of the two available punishments and it's up to the jury to decide what the appropriate punishment is under the instruction given by the court?

A-16

C.Pa.: Yes.

THE COURT: Okay. Understanding that, do you feel that you would be able to follow the court's instructions and fairly evaluate the evidence in favor of the death penalty and against the death penalty and arrive at a rational decision?

C.Pa.: Yes.

THE COURT: Okay. So in your mind then the answer that you checked initially, that you would always impose the death penalty regardless of the evidence, is not your answer as you sit there right now.

C.Pa.: Your Honor, I did not have a definition of murder one with special circumstances when I was filling that out.

THE COURT: Okay. So you didn't understand?

C.Pa.: No. I understand it now.

THE COURT: And understanding the situation now?

C.Pa.: Yes.

THE COURT: There's no hesitation in your mind about your ability to be fair and impartial in deciding the correct penalty; is that correct?

C.Pa.: Right.

THE COURT: And if in your mind the circumstances in mitigation, that is, those things which favor life without possibility of parole, weighed more heavily in your mind than those indicating the death penalty should be imposed, would you have any hesitation voting for life without possibility of parole?

C.Pa.: No hesitation.

THE COURT: On the other hand, if you felt that the factors in aggravation, that is, those things indicating that life or that the death penalty was appropriate, outweighed those indicating that life without possibility of parole is more appropriate, would you have any hesitancy in voting that way?

C.Pa.: No, sir.

THE COURT: Okay.

There was some questions about an eye for an eye — .

A-17

C.Pa.: Um-hmm.

THE COURT: — in there and you were asked whether you believed in that adage?

A. Yes, I do.

THE COURT: An eye for an eye?

And then there's another question in there. You understand that the law, as I have explained it to you, does not go along with the eye for an eye concept. That is, it is not automatic?

C.Pa.: Yes.

THE COURT: If a person kills somebody that they are automatically put to death. Do you understand that?

C.Pa.: Yes, sir.

THE COURT: Okay. Understanding that, can you put the eye for an eye concept out of your mind and follow the law as I explain it to you?

C.Pa.: Yes.

THE COURT: All right. In answer to question 28, "If you're selected as a juror in the case and if the jury got to a penalty phase would you agree to accept the court's representation that life without the possibility of parole means exactly that that the sentence would be life without the possibility of parole?" You indicated no.

As far as we know since the — since the punishment of life without possibility of parole has been instituted or re-instituted, I guess in the seventies, no one that's been sentenced to that has ever been paroled, or the fact there is no mechanism, there is no parole boards, there is no group that can grant parole of such a person.

Do you understand that?

C.Pa.: Yes.

THE COURT: As I explain it to you now.

If I explain it to that you that way are you willing to accept that life without possibility of parole means that and not have you be influenced by what might happen later on down the road?

A-18

C.Pa.: Yes.

THE COURT: Okay.

All right. I don't think I have any further questions.

\*\*\*

THE COURT: Challenge is denied based on the answers here in court. The juror has assured the court that she can follow the court's instructions and did not fully understand the original answers given.

**B.H.: Juror Questionnaire (Questions 9–32)**
The prospective juror's responses are in italics. Where the prospective juror was asked to select among multiple pre-printed responses, the juror's selections are indicated by an "**X**."

9. Check the entry which best describes your feeling about the death penalty:

    ___ Would always impose regardless of the evidence
    ___ Strongly support     _**X**_ Oppose
    ___ Support     ___ Strongly oppose
    ___ Will consider
    ___ Will never under any circumstances impose death penalty, regardless of the evidence.

10. Please explain your views on the death penalty:

    [blank]

11. In what ways, if any, have your views about the death penalty changed over time?

    [blank]

12. In this case, the defendant is charged with murder for killing an elderly man with a shotgun. Do you think everyone convicted of such a murder committed during a robbery should receive the death penalty, regardless of the evidence regarding penalty which is introduced by the People and the defendant?

    Yes    ___    No    _**X**_    Please explain:

A-19

13. If you were selected as a juror in this case and if the jury got to a penalty phase, would you agree to listen open-mindedly to any evidence submitted about the penalty, and base your decision about the penalty solely on such evidence and instructions?

Yes __**X**__ No ___ Please explain:

14. Do you feel that the death penalty is used too seldom or too often? Please explain:

*I don't hear it being used to often.*

15. Do you feel that the death penalty should be mandatory for any particular type of crime? Please explain:

*No. ?*

16. Do you feel that the death penalty should be a possible sentence for any crime other than first degree murder with special circumstances? Please explain:

*No. ?*

17. Under what circumstances, if any, do you believe that the death penalty is appropriate?

*None. ?*

18. Under what circumstances, if any, do you believe that the death penalty is inappropriate?

*Under no circumstances*

19. If a defendant was convicted of first degree murder with a special circumstance, do you feel that you would automatically vote for the death penalty and against life imprisonment without possibility of parole? Please explain:

*No.*

20. Do you feel that if a defendant was convicted of first degree murder and a special circumstance, that you would automatically vote against the death penalty and for life without possibility of parole? Please explain:

A-20

*No  ?*

21.  What would you want to know about the defendant before deciding whether to impose the death penalty or life imprisonment without possibility of parole?  Please explain:

*Nothing*

22.  Do you believe in the adage: "An eye for an eye"?

Yes  ___    No   _**X**_

What does the adage "An eye for an eye" mean to you?

*Nothing ?*

Is your belief in this adage based upon a religious conviction?

Yes  ___    No   _**X**_

23.  California law has not adopted the "eye for an eye" principle.  Will you be able to put the "eye for an eye" concept out of your mind and apply the principles the Court gives you?

Yes  _**X**_  No   ___

24.  Have you had any religious or moral training regarding the death penalty?

Yes  ___    No   _**X**_   Source:

25.  Could you set aside any such training and decide this case according to the law which the Court will give to you?

Yes  _**X**_  No   ___    Please explain:

26.  Do you belong to any organization that either advocates for the death penalty or the abolition of the death penalty?

Yes  ___    No   _**X**_

If yes, what organization(s):

A-21

27. Could you set aside your own personal feelings regarding what you think the law should be regarding the death penalty, and follow the law as the Court instructs you?

Yes **X** No ___

Please comment:

28. If you are selected as a juror in this case and if the jury got to a penalty phase, would you agree to accept the court's representation that life without the possibility of parole means exactly that, that the sentence would be life without the possibility of parole?

Yes **X** No ___ Please explain:

29. In deciding penalty — that is, life in prison without the possibility of parole or death — would the costs of keeping someone in jail for life be a consideration for you?

Yes **X** No ___ Please explain:

*I feel it would be better then the death penalty*

Would the costs of providing the appellate process be a consideration?

Yes ___ No ___ Please explain:

*?*

30. Knowing that a first degree murder verdict, with a special circumstance found true, could cause the jury to enter a second, "penalty" phase, and cause the jury to have to consider life without the possibility of parole, or death, would you, for any reason, hesitate to vote for first degree murder, or for a special circumstance, if the evidence proved either such thing true, beyond any reasonable doubt, just to avoid the task of deciding the penalty?

Yes **X** No ___ Please explain:

*I feel against the death penalty*

31. If you found the defendant guilty of first degree murder and found the special circumstance to be true, would you, regardless of the evidence,

A-22

because of your feelings about the death penalty, in every case automatically vote against the death penalty?

Yes  **X**  No  ___  Please explain:

*I against the death penalty*

32.  Are your feelings about the death penalty such, that if there was a penalty phase of a trial, you would in every case automatically vote <u>for</u> the death penalty rather than life in prison without the possibility of parole?

Yes  ___  No  **X**  Please explain:


**B.H.:  Voir Dire**

THE COURT:  Right there in the front row, ma'am, about third chair in, or fourth, wherever.

B.H.:  Right here?

THE COURT:  Okay.  Very good.

All right.  [B.H.], we just have a couple questions for you based on your answers to the questionnaire.  And I don't think we'll be detaining you too long.  Okay?

All right.  First of all, in answer to Question 9, you indicated that you oppose the death penalty, correct?

B.H.:  Yes.

THE COURT:  And then in 10 and 11, you were asked — 10 you were asked to explain your views on the death penalty.  You left that blank.

B.H.:  Uh-huh.

THE COURT:  And can you explain either, A, why you left it blank, or, B, what your views are?

B.H.:  Because I didn't know what to put down.

THE COURT:  Okay.  So you just weren't sure what to say?

B.H.:  Uh-huh.

THE COURT:  And have your views on death penalty changed over time?

B.H.:  No.

THE COURT:  I'm not clear here on some of your answers exactly what you feel here.

Is your feeling about the death penalty such that under no circumstances could you vote to approve it?

B.H.:  Under no circumstances.

THE COURT:  None whatsoever?

B.H.:  None whatsoever.

THE COURT:  Okay.  So if — even if this were the most horrible crime in history?

B.H.:  Even if.

THE COURT:  And even if the defendant was the worst person in history, you could not —

B.H.:  I don't believe in it.

THE COURT:  All right.  Thank you, ma'am.  You're excused.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Whalen
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S054569
**Date Filed:** February 4, 2013
_____

**Court:** Superior
**County:** Stanislaus
**Judge:** John G Whiteside

_____

**Counsel:**

A. Richard Ellis, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Kamala D. Harris, Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Mary Jo Graves and Michael P. Farrell, Assistant Attorneys General, Patrick J. Whalen, Carlos A. Martinez and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

A. Richard Ellis
75 Magee Avenue
Mill Valley, CA  94941
(415) 389-0251

Catherine Tennant Nieto
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 323-6307